# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Broadway 401 LLC, et al.,[1] | ) Case No. 10-10070 (KJC) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

## DECLARATION OF DAVID WELDLER IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY ORDERS

I, DAVID WELDLER, make this Declaration pursuant to 28 U.S.C. § 1746 and, to the best of my knowledge and after reasonable inquiry, state:

1. Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC are debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors") in the above-captioned cases (the "Cases") commenced voluntarily under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in this Court on January 11, 2010 (the "Petition Date"). The Debtors have filed a pre-solicited Plan of Reorganization and Disclosure Statement, which Plan has been accepted unanimously by all members of the sole impaired class of claims entitled to vote on the Plan.

2. I have served as Manager of each of the Debtors since 2006 and am generally familiar with the operations, financial affairs and books and records of the Debtors.

3. The Debtors are comprised of three (3) related entities organized under the laws of the State of Delaware. The Debtors are continuing to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Broadway 401 LLC, a Delaware limited liability company (6772), Broadway Mass Associates LLC, a Delaware limited liability company (8668), and Broadway Mass TIC I LLC, a Delaware limited liability company (3760). The address for each of the Debtors is 80 Broad Street, New York, NY 10004.

4.     To minimize the uncertainty and adverse effects on the Debtors' business as a result of the commencement of the Cases, the Debtors have filed a number of motions requesting various types of relief from the Court (each a "First Day Motion" and, collectively, the "First Day Motions"). The First Day Motions seek relief intended to preserve the value of Debtors' assets during the pendency of the Cases in anticipation of disposing of such assets pursuant to a chapter 11 plan, streamline the administration of the Cases, and facilitate the implementation of the numerous settlements and agreements underlying the Plan. In accordance with the Local Bankruptcy Rules (as defined below), the Debtors are requesting that the Court schedule a hearing at its earliest convenience to consider approval of the First Day Motions.

5.     I submit this declaration ("Declaration") concurrently with each of the Debtors' chapter 11 petitions (i) to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of the Cases and (ii) in support of the petitions and various motions and applications of the Debtors, *i.e.*, the First Day Motions, filed contemporaneously herewith. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

6.     This Declaration is divided into two parts. Part I describes the Debtors' business, capital structure and the circumstances that lead to the filing of the Cases. Part II sets forth relevant facts in support of each of the First Day Motions.

**PART I**

**A.   Background**

7.      The Debtors consist of:  Broadway 401 LLC ("Broadway 401"), Broadway Mass

Associates LLC ("Broadway Mass"), and Broadway Mass TIC I LLC ("Broadway TIC"), each a

Delaware limited liability company.  Broadway 401, Broadway Mass and Broadway TIC are

ultimately owned by Lazar Muller, Samuel Weiss, Charles Herzka, David Weidler and the 1997

Neumann Family Trust.  Organizational charts reflecting ownership interests are attached as

"Continuation Sheet 21" to the Debtors' Statement of Financial Affairs filed contemporaneously

herewith.

8.      The Debtors were formed in connection with a development project for the

construction and sale of residential condominiums in downtown Washington, D.C., consisting of

real property improved with two adjoining buildings located at 401 Massachusetts Avenue (the

"401 Premises") and 425 Massachusetts Avenue (the "425 Premises"), known as "The Dumont."

Except as described herein, the Debtors do not own any other properties or assets or engage in

any other business.

**B.   The Debtors' Business**

9.      Broadway Mass and Broadway TIC own the 425 Premises, as tenants-in-

common, and Broadway 401 owns the 401 Premises.  The Debtors acquired title to the property

in stages between December 2004 and January 2006 for a total purchase price of $47,119,367.73.

Since acquiring title, the Debtors have improved the property with two residential towers: the

401 Premises is improved by a 14-story, 189-unit residential tower and the 425 Premises is

improved by a 14-story, 370-unit residential tower.  The 401 Premises and the 425 Premises

(collectively, the "Property") are connected by a shared lobby, shared parking garage and

common roof access.  The Property is vacant but essentially is complete and ready for

occupancy. Broadway 401 is managed by Broadway 401 Manager LLC ("Broadway 401 Manager"), and Broadway Mass and Broadway TIC are managed by Broadway Mass Manager LLC ("Broadway Mass Manager" and, together with Broadway 401 Manager, the "Manager"), both of which are entities owned by Charles Herzka and me.

