## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Broadway 401 LLC, <u>et al.</u>,[1] | ) Case No. 10-10070 (KJC) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

### MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING DEBTORS -IN-POSSESSION TO USE CASH COLLATERAL; (2) AUTHORIZING DEBTORS-IN-POSSESSION TO INCUR POST-PETITION SECURED OBLIGATIONS; (3) GRANTING SECURITY INTERESTS AND PRIORITY PURSUANT TO 11 U.S.C. § 364(c) AND (d); (4) GRANTING ADEQUATE PROTECTION; AND (5) MODIFYING AUTOMATIC STAY

Broadway 401, LLC, Broadway Mass Associates, LLC, and Broadway Mass TIC I, LLC, debtors and debtors-in-possession herein (each a "Debtor" and collectively, the "Debtors"), by this motion (this "Motion"), seek entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364 and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure (the "Local Rules"): (a) authorizing the Debtors to use cash collateral; (b) authorizing the Debtors to obtain postpetition secured financing (on an interim basis up to an aggregate principal amount of $500,000 pursuant to an interim order (the "Interim Order"), and on a final basis up to an aggregate principal amount of $1,308,055); (c) granting liens and providing superpriority administrative expense status; (d) providing adequate protection to the Senior Lenders (as defined hereinafter); (e) modifying the automatic stay in certain respects; (f)

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Broadway 401 LLC, a Delaware limited liability company (6772), Broadway Mass Associates LLC, a Delaware limited liability company (8668), and Broadway Mass TIC Associates LLC, a Delaware limited liability company (3760).

scheduling a final hearing; and (g) approving certain notice procedures. In support of this Motion, the Debtors submit: (i) the proposed DIP Amendment (as defined below) attached as Annex A to the proposed Interim DIP Order; (ii) the proposed DIP Budget (as defined below) attached as **Exhibit B** to Annex A to the proposed Interim Order; and (iii) the Declaration of David Weldler (the "Weldler Declaration") filed concurrently herewith, and further state as follows:

JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.     The predicates for the relief requested are sections 105, 361, 362, 363, 364 and 507(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

BACKGROUND

**A.     General Background**

4.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     On the Petition Date, the Debtors also filed, among other pleadings, the *Joint Prepackaged Plan of Reorganization of Broadway 401 LLC, Broadway Mass Associates LLC and Mass TIC I LLC Under Chapter 11 of the United States Bankruptcy Code* (the "Plan"), and the *Disclosure Statement for Joint Prepackaged Plan of Reorganization of Broadway 401 LLC Broadway Mass Associates LLC and Mass TIC I LLC* (the "Disclosure Statement"). The Plan seeks to convey clean title to the Debtors' primary asset, which consists of real property that is

improved with two adjoining buildings located at 401 and 425 Massachusetts Avenue, Washington, D.C. and known as "The Dumont" (the "Property"), in exchange for Cash consideration from a third-party purchaser or simply in satisfaction of the Senior Lender Claims. The Plan will pay all Allowed Administrative Claims, Other Priority Claims, Other Secured Claims, and Priority Tax Claims in full.

6.      No trustee, examiner, creditors' committee, or other official committee has been appointed in the Debtors' chapter 11 cases.

7.      Reference is made to the Weldler Declaration and to the Disclosure Statement for a description of the Debtors' property, capital structure, and the circumstances leading to the chapter 11 filings.

**B.      Need for Access to DIP Financing**

8.      As set forth in the Weldler Declaration, the Debtors' estates will suffer immediate and irreparable harm if the Debtors do not obtain authorization to use cash collateral and immediate access to the proposed debtor-in-possession financing.  The Debtors do not have any operating income or any unencumbered cash and need liquidity to operate their business and pay operating expenses such as utilities and fees to maintenance and security service providers.  As the Debtors' primary asset, it is essential that the Property be kept in optimal condition.

9.      The Debtors believe that it would be futile, under the circumstances, to pursue alternative post-petition financing in the form of: (1) unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Code; (2) unsecured credit allowable under Sections 364(a) and 364(b) of the Code; or (3) secured credit pursuant to Section 364(c) of the Code, on more favorable terms and conditions from sources other than the Senior Lenders (as defined herein).  Accordingly, the Senior Lenders have agreed to fund the Debtors' continued

operations in chapter 11 in exchange for the reasonable protections proposed, including first-priority "priming" liens on all or substantially all of the Debtors' assets.

