**THE FOLLOWING DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT OR ANY OTHER GOVERNMENTAL AUTHORITY.**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Broadway 401 LLC, et al.,[1] | ) Case No. 10-_____ ( ___ ) |
| | ) |
| Debtors. | ) |

**DISCLOSURE STATEMENT FOR JOINT PREPACKAGED PLAN OF REORGANIZATION OF BROADWAY 401 LLC, BROADWAY MASS ASSOCIATES LLC AND BROADWAY MASS TIC I LLC**

YOU ARE RECEIVING THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PREPACKAGED PLAN OF REORGANIZATION OF THE ABOVE-CAPTIONED DEBTORS. IF THE REQUISITE NUMBER AND AMOUNT OF CREDITORS IN CLASS 1 VOTE TO APPROVE THE PLAN AND IF OTHER PRE-FILING CONDITIONS ARE MET, THE DEBTORS INTEND TO FILE PETITIONS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO IMPLEMENT THE PLAN.

BECAUSE CHAPTER 11 CASES HAVE NOT YET BEEN FILED, NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH OR REVIEWED BY THE BANKRUPTCY COURT, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. IF SUFFICIENT CONSENTS ARE RECEIVED AND THE BANKRUPTCY CASES ARE FILED, THE DEBTORS WILL SEEK A COURT ORDER APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT, AS MORE FULLY DESCRIBED BELOW.

Lovells LLP
Robin E. Keller, Esq.
590 Madison Avenue
New York, NY 10022
Tel: 212-909-0600
Fax: 212-909-0660

Bayard, P.A.
Neil B. Glassman, Esq.
Jamie L. Edmonson, Esq.
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel: 302-429-4224
Fax: 302-658-6395

Proposed Counsel for the Debtors and Debtors in Possession

Dated: December 31, 2009

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Broadway 401 LLC, a Delaware limited liability company (6772), Broadway Mass Associates LLC, a Delaware limited liability company (8668), and Broadway Mass TIC I LLC, a Delaware limited liability company (3760).

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING EASTERN TIME ON JANUARY 8, 2010**
**(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).**

**FOR YOUR VOTE TO BE COUNTED, THE DEBTORS' REPRESENTATIVE DESIGNATED**
**BELOW MUST <u>ACTUALLY</u> <u>RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING**
**DEADLINE.**

Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC, each a Delaware limited liability company (collectively, the "<u>Debtors</u>"), are sending you this document and the accompanying materials (this "<u>Disclosure Statement</u>") because you are a creditor in Class 1 under the proposed *Joint Prepackaged Plan of Reorganization of Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC Under Chapter 11 of the Bankruptcy Code* (as the same may be amended from time to time, the "<u>Plan</u>"), entitled to vote to accept or reject the Plan. The Debtors are commencing the solicitation of votes to approve the Plan before the Debtors file voluntary cases under title 11 of the United States Code (as amended, the "<u>Bankruptcy Code</u>").

If the requisite number and amount of Class 1 creditors vote to approve the Plan and if other pre-filing conditions are met, the Debtors intend to file voluntary cases under title 11 of the Bankruptcy Code to implement the Plan (the "<u>Chapter 11 Cases</u>"). Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will promptly seek entry of an order or orders of the Bankruptcy Court: (1) approving this Disclosure Statement as having contained "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code; (2) approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code; and (3) confirming the Plan. The Bankruptcy Court may order additional disclosures.

---

**IMPORTANT INFORMATION CONCERNING THIS DISCLOSURE STATEMENT**

---

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN FOR THE PURPOSE OF SOLICITING THEIR VOTES. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. HOWEVER, IF THE CHAPTER 11 CASES ARE FILED, THE DEBTORS WILL UTILIZE THIS DISCLOSURE STATEMENT, AS IT MAY BE AMENDED, AFTER THE BANKRUPTCY FILING DATE TO PROVIDE INFORMATION TO CREDITORS AND OTHER PARTIES IN INTEREST REGARDING THE PLAN.

THE DEBTORS CANNOT ASSURE YOU THAT THE DISCLOSURE STATEMENT THAT IS ULTIMATELY APPROVED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES: (1) WILL CONTAIN ALL OF THE TERMS DESCRIBED IN THIS DISCLOSURE STATEMENT; OR (2) WILL NOT CONTAIN DIFFERENT, ADDITIONAL, OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS DISCLOSURE STATEMENT. THEREFORE, MAKING INVESTMENT DECISIONS BASED UPON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, AND THE OTHER EXHIBITS, IS *HIGHLY SPECULATIVE*. THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN: (1) TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT (INCLUDING THE PLAN AND THE MATTERS

DESCRIBED UNDER ARTICLES VIII AND IX OF THIS DISCLOSURE STATEMENT, ENTITLED, RESPECTIVELY "PLAN-RELATED RISK FACTORS" AND "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN"); AND (2) TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY PRIOR TO DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. YOU SHOULD NOT RELY ON THIS DISCLOSURE STATEMENT FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS." SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR OBJECTION TO A CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. UNLESS OTHERWISE PROVIDED IN THE PLAN, THE DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS BEFORE OR AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN WHETHER OR NOT THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED THERETO OR HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION. IN ADDITION, THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT, HAS NOT BEEN AND WILL NOT BE AUDITED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS DRAFTED OR WILL NOT CHANGE SUBSEQUENT THERETO. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 1

    A.    Overview of the Debtors, their Assets and Liabilities.................................... 1

    B.    Events Leading up to the Chapter 11 Filing ................................................ 7

    C.    The Settlement Agreements ........................................................................ 8

III.  ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.................................. 9

IV.   SUMMARY OF THE PLAN ............................................................................. 11

    A.    Overview of Chapter 11 ............................................................................ 11

    B.    Purpose of the Plan .................................................................................. 11

    C.    Effect of the Plan...................................................................................... 12

    D.    Treatment of Unclassified Claims under the Plan...................................... 12

    E.    Classification and Treatment of Claims and Interests ................................ 14

V.    SOLICITATION PROCEDURES ...................................................................... 20

    A.    Holders of Claims and Interests Entitled to Vote on the Plan.................... 20

    B.    Voting Procedures and Instructions .......................................................... 20

VI.   CONFIRMATION OF THE PLAN .................................................................... 23

    A.    The Confirmation Hearing ........................................................................ 23

    B.    Effect of Confirmation of the Plan............................................................ 24

    C.    Statutory Requirements for Confirmation of the Plan................................ 24

**VII.  CONSUMMATION OF THE PLAN** ........................................................................... 29

**VIII. PLAN-RELATED RISK FACTORS** .......................................................................... 29

    A.    Certain Bankruptcy Law Considerations ........................................................ 29

    B.    Risk Factors That May Affect Recoveries Under the Plan .............................. 31

    C.    Risks Associated with Forward Looking Statements ..................................... 32

    D.    Disclosure Statement Disclaimer .................................................................. 32

**IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ........................ 35

    A.    Liquidation Under Chapter 7 of the Bankruptcy Code ................................... 35

    B.    Filing of an Alternative Plan of Reorganization ............................................ 35

    C.    Lifting of the Automatic Stay ........................................................................ 35

**X.  U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .................................. 35

**XI.  RECOMMENDATION** ........................................................................................... 36

## EXHIBITS

EXHIBIT A:    Proposed Joint Prepackaged Plan

EXHIBIT B:    Organizational Chart Summary

EXHIBIT C:    Appraisals of the Subject Properties

EXHIBIT D:    Liquidation Analysis

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

# I.  INTRODUCTION

The Debtors have reached a series of agreements with their secured and major unsecured creditors for a restructuring that contemplates the sale or transfer of their properties, and the compromise of various disputes between the Debtors, their Senior Lenders and their Mezzanine Lenders (together, their "Lenders"), with the Guarantors, and with other third parties, that are to be implemented through a "pre-solicited" Chapter 11 Plan.  The Debtors are sending you this Disclosure Statement because you are a creditor entitled to vote to accept or reject the Plan.  Others may receive this Disclosure Statement for informational purposes only.  The Debtors are commencing the solicitation of votes to approve the Plan before any petitions for relief under chapter 11 of the Bankruptcy Code have been filed.  If the requisite number and amount of creditors in Class 1 under the Plan vote to approve the Plan, and if other pre-filing conditions are met, the Debtors intend to commence the Chapter 11 Cases to implement the Plan in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