10. As of the Petition Date, the Debtors were not generating any income and had no employees.

### C. Prepetition Indebtedness Related to Property Development

11. The Debtors financed the purchase of the Property and construction of the improvements with the proceeds of the following loans:

Senior Loan

(a) That certain Consolidated, Amended and Restated Construction Loan Agreement dated as of December 15, 2006 (the "Senior Loan Agreement"), by and among the Debtors, as borrowers, PB Capital Corporation, a Delaware corporation, as a lender and as agent (the "PB Capital" or the "Senior Agent") for the other lenders party thereto (PB (USA) Realty Corporation, a New York Corporation ("PB Realty") and iStar Financial Inc. ("iStar"), a Maryland corporation (together with PB Capital in its capacity as a lender, the "Senior Lenders"). Pursuant to the Senior Loan Agreement, the Senior Lenders made a loan to the Debtors in the principal amount of $190,000,000.00 (the "Senior Loan"), which is evidenced by (a) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $95,000,000, made by the Debtors to iStar, (b) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $70,000,000, made by the Debtors to PB Realty, and (c) that certain Promissory Note, dated as of December 15, 2006,

in the principal amount of $25,000,000, made by the Debtors to PB Capital (collectively, as amended, modified or supplemented from time to time, the "Senior Note"), and secured by that certain Consolidated, Amended and Restated Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents dated as of December 15, 2006, made by the Debtors in favor of the Senior Agent (the "Senior Mortgage," together with the Senior Loan Agreement and the Senior Note, the "Senior Loan Documents"), which Senior Mortgage encumbers the Property.

(b) The outstanding principal balance of the Senior Loan is $190,000,000, plus accrued and unpaid interest totaling approximately $19,300,687.10 as of November 30, 2009. Interest has been accruing at the default rate provided in the Senior Loan Documents, and in addition the Lenders have asserted claims for fees and costs. In addition, the Senior Lenders have made additional protective advances toward completion and maintenance of the Property over and above the principal amount, totaling approximately $4,306,037.70 as of November 30, 2009, which amounts are added to the outstanding principal amount of the loan pursuant to Section 11.4 of the Senior Loan Agreement and other applicable provisions of the Senior Loan Documents. The Debtors defaulted on the Senior Loan on the maturity thereof, August 18, 2008. As a result, and as of November 30, 2009, the full balance of $213,606,724.80 is now due and owing.

Mezzanine Loan

(c)   The purchase and improvement of the Property was further financed by the proceeds of that certain Mezzanine Construction Loan Agreement (the "Mezzanine Loan Agreement") dated as of December 15, 2006, by and between Broadway 401 Massachusetts Ave Mezzanine LLC, Broadway 425 Massachusetts Ave Mezzanine TIC LLC, and Broadway 425 Massachusetts Ave Mezzanine LLC (the "Mezzanine Borrowers"), iStar, as a lender and Mezzanine Agent, and the other lenders party thereto[2] (the "Mezzanine Lenders"), pursuant to which the Mezzanine Lenders made a loan to the Mezzanine Borrowers in the principal amount of $25,000,000 (the "Mezzanine Loan").

(d)   The Mezzanine Loan was guaranteed pursuant to that certain Guaranty by the Debtors in favor of the Mezzanine Agent dated as of December 15, 2006 (the "Debtors' Mezzanine Guaranty"). The Debtors' Mezzanine Guaranty was secured by, among other things, that certain Guaranty Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents made by the Debtors in favor of the Mezzanine Agent, dated as of December 15, 2006 (the "Mezzanine Mortgage" and, together with the Mezzanine Loan Agreement, the Debtors' Mezzanine Guaranty and the other "Loan Documents" (as defined in the Mezzanine Loan Agreement), each as amended, modified or supplemented from time to time, the "Mezzanine Loan Documents"), which encumbers the Property. Pursuant to an agreement with

---

[2]   On information and belief, there are no other lenders party to the Mezzanine Loan Agreement.

the Senior Lenders, the Mezzanine Mortgage was not filed as a matter of record with any government office.

(e) The Mezzanine Loan has a principal balance, including deferred and capitalized interest of $29,064,130.50, plus accrued unpaid interest, costs and fees, totaling approximately $8,450,005.62 as of December 7, 2009. Parent entities of the Debtors are the borrowers under the Mezzanine Loan Agreement, but the Debtors received the proceeds of the loans in connection with the acquisition and construction of the Property, and thus are parties to the Mezzanine Mortgage and issued the Debtors' Mezzanine Guaranty. The Mezzanine Borrowers defaulted on the Mezzanine Loan on August 18, 2008. As a result, the full amount of the Mezzanine Loan is now due and owing. The Debtors are also in default of payment on the Debtors' Mezzanine Guaranty.