## C.   The Senior Loan

10.    Debtors are borrowers under that certain Consolidated, Amended and Restated Construction Loan Agreement dated as of December 15, 2006 (as amended from time-to-time, the "Senior Loan Agreement") by and among the Debtors, as borrowers, PB Capital Corporation, a Delaware corporation, as a lender and as agent ("PB Capital" or the "Senior Agent") for the other lenders party thereto (PB (USA) Realty Corporation, a New York Corporation ("PB Realty") and iStar Financial Inc. ("iStar"), a Maryland corporation (together with PB Capital in its capacity as a lender, the "Senior Lenders")).  Pursuant to the Senior Loan Agreement, the Senior Lenders made a loan to the Debtors in the principal amount of $190,000,000 (the "Senior Loan"), which is evidenced by (a) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $95,000,000, made by the Debtors to iStar, (b) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $70,000,000, made by the Debtors to PB Realty, and (c) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $25,000,000, made by the Debtors to PB Capital (collectively,  as amended, modified or supplemented from time to time, the "Senior Note"), and secured by that certain Consolidated, Amended and Restated Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents dated as of December 15, 2006, made by the Debtors in favor of the Senior Agent (the "Senior Mortgage," together with the Senior Loan Agreement and the Senior Note, the "Senior Loan Documents"), which Senior Mortgage encumbers the Property.  The Senior Mortgage and related security agreements (each, as amended from time to time, the "Pre-petition Security Documents") granted to the Agent, for the

benefit of the Senior Lenders, a security interest in substantially all of the Debtors' real and personal property, including, without limitation, the Property.

**D.    The Mezzanine Loan**

11.    The purchase and improvement of the Property was further financed by the proceeds of that certain Mezzanine Construction Loan Agreement (the "Mezzanine Loan Agreement") dated as of December 15, 2006, by and between Broadway 401 Massachusetts Ave Mezzanine LLC, Broadway 425 Massachusetts Ave Mezzanine TIC LLC, and Broadway 425 Massachusetts Ave Mezzanine LLC (the "Mezzanine Borrowers"), iStar, as a lender and Mezzanine Agent, and the other lenders party thereto (the "Mezzanine Lenders"), pursuant to which the Mezzanine Lenders made a loan to the Mezzanine Borrowers in the principal amount of $25,000,000 (the "Mezzanine Loan").

12.    The Mezzanine Loan was guaranteed pursuant to that certain Guaranty by the Debtors in favor of the Mezzanine Agent dated as of December 15, 2006 (the "Debtors' Mezzanine Guaranty"). The Debtors' Mezzanine Guaranty was secured by, among other things, that certain Guaranty Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents made by the Debtors in favor of the Mezzanine Agent, dated as of December 15, 2006 (the "Mezzanine Mortgage" and, together with the Mezzanine Loan Agreement, the Debtors' Mezzanine Guaranty and the other "Loan Documents" (as defined in the Mezzanine Loan Agreement), each as amended, modified or supplemented from time to time, the "Mezzanine Loan Documents"), which encumbers the Property. Pursuant to an agreement with the Senior Lenders, the Mezzanine Mortgage was not filed as a matter of record with any government office.

13.    The Mezzanine Loan has a principal balance, including deferred and capitalized interest of $29,064,130.50, plus accrued unpaid interest, costs and fees, totaling

approximately $8,450,005.62 as of December 7, 2009. Parent entities of the Debtors are the borrowers under the Mezzanine Loan Agreement, but the Debtors received the proceeds of the loans in connection with the acquisition and construction of the Property, and thus are parties to the Mezzanine Mortgage and issued the Mezzanine Guaranty. The Mezzanine Borrowers defaulted on the Mezzanine Loan on August 18, 2008. As a result, the full amount of the Mezzanine Loan is now due and owing. The Debtors are also in default of payment on the Mezzanine Guaranty.

14.     As parties to the Mezzanine Mortgage, the Debtors are the subject of an unperfected secured claim held by the Mezzanine Lenders, and as issuers of the Debtors' Mezzanine Guaranty, the Debtors are subject to an unsecured claim also held by the Mezzanine Lenders.

E.     **The Personal Guaranties**

15.     As further security for the foregoing loans, the Debtors' principal investors executed personal guaranties, including: (i) that certain Consolidated, Amended and Restated Guaranty of Completion dated as of December 15, 2006, executed by Joseph Neumann and delivered to the Senior Agent in connection with the Senior Loan; (ii) that certain Consolidated, Amended and Restated Recourse Liability Agreement dated as of December 15, 2006, executed by the Debtors and Joseph Neumann and delivered to the Senior Agent in connection with the Senior Loan; and (iii) that certain Limited Recourse Guaranty dated as of December 15, 2006, executed by Samuel Weiss and delivered to the Senior Agent in connection with the Senior Loan.