Because the Debtors have not yet commenced the Chapter 11 Cases, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.  If the Debtors do commence the Chapter 11 Cases, the Debtors will promptly seek entry of an order or orders of the Bankruptcy Court: (1) approving this Disclosure Statement as having contained "adequate information;" (2) approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code; and (3) confirming the Plan.

All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan attached hereto as Exhibit A.  If there is an inconsistency between the use of a term in this Disclosure Statement and the Plan, the Plan definition shall control.

# II.  BACKGROUND

## A.  OVERVIEW OF THE DEBTORS, THEIR ASSETS AND LIABILITIES

### 1.  The Debtors

The Debtors consist of:  Broadway 401 LLC ("Broadway 401"), Broadway Mass Associates LLC ("Broadway Mass"), and Broadway Mass TIC I LLC ("Broadway TIC"), each a Delaware limited liability company.  Broadway 401, Broadway Mass and Broadway TIC are ultimately owned by Lazar Muller, Samuel Weiss, Charles Herzka, David Weldler and the 1997 Neumann Family Trust, in the percentages reflected on Exhibit B hereto.

The Debtor entities were created in connection with a development project for the construction and sale of residential condominiums in downtown Washington, D.C., consisting of real property improved with two adjoining buildings located at 401 and 425 Massachusetts Avenue, known as "The Dumont."  Except as described herein, the Debtors do not own any other properties or assets or engage in any other business.

### 2.  Assets

#### (a)  The Property

Broadway Mass and Broadway TIC own the 425 Premises, as tenants-in-common, and Broadway

401 owns the 401 Premises. The Debtors acquired title to the Property in stages between December 2004 and January 2006 for a total purchase price of $47,119,367.73. Since acquiring title, the Debtors have improved the Property with two residential towers: the 401 Premises consists of a 14-story, 189-unit residential tower and the 425 Premises consists of a 14-story, 370-unit residential tower. The 401 Premises and the 425 Premises are connected by a shared lobby, shared parking garage and common roof access. The Property is vacant but essentially is complete and ready for occupancy. Broadway 401 is managed by Broadway 401 Manager LLC ("Broadway 401 Manager"), and Broadway Mass and Broadway TIC are managed by Broadway Mass Manager LLC ("Broadway Mass Manager" and, together with Broadway 401 Manager, the "Manager"), both of which are entities owned by David Weldler and Charles Herzka.

(b)    The Transferable Development Rights

As part of an urban renewal program, the District of Columbia granted the Debtors certain transferable development rights (the 401 Development Rights and the 425 Development Rights, respectively), which grant the Debtors supplemental rights to undertake commercial development with increased permissible floor area elsewhere in the District in return for the residential developments completed on the Property.

On August 18, 2008, the Debtors entered into the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract for the sale of the 401 Development Rights and the 425 Development Rights to Argent Acquisitions LLC (collectively, the "TDR Sale Contracts"). The Debtors have closed in escrow on the sale of the 401 Development Rights and the 425 Development Rights pursuant to those contracts. The purchase price under each of the TDR Sale Contracts is being held in escrow by First American Title Insurance Company ("First American"). Pursuant to a letter agreement dated as of August 3, 2009 among the Debtors, the Senior Agent and First American (the "TDR Escrow Agreement"), First American is to hold the purchase price under the TDR Sale Contracts until the Washington D.C. title registry indicates that there are no intervening liens and then First American shall hold the purchase price, net of closing costs, in the TDR Escrow Agreement until released as provided in the Senior Settlement Agreement. Such purchase price constitutes cash collateral for the obligations owed by the Debtors to the Senior Lenders.

The Debtors and the Senior Lenders have agreed pursuant to the Senior Settlement Agreement that a $375,000.00 portion (the "Debtor TDR Net Proceeds") of the net sale proceeds under the TDR Sale Contracts shall be made available to pay the Debtors' legal and professional fees and certain management expenses of the Debtors. Pursuant to the Senior Settlement Agreement, if the Senior Agent receives such net proceeds prior to the Petition Date, the Senior Agent shall disburse a portion of such cash collateral held by the Senior Agent, up to $320,000 (constituting a portion of the Debtor TDR Net Proceeds), immediately prior to the Petition Date, to pay outstanding legal fees of the Debtors, a retainer for Debtors' local counsel, and a portion of the management services fee to Debtors' representative, David Weldler. The balance of said cash collateral, including the balance of the Debtor TDR Net Proceeds, together with certain insurance settlement proceeds in the amount of $209,895.97 received by Borrowers, shall be used as provided below. In the event that the proceeds of the sales pursuant to the TDR Contracts have not been released as of the Petition Date, the Senior Lenders have agreed to advance the amount referred to in the preceding sentence immediately prior to the Petition Date to pay outstanding legal fees, local counsel retainer, and a portion of the management services fee to Debtors' representative, David Weldler. If the Senior Lenders deem it necessary, the Debtors shall promptly file a motion in the Chapter 11 Cases seeking, on an expedited basis, authority from the Bankruptcy Court to close the transactions pursuant to the TDR Sale Contracts. If the proceeds of the sales pursuant to the TDR Contracts are released subsequent to the Petition Date, the Debtors and the Senior Agent will jointly instruct First American to transfer the proceeds to the "Disbursing Agent" (as defined in the Plan) to be held, subject to the Senior

Agent's lien thereon. The cash collateral shall be disbursed pursuant to the "DIP Budget" (as defined in the Plan); provided that if the Senior Lenders advanced sums prior to the Petition Date, as aforesaid, the cash collateral shall be used first to reimburse the Senior Lenders for such advance.