(f) As parties to the Mezzanine Mortgage, the Debtors are the subject of an unperfected secured claim held by the Mezzanine Lenders, and as issuers of the Debtors' Mezzanine Guaranty, the Debtors are subject to an unsecured claim also held by the Mezzanine Lenders. Because the Mezzanine Mortgage was not filed of record in the appropriate government office, and cannot be filed without the consent of the Senior Lenders, the Mezzanine Lenders' secured claim is subordinate to any secured and validly perfected claims asserted by other creditors against the Debtors, and is potentially subject to avoidance by a trustee in bankruptcy using its strong arm powers. For this reason, the Mezzanine Mortgage claims and the Debtors' Mezzanine Guaranty

claims are classified together as a single unsecured claim against the Debtors, and are treated in the same manner as the class of general unsecured claims. Although they are impaired and deemed to have rejected the Debtors' plan of reorganization (the "Plan"), the Mezzanine Lenders have voted, in the context of the global settlements underlying the Plan, to support the Plan.

(g) Certain principals of the Debtors, namely Joseph Neumann and Samuel Weiss the ("Individual Guarantors") had issued guarantees of certain aspects of the Senior Loan and the Mezzanine Loan, more fully described below, which resulted in claims against and litigation between the Lenders and the Individual Guarantors. In exchange for the consideration described below from the Individual Guarantors, and on the terms provided in the Senior Settlement Agreement and the Mezzanine Settlement Agreement, the guaranty related disputes will be resolved, and litigation dismissed.

**D.     Events Culminating in these Chapter 11 Cases**

12.     The Debtors' ability to sell residential units, which was a fundamental underpinning of the business plan for the development of the Property, was severely impacted by the recent downturn in the domestic economy and the on-going crisis in the credit markets. The volume of residential sales has dropped significantly in the U.S., residential prices have declined, and credit standards have been tightened making it considerably more difficult for residential unit buyers to qualify for residential mortgages. Because sales volume is generally correlated to economic conditions, difficult economic conditions (such as the recent economic downturn) tend to result in decreased demand, thereby reducing overall sales volumes. The above-described downturn in the economy has significantly affected the market for new housing in Washington

D.C., leading to increased inventory levels and downward pressure on the prices that could be obtained for the units in the Dumont.

13.    It is also exceedingly difficult in this market to refinance commercial loans, such as the Senior Loan and Mezzanine Loan, or to find investment equity for a restructuring, all options that were explored by the Debtors. The market for sales of properties like the Dumont has also been virtually frozen over the last year, as buyers suffer from the same credit conditions that hampered the implementation of the business plan for the Dumont. Since the defaults in the summer of 2008, the Debtors have not been able to sell or lease space in the Property, and thus are not collecting any revenues from operations.

14.    The Debtors are highly-leveraged and require a significant amount of cash to service their indebtedness, as well as to pay the operating costs of the Property such as materials, labor, energy, fuel and other utilities, taxes, security and the like. The Senior Lenders have been funding the necessary costs over the last year through protective advances to complete construction and ready the units for occupancy, and to preserve the value of the Property while the parties considered their options. To date those protective advances total approximately $4,306,037.70.

15.    By the winter of 2008, the Debtors, the Senior Lenders and the Mezzanine Lenders were unable to agree on a restructuring strategy for the Property. In January 2009, the Senior Lenders filed a public notice of a foreclosure sale with respect to the 401 Premises and the 425 Premises, and commenced a marketing effort through a broker to try to find a purchaser for the Property. The Senior Lenders agreed with the Debtors and the Mezzanine Lenders that they would hold off on completing the foreclosure while they endeavored to negotiate the terms of a potential sale. Discussions between the Borrower, the Senior Lenders and the Mezzanine

Lenders regarding the disposition of the Property and the resolution of various claims and disputes led to settlement agreements with the Senior Lenders (the "Senior Settlement Agreement") and the Mezzanine Lenders (the "Mezzanine Settlement Agreement"). The Debtors agreed in principal during this process that they would cooperate with the Senior Lenders' and the Mezzanine Lenders' efforts to determine an appropriate disposition of the Property, and would not seek to impede that process, while reserving all their rights and defenses.