F.     **Events of Default under the Senior Loan Agreement**

16.     The Debtors defaulted on the Senior Loan on the maturity thereof, August 18, 2008. The outstanding principal balance of the Senior Loan is $190,000,000, plus accrued and

unpaid interest totaling approximately $19,300,687.10 as of November 30, 2009. Interest has been accruing at the default rate provided in the Senior Loan Documents, and in addition the Lenders have asserted claims for fees and costs. In addition, the Senior Lenders have made additional protective advances toward completion and maintenance of the Property over and above the principal amount, totaling approximately $4,306,037.70 as of November 30, 2009, which amounts are added to the outstanding principal amount of the loan pursuant to Section 11.4 of the Senior Loan Agreement and other applicable provisions of the Senior Loan Documents. As of November 30, 2009, the full balance of $213,606,724.80 is now due and owing.

### G.    Pre-Petition Collateral; Pre-Petition Obligations

17.    The Company's obligations under the Senior Loan Agreement (the "Pre-Petition Obligations")[2] are secured by valid, properly perfected, first-priority liens in and continuing pledges and security interests of and against (the "Pre-Petition Liens") substantially all of the Company's assets (the "Pre-Petition Collateral") in favor of the Senior Agent and the Senior Lenders.

18.    Pursuant to the Senior Loan Agreement and other Pre-Petition Security Documents, the Debtors were, as of the Petition Date, jointly and severally indebted to the Senior Agent and the Senior Lenders for the aggregate amount of the Pre-Petition Obligations.

---

[2]    For purposes of this Motion, the term "Pre-Petition Obligations" shall mean and include, without duplication, any and all amounts owing or outstanding under the Senior Loan Agreement or any other Pre-Petition Financing Document, interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable pursuant to the Senior Loan Agreement or any other Pre-Petition Financing Document), and any and all obligations and liabilities, contingent or otherwise, owed in respect of the letters of credit or other obligations outstanding thereunder.

**H.    Proposed Use of Cash Collateral and Proposed DIP Financing**

19.     The Senior Lenders are willing to permit the Debtors to use cash collateral (as defined by Section 363(a) of the Code, including, any pre-petition proceeds and, subject to Section 552 of the Code, any and all post-petition proceeds of the Pre-Petition Collateral (the "Cash Collateral")) and to operate under the Senior Loan Agreement as modified in certain respects by a certain Letter Agreement dated as of December 24, 2009 (the "DIP Amendment"), by and among Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC, as borrowers, Senior Agent, as agent, and the Senior Lenders, as lenders.  In addition to permitting the use of Cash Collateral, the DIP Amendment further provides the Debtors with access to additional postpetition credit in the maximum amount of $1,308,055 (the "DIP Loan") on substantially the same terms and conditions as applied pursuant to the Senior Loan Agreement prior to the Petition Date, as amended and modified by the DIP Amendment and the other DIP Loan Documents. (as defined below).[3]

20.     Given the Debtors' current debt obligations and lack of liquidity, the Debtors have had to rely for some time on protective advances from the Senior Lenders made under the Senior Loan Agreement to meet daily operating needs and remain unable to satisfy obligations as they come due.  As described in more detail in the Weldler Declaration and the Disclosure Statement, however, the Debtors have recently received proceeds pursuant to the sale of certain transferable development rights connected to the Property, which cash constitutes Cash Collateral of the Senior Lenders.  As indicated in the budget, (which is attached as Exhibit B to Annex A to the proposed Interim Order) and which has been approved by the Senior Agent and the

---

[3] All indebtedness and obligations incurred on or after the Petition Date by the Debtors to Agent and/or Senior Lenders pursuant to the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses (including reasonable attorneys' fees and expenses), as well as any other obligations under the Pre-Petition

Senior Lenders (as amended, modified or supplemented from time to time, the "DIP Budget"), the

Debtors expect that these proceeds will be sufficient to cover the Debtors' operating costs through

the effective date of the Debtors' chapter 11 Plan. The DIP Amendment will permit the Debtors to

use this Cash Collateral in accordance with the DIP Budget and further supplies access to the

DIP Loan, which is intended to backstop the Debtors' use of Cash Collateral.

## RELIEF REQUESTED

21.     By this Motion, the Debtors seek entry of the Interim Order and a final order (the

"Final Order," and, together with the Interim Order, the "DIP Orders"), *inter alia*:

a.      authorizing the Debtors to use Cash Collateral; *provided that* all expenditures of Cash Collateral shall be pursuant to the DIP Budget;

b.      authorizing the Debtors to obtain secured debtor-in-possession financing up to an aggregate principal amount of $1,308,055 (again, the "DIP Loan"); *provided that*, prior to the Final Order, the Debtors may only borrow on an interim basis up to an aggregate principal or face amount of $500,000, and *provided further* that all interim and final borrowings shall be pursuant to the DIP Budget;

c.      authorizing the Debtors to execute and enter into the DIP Amendment and such additional documents, instruments and agreements (collectively, with the DIP Amendment, the "DIP Loan Documents") as are required to implement the terms of the DIP Orders, and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

d.      granting Replacement Liens on all DIP Collateral subject and junior only to the post-petition liens described below and the Carve-Out (defined below);

e.      granting security interests, liens and superpriority claims (including a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) in favor of the Senior Agent and the Senior Lenders, to secure the Postpetition Obligations;

f.      modifying the automatic stay imposed by section 362 of the Bankruptcy Code as required to permit (i) the Debtors, the Senior Agent and the