(c)    <u>Insurance Policies and Proceeds</u>

There are various insurance policies in place relating to the Property, one of which is an umbrella policy covering other property unrelated to the Dumont, which is owned and/or managed by certain of the Debtors' principals. In order to resolve disputes regarding the transfer or assignment of rights under these policies, claims by the Debtors that additional amounts are due and owing for insurance costs related to these policies from the Senior Lenders, and the entitlement of the Debtors, the Lenders or other third parties to proceeds, refunds of premium, and/or return of collateral deposited in connection with such policies, the Debtors and the Lenders have agreed as follows:

With respect to insurance policies covering the Property (other than the OCIP Policy, which will be dealt with as described below), the Debtors will assume and assign such policies as directed by the Senior Agent. The Property is one of two unrelated properties covered by the "Insurance and Risk Management Services Program" for Broadway Management Co., Inc., on behalf of itself and all of its subsidiaries and affiliates, and Aon Risk Services, Inc. of New Jersey, provided by AIG Risk Management, Inc., Construction Risk Management Group, on behalf of itself and its affiliates (collectively, the "OCIP Insurer"), effective from October 17, 2005 (the "OCIP Policy"). All premiums under the OCIP Policy have been paid in full, and there is approximately $3.3 million of collateral funded between the two covered properties to secure payments of deductibles and self-insured amounts on claims. The premiums and the collateral were funded by the Lenders under the Senior Loan, or were derived from funds belonging to third parties unrelated to the Dumont. There is the ongoing potential for claims to be assessed, for which deductibles and self-insured amounts must be paid, and the potential for the return of collateral, or refunds of premiums. The Debtors, Broadway Management Co., Inc. (a company owned and controlled by Joseph Neumann, which is the contract counterparty to the OCIP Policy), certain other affiliates of the Debtors, and the Senior Agent have entered into the OCIP Letter Agreement attached to the Plan, which provides that Broadway Management Co., Inc., if requested by the Senior Agent, will cooperate with the Senior Agent to seek the consent of the OCIP Insurer to split the OCIP Policy into separate policies covering the Property and the other property, respectively, or, if this is not feasible, to cause the transferees of the Property to be named as "named insureds" under the OCIP Policy as directed by the Senior Agent. The OCIP Letter Agreement also provides, in the event the OCIP Policy cannot be split into separate policies as aforesaid, for an allocation as between Broadway Management Co., Inc., on the one hand, and Senior Lenders or the transferee(s) of the Property, on the other, of (i) rights with respect to the existing shared collateral referred to above under the OCIP Policy, (ii) responsibility with respect to the payment of deductibles or self-insured amounts under the OCIP Policy and (iii) rights to refunds of residual collateral returned or refunds of premium on the OCIP Policy. These agreements are more fully set forth in the OCIP Letter Agreement. Notwithstanding the above, certain insurance settlement proceeds in the amount of $209,895.97 received by the Borrowers shall be applied as described in Section 2(b) above.

(d)    <u>Guaranty Claims</u>

(i) <u>Senior Debt Guaranties</u>: In connection with the Senior Loan Agreements, Mr. Neumann executed and delivered to the Senior Agent the Completion Guaranty, the Debtors and Mr. Neumann delivered the Recourse Liability Agreement and the Environmental Indemnity, and Mr. Weiss delivered the Weiss Recourse Guaranty (all such terms as defined in the Senior Settlement Agreement).

(ii) <u>Mezzanine Debt Guaranties:</u>  In connection with the Mezzanine Loan Agreements, Mr. Neumann executed and delivered to the Mezzanine Agent the Mezzanine Completion Guaranty, the Mezzanine Borrowers and Mr. Neumann delivered the Mezzanine Recourse Liability Agreement and the Mezzanine Environmental Indemnity, and Mr. Neumann and Mr. Weiss each delivered the Mezzanine Limited Payment Guaranty.  The Debtors delivered the Mezzanine Owner Guaranty (all such terms as defined in the Mezzanine Settlement Agreement).

The Mezzanine Lenders have commenced suit against Mr. Neumann and Mr. Weiss under the Mezzanine Limited Payment Guaranty, seeking $18 million plus interest, costs and fees, which suit is pending in New York State Supreme Court (Case No. 601070/09) (the "<u>Limited Guaranty Action</u>").  The parties have extended the defendants' time to answer and counterclaim with respect to the Limited Guaranty Action pending the outcome of settlement discussions and the filing of the Plan.  The Mezzanine Lenders believe the Limited Guaranty payment is due and owing, but the defendants believe there may be equitable and legal defenses and/or counterclaims that could be asserted in defense of such claims.  The parties agree that continued litigation of the Limited Guaranty Action could be costly, could disrupt a sale or transfer of the Property and that collection of any judgment entered is uncertain.

3.      **Liabilities**

(a)      <u>The Senior Loan</u>

The Debtors financed the purchase of the Property and construction of the improvements with the proceeds of the following loans:

That certain Consolidated, Amended and Restated Construction Loan Agreement dated as of December 15, 2006 (the "<u>Senior Loan Agreement</u>"), by and among the Debtors, as borrowers, PB Capital Corporation, a Delaware corporation, as a lender and as agent (the "<u>PB Capital</u>" or the "<u>Senior Agent</u>") for the other lenders party thereto (PB (USA) Realty Corporation, a New York Corporation ("<u>PB Realty</u>") and iStar Financial Inc. ("<u>iStar</u>"), a Maryland corporation (together with PB Capital in its capacity as a lender, the "<u>Senior Lenders</u>")).  Pursuant to the Senior Loan Agreement, the Senior Lenders made a loan to the Debtors in the principal amount of $190,000,000.00 (the "<u>Senior Loan</u>"), which is evidenced by (a) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $95,000,000, made by the Debtors to iStar, (b) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $70,000,000, made by the Debtors to PB Realty, and (c) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $25,000,000, made by the Debtors to PB Capital (collectively,  as amended, modified or supplemented from time to time, the "<u>Senior Note</u>"), and secured by that certain Consolidated, Amended and Restated Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents dated as of December 15, 2006, made by the Debtors in favor of the Senior Agent (the "<u>Senior Mortgage</u>," together with the Senior Loan Agreement and the Senior Note, the "<u>Senior Loan Documents</u>"), which Senior Mortgage encumbers the Property.

The outstanding principal balance of the Senior Loan is $190,000,000, plus accrued and unpaid interest totaling approximately $19,300,687.10 as of November 30, 2009. Interest has been accruing at the default rate provided in the Senior Loan Documents, and in addition the Lenders have asserted claims for fees and costs. In addition, the Senior Lenders have made additional protective advances toward completion and maintenance of the Property over and above the principal amount, totaling approximately $4,306,037.70 as of November 30, 2009, which amounts are added to the outstanding principal amount of the loan pursuant to Section 11.4 of the Senior Loan Agreement and other applicable provisions of the Senior Loan Documents. The Debtors defaulted on the Senior Loan on the maturity thereof, August 18, 2008. As a result, and as of November 30, 2009, the full balance of $213,606,724.80 is now due and owing.

(b)   <u>The Mezzanine Mortgage and Mezzanine Guaranty</u>

The purchase and improvement of the Property was further financed by the proceeds of that certain Mezzanine Construction Loan Agreement (the "<u>Mezzanine Loan Agreement</u>") dated as of December 15, 2006, by and between Broadway 401 Massachusetts Ave Mezzanine LLC, Broadway 425 Massachusetts Ave Mezzanine TIC LLC, and Broadway 425 Massachusetts Ave Mezzanine LLC (the "<u>Mezzanine Borrowers</u>"), iStar, as a lender and Mezzanine Agent, and the other lenders party thereto[2] (the "<u>Mezzanine Lenders</u>"), pursuant to which the Mezzanine Lenders made a loan to the Mezzanine Borrowers in the principal amount of $25,000,000 (the "<u>Mezzanine Loan</u>").

The Mezzanine Loan was guaranteed pursuant to that certain Guaranty by the Debtors in favor of the Mezzanine Agent dated as of December 15, 2006 (the "<u>Debtors' Mezzanine Guaranty</u>"). The Debtors' Mezzanine Guaranty was secured by, among other things, that certain Guaranty Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents made by the Debtors in favor of the Mezzanine Agent, dated as of December 15, 2006 (the "<u>Mezzanine Mortgage</u>" and, together with the Mezzanine Loan Agreement, the Debtors' Mezzanine Guaranty and the other "Loan Documents" (as defined in the Mezzanine Loan Agreement), each as amended, modified or supplemented from time to time, the "<u>Mezzanine Loan Documents</u>"), which encumbers the Property. Pursuant to an agreement with the Senior Lenders, the Mezzanine Mortgage was not filed as a matter of record with any government office.