16.     I am advised that the Senior Lenders engaged Ideal Realty Group, Inc. (d/b/a Coldwell Banker Commercial Ideal Realty Group) ("Ideal") on January 6, 2009 to market the Property. Ideal created a marketing book and sent copies to 51 potential investors. In February 2009, in connection with such marketing efforts, the Senior Lenders commissioned appraisals of the 401 Premises and the 425 Premises (the "2009 Appraisals"). The 2009 Appraisals used market research and analysis of comparable properties in the District of Columbia to arrive at estimated valuations of approximately $63,000,000 (discounted condominium sellout) to $106,000,000 (completed rental project) for the 425 Premises and approximately $45,000,000 (discounted condominium sellout) to $51,000,000 (completed rental project) for the 401 Premises. The mid-point value of the Property under the Appraisals is approximately $140,000,000.

17.     Various investors toured the building and submitted preliminary bids throughout the spring of 2009. These preliminary bids were to purchase both buildings for consideration ranging from approximately $90,000,000 to $133,000,000. Although numerous bids were submitted, to my knowledge and belief no bids were received that would pay the Senior Loans in full, much less generate value for the Mezzanine Loans.

18.    The Lenders then decided to approach potential buyers again by separating the project into two components – the 401 Premises and the 425 Premises. Based on this strategy, preliminary bids to purchase the 425 Premises alone ranged from approximately $92,000,000 to $100,000,000. In May 2009, the Senior Lenders decided to proceed with an offer for the 425 Premises that provided for a purchase price of $100,000,000, with financing provided by PB Capital for a large portion of the purchase price. The prospective purchaser expressed a strong preference for a sale of the 425 Premises through a confirmed Plan under the Bankruptcy Code. The Senior Lenders engaged in lengthy negotiations with this prospective purchaser regarding the terms of a purchase agreement and a potential Plan under the Bankruptcy Code. These negotiations ultimately broke down. However, as of the Petition Date, discussions with other potential third party purchasers are in process.

19.    In light of the foregoing, the Debtors and the Senior Lenders determined that proceeding with a Plan under the Bankruptcy Code that provides for conveyance of the 401 Premises and the 425 Premises to an affiliate of the Senior Lenders, or to a third-party purchaser, in satisfaction of the Senior Loan represented the best possible resolution under the circumstances. If the Senior Lenders take title to the Property through such affiliate, they anticipate marketing the Property as individual condominium units.

20.    In December 2009, the Debtors finalized a global settlement with various parties in interest, including the Senior Settlement Agreement between the Debtors, the Individual Guarantors (the "Guarantors"), the Senior Loan agent and Senior Lenders, and the Mezzanine Settlement Agreement with the Mezzanine Loan agent and Mezzanine Lenders, the Debtors and the Guarantors. In general the global settlements resolve complicated issues and disputes existing among such parties and result in: the conveyance of the 425 Premises and the 401

Premises free and clear of all (non-assumed) liens, claims and encumbrances to the Lenders' designee including a possible third party purchaser; the treatment of the Debtors' Senior Loan obligations and Mezzanine Loan obligations including the resolution of intercreditor matters between the Seniors Lenders and Mezzanine Lenders; the treatment of all other claims against the Debtors and the Mezzanine Borrowers; the resolution of a lawsuit commenced by McWilliams Ballard (the "McWilliams Ballard Lawsuit"); the resolution of disputes regarding the application of the purchase price received pursuant to a sale of the Debtors' transferable development rights; the resolution of rights and claims with respect to the Debtors' OCIP Policy; and the resolution of the Guarantors' obligations and related litigation.

21.    The Senior Settlement Agreement and Mezzanine Settlement Agreement contemplate the filing of a pre-solicited Plan, and set forth the timetable and actions which are conditions to the support of the Senior Lenders and Mezzanine Lenders for the Plan. Both the Senior Settlement Agreement and Mezzanine Settlement Agreement contemplate the release of completion guaranties, and the modification and partial release of recourse agreements and environmental indemnities. In addition, the Mezzanine Settlement Agreement settles the litigation (the "Limited Guaranty Action") brought by the Mezzanine Lenders over the limited payment guaranty (the "Limited Payment Guaranty") with the Guarantors, by virtue of the agreement of the Guarantors to fund an escrow that contains a $1.5 million cash contribution from Samuel Weiss, and the pledge by Joseph Neumann of partnership interests in properties located in Tallahassee, Florida and Atlanta, Georgia, to secure payment of a $2.0 million note. Upon the effective date of the Plan, or, if earlier, September 30, 2010, these funds will be released to the Mezzanine Lenders, and the releases from the Senior Lenders and Mezzanine Lenders delivered to the Guarantors. In addition, if the real estate transfer tax exemption is for