---

Loan Documents or the DIP Loan Documents incurred on or after the Petition Date are referred to herein as the "Post-Petition Obligations," and together with the Pre-Petition Obligations, as the "Collective Obligations."

Senior Lenders to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the DIP Amendment as set forth in the Interim Order, and (ii) the bank with which the Debtors hold their primary bank and operating accounts, Signature Bank, to transfer funds or take such other actions as may be required under the Blocked Account Control Agreement;

g.     scheduling a final hearing ("Final Hearing"), to be held no later than thirty (30) days after entry of the Interim Order, to consider entry of the Final Order; and

h.     approving certain notice procedures for the hearings hereon.

22.     Pending entry of the Final Order, the Debtors seek approval of the Interim Order, which will (i) authorize the Debtors to use Cash Collateral as set forth in the DIP Budget; (ii) authorize the Debtors to borrow up to $500,000 under the DIP Loan, (iii) grant to the Senior Agent and the Senior Lenders the liens and superpriority claims described herein, (iv) schedule the Final Hearing, and (v) approve certain notice procedures.

## SUMMARY OF PRINCIPAL TERMS OF DIP FINANCING

23.     The DIP Loan is the product of vigorous, arm's length negotiations between the Debtors, the Senior Agent, the Senior Lenders and their respective advisors.

24.     Pursuant to Local Rule 4001-2, the following provisions are highlighted:

a.     Limitations on Investigation (Local Rule 4001-2(a)(i)(B)).  The proposed Interim Order p. 6, ¶J; p. 7, ¶K-L) includes stipulations and findings of fact with respect to, among other things, the extent, validity, priority, perfection and enforceability of the claims, liens and security interests of the Senior Lenders, as well as a waiver of claims held by the Debtors (and any party acting by, through or on behalf of the Debtors) against the Senior Lenders relating to the Senior Loan Documents.  The Interim Order (p. 26, ¶23), however, gives all parties in interest other than the Debtors sixty (60) days after entry of the Interim Order to investigate and, if appropriate, challenge such matters.

This is appropriate because the Debtors have requested that this Court schedule a hearing to consider approval of the Disclosure Statement and confirmation of the Plan within sixty (60) days in order to facilitate a transfer of the Debtors' Property as efficiently as possible.  This timeframe effectively extends the investigation period through the anticipated

confirmation date of these chapter 11 cases, upon which the Senior Lenders shall receive releases as provided in the Plan. In addition, given that the Property constitutes the Debtors' primary asset, the Debtors believe that a sixty-day investigation period presents all parties in interest with more than sufficient time within which to conduct any investigation of the Senior Lenders' Claims.

b.   Waiver of Surcharge Rights under § 506(c) (Local Rule 4001-2(a)(i)(C)). The proposed Interim Order (pl4 ¶ 6) provides that, upon entry of the Final Order, no costs or expenses of administration shall be charged or assessed against or recovered from the Pre-Petition Collateral, the Senior Agent, the Senior Lenders, or any of their respective claims, including pursuant to sections 506(c) of the Bankruptcy Code without the prior written consent of the Senior Agent and the Senior Lenders.

This is appropriate because parties-in-interest are being given adequate notice and an opportunity to respond before entry of the Final Order.

c.   Lien on Avoidance Actions (Local Rule 4001-2(a)(i)(D)). The proposed Interim Order (p. 15, ¶ 7) grants the Senior Agent and Senior Lenders a first-priority lien on proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

This is appropriate because it is part of the security given for the Postpetition Obligations and because it likely is of little consequence given that the Senior Lenders have funded the Debtors' operations for several months prior to the Petition Date and given that the Debtors' proposed Plan waives any avoidance claims the Debtors may have under Chapter 5 of the Bankruptcy Code.