The Mezzanine Loan has a principal balance, including deferred and capitalized interest of $29,064,130.50, plus accrued unpaid interest, costs and fees, totaling approximately $8,450,005.62 as of December 7, 2009. Parent entities of the Debtors are the borrowers under the Mezzanine Loan Agreement, but the Debtors received the proceeds of the loans in connection with the acquisition and construction of the Property, and thus are parties to the Mezzanine Mortgage and issued the Mezzanine Guaranty. The Mezzanine Borrowers defaulted on the Mezzanine Loan on August 18, 2008. As a result, the full amount of the Mezzanine Loan is now due and owing. The Debtors are also in default of payment on the Mezzanine Guaranty.

---

[2]   On information and belief, there are no other lenders party to the Mezzanine Loan Agreement.

As parties to the Mezzanine Mortgage, the Debtors are the subject of an unperfected secured claim held by the Mezzanine Lenders, and as issuers of the Debtors' Mezzanine Guaranty, the Debtors are subject to an unsecured claim also held by the Mezzanine Lenders. Because the Mezzanine Mortgage was not filed of record in the appropriate government office, and cannot be filed without the consent of the Senior Lenders, the Mezzanine Lenders' secured claim is subordinate to any secured and validly perfected claims asserted by other creditors against the Debtors, and is potentially subject to avoidance by a trustee in bankruptcy using its strong arm powers. For this reason, the Mezzanine Mortgage Claims and the Mezzanine Guaranty Claims are classified together as a single unsecured claim against the Debtors, and are treated in the same manner as the class of General Unsecured Claims. Although they are impaired and deemed to have rejected the Plan, the Mezzanine Lenders have agreed, in the context of the global settlements underlying the Plan, to support the Plan.

(c)     Other Secured or Priority Claims

The Debtors have, in the aggregate, a *de minimus* amount in miscellaneous secured or priority claims consisting of the current unpaid amounts of Community Improvement District and water and sewage charges, which will be paid in full. All such charges are expected to be paid when due by the Senior Lenders, the 401 Purchaser and/or the 425 Purchaser, as applicable.

(d)     General Unsecured Claims/Litigation Claims

The Debtors have, in the aggregate, approximately $71,820,777.95 in miscellaneous unsecured claims. Included in the Class of General Unsecured Claims is the Senior Lenders' Deficiency Claim in the stipulated amount of not less than $70,000,000, and certain ordinary course professional and trade claims totaling approximately $1,820,777.95. These amounts include approximately $800,000 in developer fees that the Debtors believe is owed to the Manager and approximately $500,000 the Debtors believe is owed to Broadway Management, a management company owned by Mr. Neumann which advanced costs for insurance premiums and losses on behalf of the Dumont. The Senior Lenders and Mezzanine Lenders dispute the entitlement of the Manager and Broadway Management to these amounts. The Manager has agreed to waive the management fees in consideration of the Senior Settlement Agreement, Mezzanine Settlement Agreement and the implementation of the Plan.

There is pending litigation against the Debtors and other entities, including principals of the Debtors and affiliated companies, and other third parties, brought by McWilliams Ballard, Inc. ("McWilliams"), which was formerly the sales agent for the sale of condominiums at the Property. Following the default on the Senior Loan, sales efforts were terminated, existing sale contracts were terminated and all deposits were returned. McWilliams is seeking damages in connection with the alleged breach of the marketing agreement it had with the Debtors. These claims are disputed by the Debtors, who believe there was no breach of the agreement. All claims that might be asserted by McWilliams in connection with the McWilliams Ballard Lawsuit are to be dismissed with prejudice as of the Effective Date of the Plan in consideration of the Senior Agent's execution of a new marketing agreement with McWilliams for the Property. In addition, in contemplation of that agreement, McWilliams agreed to release any claims it might have asserted against the transfer of the 401 Development Rights and the 425 Development Rights, thus freeing up additional value for the Senior Agent and the Debtors' estates.

General Unsecured Claims and Litigation Claims will receive no recovery from the Debtors under the Plan. They are impaired, and are deemed to have rejected the Plan.

(e)     Intercompany Claims

There are no intercompany claims outstanding.

(f) . Interests

The Mezzanine Borrowers own 100% of the Interests in the Debtors. The Mezzanine Borrowers will not receive a recovery or retain any property of the Estates under the terms of the Plan.

## B. EVENTS LEADING UP TO THE CHAPTER 11 FILING

The Debtors' ability to sell residential units, which was a fundamental underpinning of the business plan for the development of the Property, was severely impacted by the recent downturn in the domestic economy and the on-going crisis in the credit markets. The volume of residential sales has dropped significantly in the U.S., residential prices have declined, and credit standards have been tightened making it considerably more difficult for residential unit buyers to qualify for residential mortgages. Because sales volume is generally correlated to economic conditions, difficult economic conditions (such as the recent economic downturn) tend to result in decreased demand, thereby reducing overall sales volumes. The above-described downturn in the economy has significantly affected the market for new housing in D.C., leading to increased inventory levels and downward pressure on the prices that could be obtained for the units in the Dumont.

It is also exceedingly difficult in this market to refinance commercial loans, such as the Senior Loan and Mezzanine Loan, or to find investment equity for a restructuring, all options that were explored by the Debtors. The market for sales of properties like the Dumont has also been virtually frozen over the last year, as buyers suffer from the same credit conditions that hampered the implementation of the business plan for the Dumont. Since the defaults in the summer of 2008, the Debtors have not been able to sell or lease space in the Property, and thus are not collecting any revenues from operations.

The Debtors are highly-leveraged and require a significant amount of cash to service their indebtedness, as well as to pay the operating costs of the Property such as materials, labor, energy, fuel and other utilities, taxes, security and the like. The Senior Lenders have been funding the necessary costs over the last year through protective advances to complete construction and ready the units for occupancy, and to preserve the value of the Property while the parties considered their options. To date those protective advances total approximately $4,306,037.70.

By the winter of 2008, the Debtors, the Senior Lenders and the Mezzanine Lenders were unable to agree on a restructuring strategy for the Property. In January 2009, the Senior Lenders filed a public notice of a foreclosure sale with respect to the 401 Premises and the 425 Premises, and commenced a marketing effort through a broker to try to find a purchaser for the Property. The Senior Lenders agreed with the Debtors and the Mezzanine Lenders that they would hold off on completing the foreclosure while they endeavored to negotiate the terms of a potential sale. Discussions between the Borrower, the Senior Agent and the Mezzanine Agent regarding the disposition of the Property and the resolution of potential claims and disputes led to the Senior Settlement Agreement and Mezzanine Settlement Agreement. The Debtors and Guarantors agreed in principal during this process that they would cooperate with the Lenders' efforts to determine an appropriate disposition of the Property, and would not seek to impede that process, while reserving all their rights and defenses.

The Senior Lenders engaged Ideal Realty Group, Inc. (d/b/a Coldwell Banker Commercial Ideal Realty Group) ("Ideal") on January 6, 2009 to market the Property. Ideal created a marketing book and sent copies to 51 potential investors. In February 2009, in connection with such marketing efforts, the Senior Lenders commissioned appraisals of the 401 Premises and the 425 Premises (the "2009 Appraisals"). Copies of the 2009 Appraisals are attached hereto as Exhibit C. The 2009 Appraisals used market research and analysis of comparable properties in the District of Columbia to arrive at estimated valuations of approximately $63,000,000 (discounted condominium sellout) to $106,000,000 (completed rental project) for the 425 Premises and approximately $45,000,000 (discounted condominium sellout) to $51,000,000 (completed rental project) for the 401 Premises. The mid-point value of the Property under the Appraisals is approximately $140,000,000.