some reason denied under the Plan, the Guarantors will still pay the consideration described above to the Mezzanine Lenders, and will have the option to fund the balance between those amounts and the actual amount of transfer tax paid by the Mezzanine Lenders, in which case the Limited Payment Guaranty releases will be delivered. If the Guarantors elect not to fund this differential, then the Mezzanine Lenders will retain their claims under the Limited Guaranty Action solely in the remaining unpaid amount of that differential, and the balance of the Limited Payment Guaranty claims will be released.

22. In connection with the Senior Settlement Agreement and Mezzanine Settlement Agreement, on August 18, 2008, the Debtors entered into sale contracts for certain transferable development rights (the "401 Development Rights" and the "425 Development Rights", respectively), which grant the Debtors supplemental rights to undertake commercial development with increased permissible floor area elsewhere in the District of Columbia in return for the residential developments completed on the Property. The Debtors have closed the sale of the 401 Development Rights and the 425 Development Rights pursuant to these contracts. The purchase price constitutes cash collateral for the obligations owed by the Debtors to the Senior Lenders. Furthermore, pursuant to the Senior Settlement Agreement, a portion of the purchase price is being made available to pay the Debtors' prepetition and postpetition legal and professional fees and expenses and certain management expenses of the Debtors.

23. There are also various insurance policies in place relating to the Property, one of which is an umbrella policy covering other property unrelated to the Dumont, which is owned and/or managed by certain of the Debtors' principals. With the exception of the OCIP Policy (as defined below), the Debtors will assume and assign such policies as directed by the Senior Agent. The Property is one of two unrelated properties covered by the "Insurance and Risk

Management Services Program" for Broadway Management Co., Inc., on behalf of itself and all of its subsidiaries and affiliates, and Aon Risk Services, Inc. of New Jersey, provided by AIG Risk Management, Inc., Construction Risk Management Group, on behalf of itself and its affiliates (collectively, the "OCIP Insurer"), effective from October 17, 2005 (the "OCIP Policy"). The Debtors, Broadway Management Co., Inc. (a company owned and controlled by Joseph Neumann, which is the contract counterparty to the OCIP Policy), certain other affiliates of the Debtors, and the Senior Agent have entered into the OCIP Letter Agreement attached to the Plan, which provides that Broadway Management Co., Inc., if requested by the Senior Agent, will cooperate with the Senior Agent to seek the consent of the OCIP Insurer to split the OCIP Policy into separate policies covering the Property and the other property, respectively, or, if this is not feasible, to cause the transferees of the Property to be named as "named insureds" under the OCIP Policy as directed by the Senior Agent. The OCIP Letter Agreement also provides, in the event the OCIP Policy cannot be split into separate policies as aforesaid, for an allocation as between Broadway Management Co., Inc., on the one hand, and Senior Lenders or the transferee(s) of the Property, on the other, of (i) rights with respect to the existing shared collateral referred to above under the OCIP Policy, (ii) responsibility with respect to the payment of deductibles or self-insured amounts under the OCIP Policy and (iii) rights to refunds of residual collateral returned or refunds of premium on the OCIP Policy. These agreements are more fully set forth in the OCIP Letter Agreement.

24. Finally, McWilliams Ballard, the former sales agent for the Property, has reached an agreement with the Senior Lenders to act as sales agent for the Property after the effective date of the Plan. The Debtors have entered into a separate agreement with McWilliams Ballard, pursuant to which McWilliams Ballard has agreed to dismiss, with prejudice, the McWilliams

Ballard Lawsuit and waive all claims arising under or relating to its marketing agreement with the Debtors.

**PART II**

25.    This section sets forth, in summary fashion, the factual background and support for each of the First Day Motions.[3] In general, I believe that the approval of the Debtors' First Day Motions is critical and necessary to the success of the Debtors' Cases and disposition of the Debtors' assets pursuant to its chapter 11 plan.