25.   Certain key terms of the DIP Amendment are as follows:[4]

a.   Borrowers:  Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC

b.   Use of DIP Loan: The DIP Loan shall be used only to the extent that Cash Collateral (held by Agent subject to Agent's liens securing the Collective Obligations) is not sufficient to pay the Debtors' and other expenses set forth in the DIP Budget.

c.   DIP Budget:  Payment of any expenses, whether through the use of Cash Collateral or with the proceeds of DIP Advances, shall be made only pursuant to the DIP Budget, provided that (i) total cash expenditures may exceed the amounts set forth in the DIP Budget provided that such cash expenditures do not, in the aggregate, exceed 110% of the total cash expenditures set forth in the DIP Budget in any fiscal month without the

---

[4]   This summary is qualified in its entirety by reference to the DIP Amendment. To the extent there is any inconsistency between this Motion and the DIP Amendment, the latter shall govern.

prior written consent of Senior Agent, provided further that in no event shall amounts paid for professional fees and management fees exceed the amount provided for such items in the DIP Budget, and (ii) Senior Agent may, without being subject to the limitation set forth in the preceding subclase (i), in its sole discretion, make DIP Advances (subject to the Maximum DIP Commitment and Interim Order or Final DIP Order) or use Cash Collateral to pay the costs of maintenance, construction, alteration, repair, preservation, marketing or operation of the Premises, or otherwise to preserve or protect the Collateral or the lien thereon, whether or not such item of expense is specifically set forth in the DIP Budget.

d.    <u>Interest Rate</u>: The DIP Loan shall bear interest at the Default Rate specified in the Senior Loan Agreement for the period from the date of the advance thereof until repaid in full, and shall constitute, and all interest that accrues thereon shall constitute, a portion of the Collective Obligations under the DIP Loan Documents.

e.    <u>Security and Superpriority</u>: The Prepetition Obligations shall be secured by the Replacement Liens (as defined below). The DIP Loan shall be secured, and all interest that accrues thereon shall be secured, by the Senior Loan Documents, the Replacement Liens and by post-petition liens pursuant to sections 363(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code. In addition, the DIP Loan shall have superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code.

f.    The post-petition liens on and security interests in the DIP Collateral securing the DIP Loan shall be subject only to: (i) amounts necessary to pay any unpaid fees payable pursuant to 28 U.S.C. § 1930 and any unpaid fees payable to the Clerk of this Court or the U.S. Trustee; (ii) so long as the Loan Payment Date (as defined in the Interim Order) has not occurred, administrative expenses of the kind specified in 11 U.S.C. §§ 330 and 331, including, but not limited to, the reasonable fees and expenses of the Debtor Professionals and the Committee Professionals (each as defined below) as the same may be due and payable; and (iii) following the occurrence of the Loan Payment Date, the allowed professional fees and disbursements of the Debtor Professionals and the Committee Professionals incurred or accrued after the occurrence of the Loan Payment Date in an aggregate amount not to exceed $20,000.00 (which amount shall be in addition to any compensation previously awarded or incurred prior to the occurrence of the Loan Payment Date, but subject to Court approval) (the "Carve-Out"). For purposes of the Interim Order: (i) the professionals retained by the Debtors pursuant to Section 327 of the Bankruptcy Code shall be referred to here as the "Debtor Professionals"; and (ii) the professionals retained by a Committee pursuant to Section 1103(a) of the Bankruptcy Code, if such a Committee is appointed by the Court, shall be referred to herein as the "Committee Professionals." Prior to the occurrence of the Loan Payment Date, the allowed professional fees

and disbursements of the Debtor Professionals incurred or accrued prior to the occurrence of the Loan Payment Date shall be paid in compliance with the DIP Budget.

g.  No proceeds of the DIP Loan or any other extensions of credit made by the Senior Lenders to the Debtors prior to the Petition Date, or, prior to payment in full in cash of the Collective Obligations, any Cash Collateral or DIP Collateral (or proceeds thereof) may be used to pay, any and all claims for services rendered by Debtor Professionals or, if such a Committee is appointed, the Committee Professionals, in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Collective Obligations or the pre-petition and post-petition liens and security interests of Senior Agent in the DIP Collateral (including the Pre-Petition Collateral); or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by Senior Agent and/or any Senior Lender of any of their rights and remedies under the Interim Order, the Final Order and/or the DIP Loan Documents or Senior Agent's enforcement or realization upon any of the liens on or security interests in any DIP Collateral. If a Committee is appointed, Cash Collateral and, if needed, proceeds of the DIP Loan will cover such a Committee's fees and expenses incurred in connection with the investigation of the Senior Lenders' claims and pre-petition liens provided that fees and expenses related to such investigation shall not exceed $15,000.00.

## BASIS FOR RELIEF

### A.    Basis for Emergency Relief

26.    As set forth in the Weldler Declaration, the Debtors bring this Motion on an expedited basis to avoid the immediate and irreparable harm that will be suffered by these estates if the Debtors do not obtain the liquidity needed to operate their business during these chapter 11 cases and preserve the value of the Property.   The Debtors need immediate access to both cash collateral and the proposed interim financing.