Various investors toured the building and submitted preliminary bids throughout the spring of 2009. These preliminary bids were to purchase both buildings for consideration ranging from approximately $90,000,000 to $133,000,000. Although numerous bids were submitted, few contained pricing and other terms that were acceptable to the Senior Lenders and the Mezzanine Lenders, and no bids were received that would pay the Senior Loans in full, much less generate value for the Mezzanine Loans.

It was then decided to approach the investors again by separating the project into two components – the 401 Premises and the 425 Premises. Based on this strategy, preliminary bids to purchase the 425 Premises alone ranged from approximately $92,000,000 to $100,000,000. In May 2009, the Senior Lenders decided to proceed with an offer that provided for a purchase price of $100,000,000, with financing provided by PB Capital for a large portion of the purchase price. The prospective purchaser expressed a strong preference for a sale of the 425 Property through a confirmed Plan under the Bankruptcy Code. The Debtors and the Senior Lenders proceeded to engage in lengthy negotiations with this prospective purchaser regarding the terms of a purchase agreement and a potential Plan under the Bankruptcy Code. These negotiations ultimately broke down. However, as of the Petition Date, discussions with other potential third party purchasers are in process.

In light of the foregoing, the Debtors and the Senior Lenders determined that proceeding with a Plan under the Bankruptcy Code that provides for conveyance of the 401 Premises and the 425 Premises to an affiliate of the Senior Lenders, or to a third-party purchaser designated by the Senior Agent, in satisfaction of the Debtors' Senior Loan Obligations represented the best possible resolution under the circumstances. If the Senior Lenders take title to the Property through such affiliate, they anticipate marketing the Property as individual condominium units.

## C.    THE SETTLEMENT AGREEMENTS

In December 2009, the Debtors finalized a global settlement with various parties in interest, including the Senior Settlement Agreement between the Debtors, the Guarantors and the Senior Agent and Senior Lenders, and the Mezzanine Settlement Agreement with the Mezzanine Agent and Mezzanine Lenders, the Debtors and the Guarantors. In general the global settlement resolves complicated issues and disputes existing among such parties and results in: the conveyance of the 425 Premises and the 401 Premises free and clear of all (non-assumed) liens, claims and encumbrances; the treatment of the Debtors' Senior Loan Obligations and Mezzanine Loan Obligations including the resolution of intercreditor matters between the Seniors Lenders and Mezzanine Lenders; the treatment of claims against the Debtors and the Mezzanine Borrowers; the resolution of the McWilliams Ballard Lawsuit; the resolution of disputes regarding the application of the purchase price received under the TDR Contracts; the resolution of rights and claims with respect to the OCIP Policy; and the resolution of the Guaranty Obligations and related litigation.

The Senior Settlement Agreement and Mezzanine Settlement Agreement contemplate the filing of this pre-packaged Plan, and set forth the timetable and actions which are conditions to the support of the Lenders for this Plan. The Senior Settlement Agreement is attached to the Plan as Exhibit A, and the Mezzanine Settlement Agreement is attached to the Plan as Exhibit D. Both contemplate the release of the Completion Guaranties, and the modification and partial release of the Recourse Agreements and the Environmental Indemnities. In addition, the Mezzanine Settlement Agreement settles the litigation brought by the Mezzanine Lenders over the Limited Payment Guaranty with the Guarantors, by virtue of the agreement of the Guarantors to fund an escrow that contains a $1.5 million cash contribution from Samuel Weiss, and the pledge by Joseph Neumann of partnership interests in properties located in Tallahassee, Florida and Atlanta, Georgia, to secure payment of a $2.0 million note. Upon the Effective Date, or, if earlier, September 30, 2010, these funds will be released to the Mezzanine Lenders, and the releases from the Senior Lenders and Mezzanine Lenders delivered to the Guarantors. In addition, if the transfer tax exemption is for some reason denied under the Plan, the Guarantors will still pay the consideration described above to the Mezzanine Lenders, and will have the option to fund the balance between those amounts and the actual amount of transfer tax paid by the Mezzanine Lenders, in which case the Limited Payment Guaranty releases will be delivered. If the Guarantors elect not to fund this differential, then the Mezzanine Lenders will retain their claims under the Limited Guaranty Action solely in the remaining unpaid amount of that differential, and the balance of the Limited Guaranty claims will be released.

Finally, McWilliams, the former sales agent for the Property, has reached an agreement with the Senior Lenders to act as sales agent for the Property after the Effective Date of the Plan. The Debtors have entered into a separate agreement with McWilliams, pursuant to which McWilliams has agreed to dismiss, with prejudice, the McWilliams Ballard lawsuit and waive all claims arising under or relating to its marketing agreement with the Debtors.

## III. ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### 1.     Voluntary Petitions

Upon successful completion of the solicitation of votes accepting the Plan, Broadway 401 LLC, Broadway Mass Associates LLC, and Broadway Mass TIC I LLC will each file a voluntary petition commencing their respective Chapter 11 Case.

### 2.     Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly. However, there can be no assurances that the Bankruptcy Court will enter the various orders on the timetable anticipated by the Debtors. On the Petition Date or shortly thereafter, the Debtors will request that the Bankruptcy Court schedule a combined hearing for a date no later than 45 days after the Petition Date to consider approval of the adequacy of this Disclosure Statement and confirmation of the Plan. If the Plan is confirmed, the Effective Date is projected to be 15 days after the date the Bankruptcy Court enters the Confirmation Order. The Debtors will seek a waiver of the requirement of a Section 341 meeting of creditors, and believe that given the lack of funds for general unsecured creditors, and the small amounts owed to non-insider general unsecured creditors, it is unlikely that an Official Committee of Unsecured Creditors will be formed.

### 3. First Day Relief

In order to facilitate the Chapter 11 Cases and the transactions contemplated by the Plan, the Debtors plan to present certain motions (the "First Day Motions") to the Bankruptcy Court on the Petition Date seeking the relief described below. The relief sought will facilitate the administration of the Chapter 11 Cases, however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.

(a)  Order Setting Hearing on Adequacy of Disclosure Statement, Solicitation Procedures and Plan Confirmation

To expedite the Chapter 11 Cases, the Debtors intend to seek an immediate order setting dates for a combined hearing to consider (i) approval of the adequacy of the Disclosure Statement and the procedures for the Solicitation and (ii) Confirmation of the Plan. The Debtors will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such Confirmation Hearing.

(b)  DIP Financing Order

The Debtors will seek approval of a debtor in possession financing facility (the "DIP Facility") authorizing the Debtors to draw on a facility to be provided by the Senior Lenders in an amount sufficient to fund operating and certain other required expenses through Confirmation, in accordance with the Budget attached to the motion to approve the DIP Facility. On the Petition Date, the Debtors will seek interim authority to access the DIP Facility in accordance with the Budget, and as soon as practicable thereafter, will seek final authority to access the balance of the DIP Facility. Among other things, the DIP Facility provides for the payment of certain insurance and tax obligations as set forth in the Budget. The Debtors believe that the borrowings available to them under the DIP Facility will be sufficient to meet the Debtors' needs during the Chapter 11 Cases.

(c)  Joint Administration

The Debtors will ask the Bankruptcy Court to jointly administer and consolidate the Chapter 11 Cases for procedural purposes.