A.    **Motion for Order Directing Joint Administration of Chapter 11 Cases**

26.    By this motion (the "Joint Administration Motion"), the Debtors seek the joint administration of the Cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for this District (the "Local Rules").

27.    There are a total of three Debtors covered by the Cases, therefore, joint administration is appropriate because it will ease the administrative burden of the Court and parties-in-interest. Samuel Weiss and Lazar Muller each indirectly hold in excess of 20 percent of the outstanding voting securities with power to vote of Broadway 401 LLC; Samuel Weiss indirectly holds in excess of 20 percent of the outstanding voting securities with power to vote of Broadway Mass Associates LLC (Lazar Muller is also an indirect holder, but holds less than 20 percent of the outstanding voting securities with power to vote), thereby making Broadway 401 LLC and Broadway Mass Associates LLC "affiliates" under section 101(2)(B) of the Bankrupty

---

[3] The summary in Part II that follows is qualified in its entirety by reference to the each of the specific First Day Motions. To the extent of any inconsistency between this Part II of the Declaration and the First Day Motions, the First Day Motions govern. Further, capitalized terms used but not defined in this section will have the meanings ascribed to them in such respective First Day Motion.

Code; and Lazar Muller indirectly holds in excess of 20 percent of the outstanding voting securities with power to vote of Broadway Mass TIC I, thereby making Broadway 401 LLC and Broadway Mass TIC I "affiliates" under section 101(2)(B) of the Bankruptcy Code.

28.     Therefore, each Debtor is an "affiliate" with at least one other Debtor within the meaning of section 101(2)(B) of the Bankruptcy Code and all, to some percentage, share common parents, i.e., Samuel Weiss and Lazar Muller. In addition, all of the Debtors are borrowers under the Senior Loan Agreement, the proceeds of which were used to develop the Debtors' properties which are the subject of the Cases and, most other creditors are joint creditors of both properties; thus the Debtors share a commonality that makes joint administration of the Cases appropriate.

29.     Moreover, it is anticipated that each of the Cases will proceed on the same timetable and that essentially all of the notices, applications, motions and other pleadings filed and orders entered in the Cases will affect all of the Debtors. Joint administration will allow the Clerk of the Court to use a single docket for these cases rather than maintaining three different dockets. Similarly, joint administration will eliminate the need for duplicative notices, applications, motions and orders, thereby allowing the Debtors and other parties-in-interest to (a) file one pleading in a consolidated case rather than separate pleadings in each chapter 11 case, (b) combine and streamline the service of pleadings and notices on creditors and other parties-in-interest and (c) monitor these chapter 11 cases by reviewing only one docket.

30.     Finally, the rights of the Debtors' creditors will not be adversely affected by the proposed procedural joint administration of the Cases. Joint administration is for procedural purposes only and each creditor and party-in-interest will maintain whatever claims or rights it has against the particular Debtors' estate in which it allegedly has a claim or right.

31.     The joint administration of the Cases is in the best interests of the Debtors, their creditors, and all parties-in-interest, and the Joint Administration Motion should be granted in all respects.

**B.      Application For Authority to Employ and Retain Lovells LLP**

32.     By this application (the "Lovells Retention Application"), the Debtors seek to employ and retain Lovells LLP ("Lovells"), pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Rule 2014-1 effective *nunc pro tunc* as of the Petition Date, to represent the Debtors as their restructuring counsel in connection with the filing of their chapter 11 petitions and the prosecution of the Cases. The Debtors desire to retain Lovells to perform the legal services that will be necessary in the Cases, in accordance with Lovells' normal hourly rates in effect when services are rendered and normal reimbursement policies, but subject in other respects to the fee arrangements set forth in the motion and orders relating to the debtor in possession credit facility and the Senior Settlement Agreement.

33.     Lovells has worked extensively on the preparation for these Cases, including the negotiation and documentation of comprehensive settlement agreements with the Debtors' Senior Lenders, Mezzanine Lenders, litigation claimants, other equity participants and other parties in interest. Lovells prepared the Plan and disclosure statement for the Debtors, which has been solicited and accepted by the Senior Lenders prior to the commencement of these cases. In addition, Lovells has prepared the "first day" pleadings, draft orders and other documents that have been, or will soon be, filed in these Cases. Lovells is, therefore, particularly qualified to assist the Debtors in their reorganization efforts. Lovells is familiar with the Debtors' business operations and capital structure and is therefore able to immediately and knowledgeably assist the Debtors in their reorganization efforts.