27.    Local Rule 4001(b) provides that the Court may grant interim relief when it is necessary to avoid immediate and irreparable harm to the estate.   Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 of the

Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such

motion. Upon request, however, this Court is empowered to conduct an interim expedited

hearing on motion at which time it may authorize a debtor to obtain credit to the extent necessary

to avoid immediate and irreparable harm to a debtor's estate. Pursuant to Bankruptcy Rule

4001(c) and Local Rule 4001(b), the Debtors request that the Court conduct an expedited Interim

Hearing as soon after the Petition Date as the Court's schedule permits.

28. The Debtors have determined, in consultation with their advisors, that they would

not be able to obtain alternative financing on terms superior to the terms of the DIP Loan, and

such terms are market terms that represent the best terms reasonably available to the Debtors.

**B.** **The Court Should Permit the Debtors' Use of Cash Collateral**

29. Section 363(c)(2) of the Bankruptcy Code provides that debtors may not use, sell or

lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or

(b) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the

provisions of this section." 11 U.S.C. § 363(c)(2). "Cash collateral" is defined to mean "cash,

negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in

which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

30. Section 363(e) of the Bankruptcy Code provides that upon request of an entity

that has an interest in property to be used by a debtor, the Court shall prohibit or condition such

use as is necessary to provide adequate protection of such interest. Although "adequate

protection" is not defined in the Bankruptcy Code, section 361 of the Bankruptcy Code provides

the following three non-exclusive examples of what may constitute adequate protection:

> (1)     requiring the trustee to make a cash payment or periodic
>           cash payments to such entity, to the extent that the . . . use .
>           . . under section 363 of this title, or any grant of a lien
>           under section 364 of this title results in a decrease in the
>           value of such entity's interest in such property;

<ol>
<li value="2">providing to such entity an additional or replacement lien to the extent that such . . . use . . . results in a decrease in the value of such entity's interest in such property; or</li>
<li value="3">granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.</li>
</ol>

11 U.S.C. § 361.

31.     According to the legislative history, a finding of adequate protection is "left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principals." H.R. Rep. No. 595, 95th Cong., 2nd Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295. *See In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Nashua Trust Co.*, 73 B.R. 423, 430-31 (Bankr. D. N.J. 1987). The purpose is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re Planned Sys., Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).

32.     The Senior Lenders have consented to the Debtors' use of Cash Collateral on the terms and conditions set forth in the DIP Amendment and Interim Order. The Senior Lenders have conditioned their consent to funding the DIP Loan on their receipt of the following adequate protection for their interest in the Prepetition Collateral (the "Adequate Protection"):

<ol type="a">
<li>The Senior Agent and Senior Lenders shall receive replacement liens on all DIP collateral (the "Replacement Liens"), which are granted subject and junior only to the Postpetition Liens (described below), certain permitted liens (but only to the extent such permitted liens were senior in priority to the Pre-Petition Liens as of the Petition Date) and the Carve-Out. To the extent any Cash Collateral was used by the Debtors prior to the date of the Interim Order, but after the Petition Date, the adequate protection provided pursuant to the Interim Order (including, without limitation, the Replacement Liens) shall apply to provide the Senior Agent and the Senior Lenders with adequate protection against any diminution in</li>
</ol>

their interests in the Pre-Petition Collateral resulting from such use of such Cash Collateral prior to the date of the Interim Order.

b.     The Replacement Liens shall be deemed perfected automatically upon entry of the Interim Order, without the necessity of the filing of any UCC-1 financing statement, state or federal notice, mortgage or similar instrument or document in any state or public record or office and without the necessity of taking possession or "control" (within the meaning of the Uniform Commercial Code) of any Collateral.

33.     The Debtors submit that the foregoing protections to be granted to the Senior Lenders will provide the Senior Lenders with sufficient adequate protection.

## C.     The Court Should Permit the Debtors to Obtain Secured DIP Financing

34.     Section 364 of the Bankruptcy Code authorizes this Court to allow the Debtors to obtain postpetition financing in the manner proposed. As security for all obligations owed under the DIP Loan, the Debtors propose to grant to the Senior Agent and Senior Lenders, subject to the Carve-Out, a superpriority claim and perfected first-priority security interests and liens on the DIP Collateral to the extent it is property of the Debtors' estates.

35.     Section 364 of the Bankruptcy Code provides as follows:

(c)     If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

(1)     with priority over any and all administrative expenses of the kind specified in section 503(b) and 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien;

(3)     secured by a junior lien on property of the estate that is subject to a lien.

(d)     (1)     The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of
the lien on the property of the estate on which such senior
or equal lien is proposed to be granted.