(d)  Use of Existing Cash Management System

The Debtors will seek authority to maintain their prepetition cash management systems after commencement of the Chapter 11 Cases, including the continued use of bank accounts. This facilitates the efficient operation of the Debtors by not requiring them to incur the burden of making technical adjustments to their existing cash management system.

(e)  Utilities

The Debtors will seek entry of an order approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Debtors are not required to provide any additional adequate assurance pending entry of a final order. The Debtors believe that uninterrupted utility services are essential to preserve the integrity of the Property during the pendency of the Chapter 11 Cases, and to prevent damage to the buildings.

The Debtors will seek authority on the Petition Date to retain the various professionals who will be advising the Debtors during the Chapter 11 Cases.

## IV.  SUMMARY OF THE PLAN

> **THIS SECTION IV IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DESCRIPTION OF THE PLAN.  TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL GOVERN.**

### A.     OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code and promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from some or all affected creditors before filing for bankruptcy.  Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

Consummating a plan is the principal objective of a chapter 11 case.  The bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan provides for the treatment of the debtors' creditors and interest holders in accordance with the terms of the confirmed plan.

### B.     PURPOSE OF THE PLAN

The Plan is part of a global resolution of claims in and against the Property, the Debtors, and the Guarantors, including, most significantly, claims belonging to the Senior Lenders and the Mezzanine Lenders.  All other secured and priority liabilities are being funded as part of the transactions contemplated by this Plan.  Further, the Plan offers a vehicle to consummate the sale and transfer of the Property under Sections 363, 1123 and 1129 of the Bankruptcy Code to the 401 Purchaser and the 425 Purchaser. Given the Debtors' current debt obligations and lack of liquidity, the Debtors have had to rely for some time on protective advances from the Senior Lenders under the Senior Loan Agreement to meet their daily operating needs and remain unable to satisfy their obligations as they come due.

### 1. Financial Transactions Under the Plan

The transactions proposed under the Plan, if consummated in accordance with Article IX of the Plan and on the terms set forth in the respective exhibits thereto, will:

- pay all allowed Administrative Claims, Priority Tax Claims, Other Secured Claims and Priority Claims in full;

- facilitate the sale or other disposition of the assets of the Debtors;

- resolve potentially significant disputes between the Debtors, the Lenders, the Guarantors and other third parties; and

- provide for certain releases, and in certain instances the continuation of certain obligations, of the Guarantors, the Debtor Releasees and the Third Party Releasees.

### C. EFFECT OF THE PLAN

The Plan's primary purpose is to make the most of the Debtors' finite assets to maximize creditor recoveries. The transactions outlined above will convey clean title to the Property in exchange for, as applicable, either cancellation of debt, Cash consideration or the assumption of mortgage debt and other liabilities by a third-party purchaser and by paying all Allowed Administrative Claims, Priority Claims, Other Secured Claims, and Priority Tax Claims in full. The Debtors strongly believe that the Plan presents the best possibility for creditor recoveries under these facts.

In addition, the Plan settles disputes between the Lenders and with third parties, reflects the cooperation of the Debtors' principals and the Mezzanine Borrowers, and facilitates the payment of most creditor obligations, the expeditious transfer of the Property to new owners, and the release of the Guarantors from potentially crushing obligations.

Pursuant to Bankruptcy Code Sections 1141(c) and 1141(d)(3), confirmation will not discharge Claims against the Debtor; provided, however, that no holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against, the Debtors, the 425 Purchaser, the 401 Purchaser, the Senior Agent, the Senior Lenders, the Mezzanine Agent, the Mezzanine Lenders and/or their successors, assigns and/or property, including, without limitation, the Property, except as expressly provided in the Plan. The Debtors may, on request, obtain releases from the Senior Lenders and the Mezzanine Lenders of their claims against the Debtors, as necessary or appropriate in order to dissolve the Debtor entities under state law.

> **ACCORDINGLY, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLASS 1 SENIOR LENDER CLAIMS VOTE TO ACCEPT THE PLAN.**

### D. TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The following is a summary of the treatment of DIP Facility Claims, Administrative Claims and Priority Tax Claims under the Plan. For a more detailed description of the treatment of such Claims under the Plan, please see Article III of the Plan.

1. **DIP Facility Claims**

Except to the extent each DIP Lender agrees otherwise, its respective Allowed DIP Facility Claim shall be paid in full in Cash on the Effective Date in full and final satisfaction, settlement, release and discharge of, and in exchange for, such DIP Facility Claim.

2. **Administrative Claims**

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid such Allowed Administrative Claim in accordance with the terms of the applicable contract or agreement governing such Claim, if any. Except to the extent a Holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Administrative Claim and the Debtors agree otherwise, all other Holders of Allowed Administrative Claims will be paid, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, in full in Cash on or as soon as reasonably practicable after the Effective Date.

3. **Priority Tax Claims**

Except to the extent a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Priority Tax Claim and the Debtors agree otherwise, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors, each Holder of an Allowed Priority Tax Claim, if any, shall receive on account of such Allowed Priority Tax Claim: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the Effective Date; or (2) Cash equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code (or such lesser rate as is agreed to by the Holder of such Holder of an Allowed Priority Tax Claim), payable over a period ending no later than five (5) years from the Petition Date; provided, however, that the Debtors reserve the right to prepay at any time under the latter option. All Allowed Priority Tax Claims that are not due and payable on or prior to the Effective Date shall be paid in the ordinary course of business by the transferees of the Property as such obligations become due.

4. **General Unsecured Claims/Litigation Claims**

Holders of General Unsecured Claims will not receive any distributions under the Plan.

5. **Withholding and Reporting Requirements**

In accordance with Bankruptcy Code Section 346 and in connection with the Plan and all distributions hereunder, the Debtors shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local or foreign taxing authority. The Debtors shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All distributions hereunder shall be subject to applicable legal withholding and reporting requirements. As a condition of making any distribution under the Plan, the Debtor may require the holder of an Allowed Claim to provide such holder's taxpayer identification number, and such other information, certification or forms as necessary to comply with applicable tax reporting and withholding laws. Notwithstanding any other provision of the Plan, each entity receiving distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such distribution.

## E.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims and Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claims/Interests | Projected Recovery Under the Plan |
| 1 | Senior Lender Claims<br><br>Approximately $213,606,724.80 consisting of principal, accrued pre-petition interest, protective advances, costs and fees. | (a)  *Classification*: Class 1 consists of all Senior Lender Claims.<br><br>(b)  *Treatment*:<br><br>(A)  *Allowance*. The Senior Lender Claims are hereby deemed Allowed in the principal amount of not less than $190,000,000.00, plus: (i) accrued and unpaid interest at the applicable default rate set forth in the Senior Loan Document for the period from the Maturity Date through and including the Petition Date; (ii) protective advances made pursuant to the Senior Loan Agreement prior to the Petition Date; and (iii) reasonable and documented out-of-pocket fees and actual expenses payable from the Maturity Date through and including the Petition Date, subject to the terms and conditions of the Senior Loan Documents.<br><br>(B)  *Treatment*. On the Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for, all Allowed Senior Lender Claims:<br><br>(1)  the 401 Premises shall be conveyed to the 401 Purchaser free and clear of all liens, claims, encumbrances or interests (other than permitted liens or encumbrances, if any, specified by Senior Agent);<br><br>(2)  the 425 Premises shall be conveyed to the 425 Purchaser free and clear of all liens, claims, encumbrances or interests (other than permitted liens or encumbrances, if any, specified by Senior Agent); | 50.5% - 73.5 % (est.) |