34.     By separate application, the Debtors are seeking to employ and retain Bayard, P.A. ("Bayard") as local counsel.  The Debtors submit that it is necessary and efficient for the Debtors to employ Delaware co-counsel in the Cases.  Although Lovells may consult with Bayard on certain matters including local practice and procedure, Lovells and Bayard have assured the Debtors that they will make every effort to avoid providing duplicative services.

35.     The retention and employment of Lovells in connection with the Cases is in the best interests of the Debtors' estates and the Lovells Retention Application should be granted in all respects.

### C.     Application For Authority to Employ and Retain Bayard, P.A.

36.     By this application (the "Bayard Retention Application"), The Debtors are seeking to employ and retain Bayard, P.A., effective *nunc pro tunc* as of the Petition Date, to represent the Debtors as local counsel in connection with the filing of their chapter 11 petitions and the prosecution of the Cases.

37.     The retention and employment of Bayard, P.A. in connection with the Cases is in the best interests of the Debtors' estates and should be granted in all respects.

### D.     Motion Regarding Cash Management System

38.     By this motion (the "Cash Management Motion"), the Debtors seek an order (i) authorizing the Debtors' continued use of their existing cash management system, maintenance of their existing bank accounts and continued use of their existing business forms, and (ii) authorizing the Debtors to utilize their existing bank deposit accounts without the need for the bond or other collateral otherwise required by section 345(b) of the Bankruptcy Code or to seek a waiver for cause of such requirements under section 345(b)(2) of the Bankruptcy Code and Local Rule 2015-2.

39.     Before the commencement of the Cases, the Debtors, in the ordinary course of their business, used an automated, centralized cash management system to collect, transfer and disburse funds generated by their operations and to accurately record all such transactions as they were made (the "Cash Management System").  The Cash Management System provides a substantially unified system for the Debtors that allows for an integrated method of accounting for revenues and expenses to be collected and paid.  The Cash Management System consists of three (3) bank accounts (collectively, the "Bank Accounts") to manage cash receipts and disbursements.   The Bank Accounts are maintained at Signature Bank and all such accounts are checking accounts.

40.     Any cash received by the Debtors is deposited into the appropriate Bank Account and recorded in the books and records of the relevant Debtor.  Disbursements from the Bank Accounts are typically made by check or ACH transfers and recorded in the books and records of the relevant Debtor.  The Debtors do not maintain any investment accounts and do not invest any amounts in the Bank Accounts in money market accounts, overnight paper or similar investments.   The Debtors have used the Cash Management System since approximately 2006 with limited variations.  The Cash Management System is automated and includes accounting control features to enable the Debtors to trace funds and ensure that transactions are documented. The Debtors will continue to maintain detailed records reflecting all transfers of funds.

41.     The Debtors currently have no income, and minimal amounts are expected to run through their bank accounts during these cases.  Instead, under the DIP Loan, the Senior Lenders will advance funds necessary to fund operating and bankruptcy related costs, generally direclty to the vendor.  However, maintaining the existing programs in place will facilitate whatever funding the Debtors are obligated to undertake. Adopting a new segmented cash management

system at this time would be unnecessarily expensive and burdensome. In sum, the Debtors request that the Bank Accounts be deemed debtor in possession accounts and that their maintenance and continued use, in the same manner and with the same account numbers, styles and document forms as those employed prior to the Petition Date, be authorized.

42.     The relief requested in the Cash Management Motion is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

**E.     Motion Regarding Utilities**

43.     By this motion (the "Utilities Motion"), the Debtors request entry of an interim and final order (i) determining that the Utility Companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (ii) prohibiting the Utility Companies from altering, refusing or discontinuing services on account of prepetition amounts outstanding, (iii) approving the Adequate Assurance Procedures and (iv) scheduling a final hearing. The relief requested in the Utilities Motion is intended to apply to all Utility Companies with respect to all Utility Services rendered and is not limited to those Utility Companies listed on Exhibit A attached to the Utilities Motion.

44.     In the normal conduct of their business operations, the Debtors receive service from approximately ten utility companies and other providers for the provision of gas, water, sewer, waste and refuse removal, electric and telephone and other similar utility services. The Utility Companies provide the Utility Services for the Debtors' two properties and buildings located at 401 Massachusetts Avenue, N.W., Washington D.C., and 425 Massachusetts Avenue, N.W., Washington D.C.