11 U.S.C. § 364.

36.     Generally, sections 364(c) and (d) of the Bankruptcy Code require a debtor to

demonstrate that alternative sources of post-petition credit are not available under sections 364(a)

or (b). However, where few lenders are likely able or willing to extend the credit required, "it

would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for

financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*,

*Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

37.     The universe of lenders who would commit to meet the Debtors' postpetition

financing requirements is limited. Given the Debtors' financial condition and existing financing

arrangements, the Debtors determined in consultation with their advisors that they would not be

able to obtain unsecured credit or other financial accommodations allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code. DIP financing is not otherwise

available without the Debtors (i) granting, pursuant to section 364(c)(1) of the Bankruptcy Code,

claims having priority over any and all administrative expenses of the kinds specified in sections

503(b) and 507(b), of the Bankruptcy Code, other than in respect of the Carve-Out; and (ii)

securing, pursuant to section 364(c)(2) and (3) of the Bankruptcy Code, such obligations with

security interests in and liens on certain of the Debtors' assets (*i.e.*, the DIP Collateral).

38.     The Debtors have determined in consultation with their advisors that the terms of

financing proposed by the Senior Lenders are the most favorable available under the

circumstances. This is particularly true given: (i) reduced liquidity in the financial markets; (iii)

the delay and cost attendant to soliciting proposals from new lenders, which would require

additional due diligence and related fees; (iv) the Debtors cannot survive through use of

unencumbered property; and (v) any effort to bring in alternative debtor-in-possession financing will entail a "priming fight" that would be expensive, a distraction for the Debtors' management and involve litigation risk. Further, the knowledge the Senior Agent and Senior Lenders possess about the business permitted a shortened due diligence period and enabled the Debtors to prepare for chapter 11. Finally, the Debtors and Senior Lenders have agreed that the Debtors may only use the DIP Loans in the event that the use of Cash Collateral, as permitted by the DIP Amendment and the proposed Interim Order, is insufficient to meet the Debtors' operating needs as set forth in an approved DIP Budget.

39.     The Debtors negotiated the best financing arrangement that they can reasonably expect under the circumstances. The fees are customary and reasonable, and courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992). Moreover, the alternatives are dire; without additional liquidity the Debtors cannot continue operations and will be forced to dismiss these cases or convert to chapter 7.

40.     Based on the foregoing, the Debtors request that the Court approve the DIP Loan in accordance with the terms in the DIP Amendment and DIP Orders.

**D.     The Senior Agent and Senior Lenders Are Entitled to the
        "Good Faith" Protections of Section 364(e) of the Bankruptcy Code**

41.     The terms and conditions of the DIP Loan are fair and reasonable. Such terms and conditions were negotiated in good faith and at arm's length at all times by the Debtors, the Senior Agent, the Senior Lenders and their respective advisors. The DIP Loan Documents went through multiple iterations and reflect material changes from the terms originally proposed by the Senior Agent and Senior Lenders. The Debtors, the Senior Agent and the Senior Lenders also conducted extensive negotiations concerning the DIP Budget and the terms of certain "first-

day" pleadings that require the immediate use of cash collateral and access to interim financing from the Senior Lenders.

42.     In light of the foregoing, the Senior Agent and the Senior Lenders should be accorded the benefits and protections of section 364(e) of the Bankruptcy Code with respect to the DIP Loan; specifically, any loans, advances or other financial accommodations that the Senior Agent and the Senior Lenders make or cause to be made from time-to-time to the Debtors on the terms and conditions set forth in the DIP Loan should be deemed to have been made and provided in "good faith" as the term is used in section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the DIP Orders or DIP Loan or any provisions are hereafter modified, vacated, amended or stayed by subsequent order of this Court or any other court without the express consent of the Senior Agent and Senior Lenders.

**E.     The Section 506(c) Waiver in the Final Order Should be Approved**

43.     The Court should approve the Debtors' waiver, in the Final Order, of any right to surcharge the Postpetition Collateral. Such waivers and provisions are standard and customary under financings between sophisticated parties such as the Debtors and the Postpetition Agent. As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *See also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor-in-possession financing); *cf. In re Telesphere*

*Communications, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights (including 506(c) rights) against the lenders in exchange for valuable consideration).

44.    The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from a carve-out.  Under the DIP Loan, the Debtors agree to waive any rights to charge costs and expenses against the Senior Lenders' collateral *except* for the Carve-Out.  In other words, the Debtors have waived the uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the Debtors' other estate professionals under a carve-out.  *Cf. In re Lunan Family Restaurants Ltd. P'ship*, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure]."), *citing In re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984) and *New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)*, 112 B.R. 811, 815 (E.D. La. 1990), *rev'd on other grounds sub nom.*, *In re Delta Towers*, 924 F.2d 74 (5th Cir. 1991).