| Class | Claim/ Interest | Treatment of Claims/Interests | Projected Recovery Under the Plan |
|-------|-----------------|-------------------------------|-----------------------------------|
|       |                 | (3)     in the event that the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract are terminated prior to the Effective Date or rejected by the Debtors on the Effective Date, the 401 Development Rights and/or the 425 Development Rights, as applicable, shall be conveyed free and clear of all liens, claims, encumbrances or interests (other than permitted liens or encumbrances, if any, specified by Senior Agent) to, at the Senior Lenders' election and in their sole discretion, either the 401 Purchaser, the 425 Purchaser or a third party purchaser (provided the purchase price is acceptable to the Senior Agent in its sole discretion); | |
|       |                 | (4)     in the event that the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract remain in effect on the Effective Date (i.e., have not been terminated prior to the Effective Date or rejected in connection with this Plan), but have not been consummated, the Debtors shall assume and assign the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract, as applicable, to, at the Senior Lenders' election and in their sole discretion, either the 401 Purchaser, the 425 Purchaser or a third party purchaser (provided the purchase price is acceptable to the Senior Agent in its sole discretion); | |
|       |                 | (5)     the Development Rights Escrow Agent shall disburse, as applicable (if the same has not previously been distributed by the Development Rights Escrow Agent in accordance with the Senior Settlement Agreement): (1) the net proceeds from the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract, if such sales are consummated, or (2) if such contracts are terminated, any deposits to which the Debtors become entitled pursuant to the terms of the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract, to the Disbursing Agent, for application in accordance with the Senior Settlement Agreement; | |
|       |                 | (6)     in the event purchase money financing is provided by one or more lender(s) to the 401 Purchaser and/or the 425 Purchaser, the Senior Note and Senior Mortgage shall be modified, inter alia, to reflect the 401 Purchaser and/or the 425 Purchaser, as applicable, as the successor obligor thereunder and the amount and terms of such purchase money financing | |

| Class | Claim/ Interest | Treatment of Claims/Interests | Projected Recovery Under the Plan |
|-------|-----------------|-------------------------------|-----------------------------------|
| | | and the 401 Purchaser and/or the 425 Purchaser shall assume the Senior Note and Senior Mortgage as modified; | |
| | | (7) the proceeds or the rights to proceeds, as applicable, of any insurance policies maintained in connection with the 401 Premises in connection with a casualty thereto shall be disbursed or assigned to the 401 Purchaser; | |
| | | (8) the proceeds or the rights to proceeds, as applicable, of any insurance policies maintained in connection with the 425 Premises in connection with a casualty thereto shall be disbursed or assigned to the 425 Purchaser; | |
| | | (9) the Debtors shall, in accordance with the terms of the OCIP Letter Agreement attached hereto as Exhibit B, cooperate with Senior Agent to effect a division of the OCIP Policy into separate policies covering the Property and the other property or, if this is not feasible, cause the OCIP Policy to be endorsed to name the Senior Agent or its designee as a "named insured"; provided that the proceeds of certain refunds of premiums and/or collateral deposited in connection with the OCIP Policy shall be disposed of pursuant to the terms of the OCIP Letter Agreement; | |
| | | (10) any refunds of real estate taxes paid with respect to the 401 Premises shall be disbursed to the 401 Purchaser; | |
| | | (11) any refunds of real estate taxes paid with respect to the 425 Premises shall be disbursed to the 425 Purchaser; | |
| | | (12) the Senior Agent, on behalf of the Senior Lenders, shall receive an Allowed Unsecured Deficiency Claim classified in Class 5 and hereby deemed Allowed in the amount of not less than $70,000,000; and | |
| | | (13) any Cash, including Cash Collateral, remaining in the Debtors' Cash balances after payment of Allowed Administrative Claims, DIP Facility Claims, and Priority Tax Claims pursuant to this Plan shall be disbursed to the Senior Lenders. | |
| | | (c) Upon the occurrence of the Effective Date, the Guaranties shall | |

| | | **SUMMARY OF EXPECTED RECOVERIES** | |
|---|---|---|---|
| **Class** | **Claim/ Interest** | **Treatment of Claims/Interests** | **Projected Recovery Under the Plan** |
| | | be released, extinguished and discharged, subject however to the Retained Liabilities, pursuant to the terms of Sections 8 and 9 of the Senior Settlement Agreement and Section 9 and 10 of the Mezzanine Settlement Agreement.<br><br>(d)    *Voting*: Class 1 is an Impaired Class. Each Holder of a Senior Lender Claim is entitled to vote on this Plan. | |
| 2 | Other Secured Claims<br><br>*De minimus* amount | (a)    *Classification*: Class 2 consists of all Other Secured Claims.<br><br>(b)    *Treatment*: The legal, equitable and contractual rights of the Holders of Other Secured Claims will not be altered by this Plan. Except to the extent a Holder of an Other Secured Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Secured Claim and the Debtors agree otherwise, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Confirmation Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent applicable) shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Secured Claim, in the sole discretion of the Debtors, one of the following alternative treatments:<br><br>    ●    Reinstatement of such Allowed Other Secured Claim;<br><br>    ●    payment of such Allowed Other Secured Claim either (i) in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Other Secured Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such Other Secured Claim;<br><br>    ●    delivery of the collateral securing such Allowed Other Secured Claim; or<br><br>    ●    such other treatment so as to render the Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.<br><br>(c)    *Voting*: Class 2 is an Unimpaired Class. Each Holder of an Other Secured Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan. | 100% |
| 3 | Other Priority Claims | (a)    *Classification*: Class 3 consists of all Other Priority Claims.<br><br>(b)    *Treatment*: The legal, equitable and contractual rights of the | 100% |

| Class | Claim/ Interest | Treatment of Claims/Interests | Projected Recovery Under the Plan |
|---|---|---|---|
| | *De minimus* amount | Holders of Other Priority Claims will not be altered by this Plan. Except to the extent a Holder of an Other Priority Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Priority Claim and the Debtors agree otherwise, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Priority Claim, one of the following alternative treatments:<br>• to the extent an Other Priority Claim is Allowed on or prior to the Effective Date, such Claim shall be paid in full in Cash on or as soon as reasonably practicable after the Effective Date;<br>• to the extent an Other Priority Claim is Allowed after the Effective Date, such Claim shall be paid thereafter either (i) in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Other Priority Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such an Other Priority Claim; or<br>• such other treatment so as to render the Allowed Other Priority Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.<br><br>(c)    *Voting*: Class 3 is an Unimpaired Class. Each Holder of an Other Priority Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan. | |
| 4 | Mezzanine Lender Claims<br><br>Approximately $37,514,136.12 in aggregate | (a)    *Classification*: Class 4 consists of all Mezzanine Lender Claims.<br><br>(b)    *Treatment*: No property of the Estates will be distributed to or retained by Holders of Class 4 Claims.<br><br>(c)    *Voting*: Class 4 is an Impaired Class. Each Holder of a Class 4 Claim is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan. | 0% |
| 5 | General Unsecured Claims<br><br>Approximately $71,820,777.95 | (a)    *Classification*: Class 5 consists of all General Unsecured Claims, including the Unsecured Deficiency Claim.<br><br>(b)    *Treatment*: No property of the Estates will be distributed to or retained by Holders of Class 5 Claims.<br><br>(c)    *Voting*: Class 5 is an Impaired Class. Each Holder of a Class 5 Claim is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan. | 0% |
| 6 | Intercompany | (a)    *Classification*: Class 6 consists of all Intercompany Claims. | 0% |

| Class | Claim/ Interest | Treatment of Claims/Interests | Projected Recovery Under the Plan |
|-------|-----------------|-------------------------------|-----------------------------------|
| | Claims $0 | (b) *Treatment*: No property of the Estates will be distributed to or retained by Holders of Class 6 Claims.<br><br>(c) *Voting*: Class 6 is an Impaired Class. Each Holder of a Class 6 Claim is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan. | |
| 7 | Interests | (a) *Classification*: Class 7 consists of all Interests.<br><br>(b) *Treatment*: No property of the Estates will be distributed or retained by Holders of Class 7 Interests and such Interests shall be deemed cancelled and extinguished on the Effective Date.<br><br>(c) *Voting*: Class 7 is an Impaired Class. Each Holder of a Class 7 Interest is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan. | 0% |