45.     The Debtors estimate that, in the year prior to the Petition Date, their prepetition senior secured lenders paid on their behalf, in the form of protective advances under the Debtors' prepetition senior credit facility, approximately $85,000 in average aggregate monthly payments

to the Utility Companies for Utility Services rendered. Prior to the Petition Date, the Debtors maintained good payment histories with the Utility Companies. To the Debtors' knowledge, there were no significant past due arrearages on any Utility Services as of the Petition Date.

46.     The Debtors anticipate that they will have sufficient availability of funds with which to timely pay all postpetition charges for Utility Services by virtue of proceeds from debtor in possession financing provided to the Debtors pursuant the proposed post-petition financing credit agreement and the expected sale or other disposition of its assets as part of its chapter 11 plan. Payments for Utility Services to the Utility Companies have been included in the Debtors' proposed DIP budget, filed contemporaneously herewith as an exhibit to the Debtors' DIP motion and the Debtors fully anticipate all such payments being made on time and in full, as they were made prior to the Petition Date by Debtors and/or the DIP lenders on behalf of the Debtors.

47.     As an additional measure, within twenty (20) days of the Petition Date, the Debtors, utilizing cash collateral of their pre-petition senior secured lenders or proceeds of the post-petition loan extended under the DIP Credit Agreement, propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services, or $42,500, into an account maintained by PB Capital Corporation, the agent for the proposed DIP lenders (the "Utility Deposit Account"), to provide adequate assurance of payment for future services to the Utility Companies. The Debtors submit that the Utility Deposit Account constitutes sufficient adequate assurance to the Utility Companies of payment for postpetition Utility Services.

48.     The Debtors' access to uninterrupted Utility Services is essential to their ongoing operations during the pendency of the Cases and to enable the Debtors to bring about a

successful resolution of the Cases. If a Utility Company refused or discontinued Utility Services, even for a brief period, the Debtors' properties – which make up the entire universe of the Debtors' assets - would be adversely impacted. Any deterioration in the value of the properties adversely affects the viability of the Plan and injures creditors. It is therefore critical that the Utility Services continue uninterrupted.

49.     The relief requested in the Utilities Motion is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

**F.      Motion for Authority to Use Cash Collateral
          and Approval of Debtor in Possession Financing**

50.     By this motion (the "DIP Motion"), the Debtors request entry of an interim and final order: (a) authorizing the Debtors to continue to operate under their existing credit facility, as modified in certain respects, with PB Capital Corporation as Agent ("Agent") and the lenders named therein ("Lenders") to obtain postpetition secured financing (on an interim basis up to an aggregate principal amount of $[500,00], and on a final basis up to an aggregate principal amount of $[1,300,000]); (b) granting additional security interests and liens and superpriority claim status to Agent and Lenders pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code; (c) authorizing the Debtors' use of cash collateral; (d) providing adequate protection to the Senior Lenders; (e) modifying the automatic stay in certain respects; (f) scheduling a final hearing; and (g) approving certain notice procedures.

51.     The Debtors' estates will suffer immediate and irreparable harm if the Debtors do not obtain immediate access to the proposed debtor-in-possession financing. The Debtors do not have unencumbered cash and need liquidity to operate their business and pay operating expenses such as utilities and fees to maintenance and security service providers. As the Debtors' sole asset, it is essential that the Property be kept in optimal condition.

52.     The Debtors are unable to obtain the required debtor-in-possession financing either as unsecured credit under sections 364(a) or (b) of the Bankruptcy Code, allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or as secured credit under section 364(c) of the Bankruptcy Code, on more favorable terms from other sources. Accordingly, the Lenders have agreed to fund the Debtors' continued operations in chapter 11 in exchange for the reasonable protections proposed, including first-priority "priming" liens on all or substantially all of the Debtors' assets.

53.     The relief requested in the DIP Motion is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

## CONCLUSION

54.     The primary purposes of the filing of these chapter 11 cases are to preserve the value of the Debtors' assets while they are marketed and sold in order for the maximum realizable value, in accordance with the terms and conditions laid out in the various settlement agreements underlying the Plan.   In the interim, through the motions and applications described above, the Debtors will minimize any adverse affects that these chapter 11 cases might otherwise have on their properties.   I certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.


Executed On: January 11, 2010

_David Weldler_

Name: David Weldler
Title:   Manager