**F.**   **Modification of Automatic Stay**

45.   The DIP Loan contemplates a modification of the automatic stay to the extent
applicable and necessary, to permit (i) the Debtors, the Senior Agent and the Senior Lenders to
implement the terms of the DIP Orders and, upon the occurrence and during the continuance of
an Event of Default, to exercise all rights and remedies in the DIP Amendment as set forth in the
Interim Order, and (ii) Signature Bank to transfer funds or take such other actions as may be
required.  Provisions of this kind are standard in debtor-in-possession financing and are
reasonable under the circumstances.

**G.**   **Establishing Notice Procedures
and Request for Final Hearing**

46.   Pursuant to Bankruptcy Rule 4001(b)(2), the Court may commence a final hearing
fifteen (15) days after service of this Motion.  Local Rule 4001-2(c) further specifies that the
Final Order may only be entered after notice and a hearing and that ordinarily a final hearing
shall be held at least ten (10) days after the organizational meeting of a creditors committee, if
any.  The Debtors shall, within three (3) business days of the entry of the Interim Order by the
Court, serve by overnight mail, a copy of the Interim Order and a notice of the Final Hearing
("Final Hearing Notice") to consider entry of the Final Order on the date established by the
Court.

47.   Any party in interest objecting to the relief sought at the Final Hearing shall serve
and file objections, which objections shall:  (i) be in writing; (ii) conform to the Bankruptcy
Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy
Court for the District of Delaware no later than three (3) business days before the Final Hearing
and served upon the following parties so as to be received not less than three (3) business days
before the Final Hearing:  (a) counsel to the Debtors, Bayard, P.A., Attn: Neil B. Glassman, Esq.

and Jamie L. Edmonson, Esq., 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19899 and Lovells LLP, Attn: Robin E. Keller, Esq. and Christopher R. Bryant, Esq., 590 Madison Avenue, New York, New York 10022; and Bayard, P.A. 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19801, Attn: Neil B. Glassman, Esq. and Jamie L. Edmonson, Esq. (b) the United States Trustee for the District of Delaware; (c) counsel to the Senior Agent and Senior Agent, Kaye Scholer LLP, 70 W. Madison, Suite 4100, Chicago, IL 60602 (Attn: D. Tyler Nurnberg and Kathryn L. Schmanski) and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attn: David Stratton); (d) counsel to the Lenders, including in their capacity as Senior Lenders and Senior Lenders, Kaye Scholer LLP, 70 W. Madison, Suite 4100, Chicago, IL 60602 (Attn: D. Tyler Nurnberg and Kathryn L. Schmanski), Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attn: David Stratton) and Katten Muchin Rosenman LLP, 525 W. Monroe Street, Chicago, IL 60661-3693 (Attn: Peter A. Siddiqui); and (e) counsel to any statutory committee appointed in these chapter 11 cases.

48.     The Debtors request that the Court schedule the Final Hearing and approve the proposed notice and objection procedures for the Final Hearing set forth herein.

## NOTICE AND PRIOR MOTIONS

49.     The Debtors shall, as soon as reasonably possible after the Court schedules the interim hearing on this Motion to consider entry of the proposed Interim Order, serve by overnight mail, a notice of such interim hearing on (a) the U.S. Trustee, (b) the creditors listed on the Debtors' Consolidated List of Creditors Holding 20 Largest Unsecured Claims, (c) counsel to the Senior Agent and Senior Agent, (d) counsel to the Lenders, including in their capacity as Senior Lenders and Senior Lenders; (e) the Senior Lenders, (f) the Senior Lenders, and (g) all parties with liens of record on the Debtors' assets as of the Petition Date.

50.     In light of the nature of the relief requested herein, the Debtors submit that no other and further notice of the Motion is necessary or required.

51.     No previous request for the relief sought has been made to this or any other court.

*[Text Continued on Next Page]*

WHEREFORE, the Debtors request that the Court (i) immediately enter the Interim

Order, (ii) schedule the Final Hearing, and (iii) grant the Debtors such other and further relief as

it deems may be just and proper under the circumstances.

Dated: January 11, 2010           **BAYARD, P.A.**
       Wilmington, Delaware

Neil B. Glassman, Esq. (No. 2087)
Jamie L. Edmonson, Esq. (No. 4247)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
Tel: (302) 655-5000
Fax: (302) 658-6395
nglassman@bayardlaw.com
jedmonson@bayardlaw.com

- and -

**LOVELLS LLP**
Robin E. Keller, Esq.
Christopher R. Bryant, Esq.
590 Madison Avenue
New York, New York 10022
Tel: (212) 909-0600
Fax: (212) 909-0660
robin.keller@lovells.com
christopher.bryant@lovells.com

Proposed Attorneys for the Debtors
and Debtors-in-Possession