The table title at top reads: **SUMMARY OF EXPECTED RECOVERIES**

# V. SOLICITATION PROCEDURES

> THIS DISCUSSION OF THE SOLICITATION PROCESS IS ONLY A SUMMARY. HOLDERS OF CLASS 1 SENIOR LENDER CLAIMS ARE ENCOURAGED TO REVIEW THE RELEVANT PROVISIONS OF THE BANKRUPTCY CODE AND/OR CONSULT THEIR OWN ATTORNEY PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

## A.  HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN

Under the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class) under the Plan:

| SUMMARY OF STATUS AND VOTING RIGHTS | | | |
|---|---|---|---|
| Class | Claim/Interest | Status | Voting Rights |
| 1 | Senior Lender Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Not Entitled To Vote – Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Not Entitled To Vote – Deemed to Accept |
| 4 | Mezzanine Lender Claims | Impaired | Not Entitled to Vote - Deemed to Reject |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote - Deemed to Reject |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote - Deemed to Reject |
| 7 | Interests | Impaired | Not Entitled to Vote - Deemed to Reject |

Based on the foregoing, only holders of Class 1 Claims will be solicited with respect to voting on the Plan.

### 1.  Contents of the Solicitation Package

The following documents and materials will collectively constitute the Solicitation Package:

- the Disclosure Statement (and exhibits annexed thereto, including the Plan); and

- a Ballot, voting instructions, and a pre-addressed, postage prepaid return envelope.

## B.  VOTING PROCEDURES AND INSTRUCTIONS

> THIS DISCUSSION IS ONLY A SUMMARY. PLEASE REFER TO THE "VOTING INSTRUCTIONS" ACCOMPANYING EACH BALLOT FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR VOTE IS COUNTED.

1.     **The Voting Deadline**

In order to be counted, <u>all</u> Ballots must be properly executed, completed and delivered to the Debtors (the "<u>Voting Deadline</u>") by **5:00 p.m. prevailing Eastern Time on January 8, 2010**, unless the Debtors, in consultation with the Senior Lenders, extend the date by which Ballots must be received. Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

> **UNLESS THE DEBTORS DETERMINE OTHERWISE, YOUR VOTE WILL NOT BE COUNTED UNLESS A PROPERLY EXECUTED, COMPLETED AND DELIVERED BALLOT IS <u>ACTUALLY</u> <u>RECEIVED</u> BY THE DEBTORS ON OR BEFORE THE VOTING DEADLINE.**

**2. Voting Instructions**

Under the Plan, Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan. Those Holders may so vote by completing a Ballot and returning it to the Debtors prior to the Voting Deadline. To be counted as votes to accept or reject the Plan, <u>all</u> Ballots (which will clearly indicate the appropriate return address) must be properly executed, completed and delivered by using the return envelope provided by (a) first class mail, (b) overnight courier or (c) personal delivery, so that they are **<u>actually</u> <u>received</u>** on or before the Voting Deadline by the Debtors at the following address:

Broadway 401 LLC, <u>et al.</u>
c/o Lovells LLP
590 Madison Avenue
New York NY 10022
Attn: Robin E. Keller, Esq.

**2.     Voting Tabulation**

Only Holders of Claims in the Voting Class shall be entitled to vote. The following procedures will be used for tabulating votes to accept or reject the Plan:

a.      <u>Votes Not Counted</u>. The following Ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

    i.      any Ballot that is received after the Voting Deadline and for which the Voting Deadline was not extended;

    ii.      any Ballot that is illegible or contains insufficient information to permit the identification of the voting creditor;

    iii.      any Ballot cast by an entity that does not hold a Claim classified in one of the Voting Class;

    iv.      any Ballot sent to anyone other than the Debtors' counsel at the address given above;

    v.      any Ballot transmitted by facsimile or other electronic means;

    vi.      any unsigned Ballot; or

vii.    any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

THE METHOD OF DELIVERY OF THE BALLOTS TO BE SENT TO THE DEBTORS IS AT THE ELECTION AND RISK OF EACH VOTING HOLDER.

b.    Rejected Ballots.  Except as provided herein and subject to any contrary order of the Court, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors shall reject such Ballot as invalid and, therefore, decline to count it in connection with Confirmation and, furthermore, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules (which rejections shall be documented in the Voting Report).

c.    Multiple Ballots.  If multiple Ballots are received from the same voting party with respect to the same Claim prior to the Voting Deadline, the last Ballot timely received shall count (*i.e.*, the last Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot); *provided, however* that in instances where ambiguity exists in respect of which Ballot was last mailed, the Debtors have the right to contact the respective claimant to determine such Claimant's intent and calculate the vote according thereto.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM CERTIFIES TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

d.    Withdrawal.  No Ballot may be withdrawn at any time without the prior consent of the Debtors, in the Debtors' sole discretion, or upon later Court order.

e.    No Vote-Splitting.  Holders must vote all of their Claims within Class 1 either to accept or reject the Plan and may not split any such votes.  Accordingly, any Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, if a Holder has multiple Claims within Class 1, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within Class 1 for the purpose of counting votes.

f.    Defective Ballots.  The Debtors, subject to contrary order of the Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline, provided, however, that:

i.    any such waivers will be documented in the Voting Report;

ii.    neither the Debtors, nor any other Entity, will be under any duty to provide notification of such defects or irregularities other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification; and

iii.    unless waived by the Debtors, subject to contrary order of the Court, any defects or irregularities associated with the delivery of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

g.  Lack of Good Faith Designation.  In the event a designation for lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected by such Claim.

3.  **The Voting Report**

The Debtors will File with the Bankruptcy Court, on the Petition Date or as soon as practicable thereafter, the Voting Report.  The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or e-mail or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

4.  **Modifications to the Plan**

The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).  The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the changes are material or the Debtors waive a material condition to Confirmation.  In that event, the solicitation will be extended as directed by the Bankruptcy Court.

5.  **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement no fewer than seven (7) days prior to the Confirmation Hearing.  The Plan Supplement will include, without limitation, the following information:

- the documents, agreements and/or other instruments to be executed and delivered in connection with the Settlement Agreements, the Purchase and Sale Agreement, and all other agreements and settlements required to be implemented to consummate the Plan;

- a schedule of Executory Contracts and Unexpired Leases to be rejected under the Plan; and

- a schedule of the Executory Contracts and Unexpired Leases to be assumed under the Plan.


## VI.  CONFIRMATION OF THE PLAN

### A.  THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider the approval of the prepetition procedures for the Solicitation, including this Disclosure Statement and confirmation of the Plan (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  On or about the Petition Date, the Debtors will seek entry of an order of the Bankruptcy Court scheduling the Confirmation Hearing.