Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court. **The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.**

## B.    EFFECT OF CONFIRMATION OF THE PLAN

Article X of the Plan contains certain provisions relating to, among other things: (a) the compromise and settlement of Claims; (b) the release of the Debtors and related parties and certain other third parties; (c) the exculpation of certain parties; and (d) the enjoining of Claims and Causes of Action. **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.**

> THE PLAN PROPOSES TO BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER: (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN; (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES; OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all such requirements; (2) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith.

Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last day of the calendar month following the calendar quarter for which the fee is owed in each of the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

1.      **Best Interests of Creditors Test/Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code, the so-called "best interests" test, requires that a bankruptcy court find, as a condition to confirmation, that a plan provides, with respect to each class, that each holder of a claim or interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the bankruptcy court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

Accordingly, in theory, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation. Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtors' business and the use of chapter 7 for purposes of a liquidation.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Debtors (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Plan. It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Debtors' assets, the rule of absolute priority of distribution would apply (*i.e.*, no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full).

However, the Debtors' Senior Lenders assert perfected first-priority liens in all of the Debtors' assets, including, without limitation, the Property, the 401 Development Rights, the 425 Development Rights, and insurance policies and proceeds. The Senior Lender Claims far exceed the current and foreseeable market values of the Debtors' assets. In a forced liquidation scenario, the Senior Lenders would recover an even smaller portion of the amounts outstanding under the Senior Loan Documents than that provided for in the Plan, as a result of the unavailability of the transfer tax exemption, and the failure to achieve settlements with the Mezzanine Lenders, and the Debtors' principals, which are abrogated in the event of a Chapter 7 filing. Payments to secured and priority creditors are being provided by the DIP Facility, which would not be available in a Chapter 7. The settlement with McWilliams avoids interference with the transfer of title to the property and the sale of the 401 Development Rights and 425 Development Rights, which might diminish their value to the Debtors' estates. General Unsecured Claim holders and Interest holders receive no distribution, in either case.

In a chapter 7 liquidation, a chapter 7 trustee may investigate and seek to pursue so-called avoidance actions under chapter 5 of the Bankruptcy Code, which, if successful, could augment creditor recoveries. However, in this case, the Debtors believe no such claims are available. The Debtors have no independent sources of income or cash, and have been relying on protective advances from the Senior Lenders to pay operating expenses for over a year. The Debtors believe, based on their review of payables data over the past twelve (12) months, that there are no claims of any value that might be asserted under chapter 5 of the Bankruptcy Code, and thus there is no justification to incur the costs of litigating such claims. Further, the Debtors' examination of the validity and priority of the liens of the Senior Lenders indicates it is unlikely that any value would be available for general unsecured creditors as a result of challenges to such liens.

Because the Bankruptcy Code requires that impaired creditors either accept the plan or receive at least as much under the plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Debtors' Plan is whether, after accounting for recoveries by Holders of unclassified or Unimpaired Claims or Interests, Holders of Impaired Claims and Interests will receive more or less under the Plan than would be received in a chapter 7 liquidation. If the probable distribution to Holders of Impaired Claims and Interests under a hypothetical chapter 7 liquidation is greater than the distributions to be received by such parties under the Plan, then the Plan is not in the best interests of Holders of Impaired Claims and Interests.

As shown in the Liquidation Analysis attached hereto as <u>Exhibit D</u>, the Debtors believe that confirmation of the Plan will provide Holders of Secured and Priority Claims with a greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code and holders of General Unsecured Claims and Interests with not less than they would receive in a Chapter 7. In Chapter 7, there is no assurance that the Senior Lenders would make any funds available for priority creditors and administrative costs. In addition, the fees and expenses of a chapter 7 trustee and his/her professionals would augment the total administrative costs. Distributions under a chapter 7 case may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions, as the chapter 7 trustee and its advisors would need to become knowledgeable about the Debtors and their obligations. Accordingly, the Debtors believe that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

2. **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by further financial reorganization or liquidation, beyond such reorganization or liquidation proposed by the Plan. Because the Plan provides for the sale or conveyance of substantially all of the Debtors' assets and provides a mechanism for the Debtors to dissolve following the Effective Date, the Debtors believe that the Plan meets the feasibility requirement in section 1129(a)(11) of the Bankruptcy Code The transactions and transfers contemplated by the Plan are normal business transactions that are likely to occur, certain administrative costs for the Debtors' professionals are voluntarily funded by the Mezzanine Lender, and Confirmation is not likely to be followed by any additional liquidation or reorganization. The Plan shall primarily be funded from the proceeds of the DIP Credit Facility and, if applicable, any Cash proceeds from other collateral.

3. **Acceptance by Impaired Classes**

The Bankruptcy Code requires that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Holders of Claims in Class 1 are Impaired under the Plan, and as a result, are entitled to vote to accept or reject the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Class must accept the Plan for the Plan to be Confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein. Class 1 will have accepted the Plan if the Plan is accepted by at least: (a) two-thirds in amount; and (b) a majority in number of the holders of claims in such class (other than claims designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the Plan.

Holders of Claims in Classes 2 and 3 are Unimpaired under the Plan and, as a result, are conclusively deemed to have accepted the Plan.

Holders of Claims in Classes 4, 5, 6, and 7 will not receive any recovery or retain any property under the Plan and, as a result, are conclusively deemed to have rejected the Plan. However, the Debtors believe that the sole member of Class 4, the holder of the Mezzanine Lender Claims, is supportive of the Plan as evidenced by the Mezzanine Settlement Agreement. Further, the holders of Interests have agreed not to oppose confirmation of the Plan.

## 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

## 5. No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. In this instance, no general unsecured creditor receives a different treatment than any other, as no property of the Debtors' estates will be distributed to holders of Claims in Classes 4, 5 or 6.

## 6. Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or interests in such class:

- Secured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens. If Class 1 votes to accept the Plan, there will be no dissenting secured class. In no event will holders of Claims in Class 1 receive more than 100% of the Allowed amounts of their claims, given the distressed valuations of the Property.

- Unsecured Claims. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property. Under the Plan, no claim or equity interest junior to the general unsecured creditors will receive any distribution.

- Interests. The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either:

o        the plan provides that each holder of an interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

o        if the class does not receive the amount required in the paragraph directly above, no class of interests junior to the non-accepting class may receive a distribution under the plan. In this case, there is no junior class of interests that is receiving any value.

If and to the extent that Class 1 votes to reject the Plan, the Debtors will not file the Plan unless required to do so by the Senior Agent. The Debtors do not believe that the Plan discriminates unfairly against any Impaired Class and that the Plan and its proposed treatment of all Classes of Claims and Interests satisfy the foregoing requirements for Confirmation.

## VII. <u>CONSUMMATION OF THE PLAN</u>

It will be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan. Following Confirmation, the Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

## VIII. <u>PLAN-RELATED RISK FACTORS</u>

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLASS 1 CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A. CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1. Parties in Interest May Object to the Debtors' Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class, and which reflect the statutory order of priorities under the Bankruptcy Code and applicable law. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Debtors May Fail to Satisfy the Vote Requirement.

The Debtors must obtain acceptance of the Plan by holders of Class 1 claims in order to be able to proceed with the Plan. If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors will not file the Plan unless required to do so by the Senior Agent. If there is an unfavorable vote on the Plan, it is likely that the underlying Settlement Agreements will unwind or change, and it is not clear that the Plan will be confirmable in that event.

### 3. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Even if the requisite acceptances from Class 1 are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge, for example, either the adequacy of this Disclosure Statement, or whether the Plan meets the requirements for Confirmation. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

Confirmation is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive, but it is unlikely those distributions would exceed what is contemplated to be available under the Plan if it is confirmed and becomes effective.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the Plan as necessary for purposes of Confirmation. The impact of such modifications might not be favorable to parties affected by the Plan. Any such modification might require a re-solicitation of votes and there is no assurance that any such revised Plan would be accepted by any impaired Class of Creditors.

### 4. Non-consensual Confirmation of the Plan.

The Debtors believe that the Plan satisfies the requirements for non-consensual Confirmation of the Plan set forth in section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 5. The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the anticipated distributions under the Plan.

### 6. Risk of Delay or Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after Confirmation, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur. If the Effective Date fails to occur, the Senior Lenders may move to lift the automatic stay to allow foreclosure on the Property to proceed, which process may eliminate the funds available for the payment of administrative, secured and priority claims, and the other settlements that generate value for parties such as insurance counterparties, McWilliams, and the Mezzanine Lenders.

**B. RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN**

      **1. The Valuation of the Debtors May Not Be Adopted by the Bankruptcy Court.**

As described above in Section II.B and in <u>Exhibit C</u> hereto, the 2009 Appraisals place the value of: (i) the 425 Premises at between approximately $63,000,000 and $106,000,000; and (ii) the 401 Premises at between approximately $45,000,000 and $51,000,000, depending upon completion and intended use of each. Taken together, the 2009 Appraisals demonstrate an approximate midpoint fair market value of $140,000,000 for the Property. Parties in interest in these Chapter 11 Cases may oppose Confirmation by alleging that the fair market value of the Property is higher than $140,000,000 and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court will be presented with evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Property. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for purposes of the Plan. The Debtors believe that there is no reasonable valuation of the Property that would result in a distribution to classes junior to the Senior Lenders.

The Debtors and the Senior Lenders reserve the right to show that the Appraisals may overstate the fair market value of the Property, based on the actual experience of the Senior Lenders in their recent marketing and sales efforts, and thus that the value allocable to the Property upon transfer to the designee(s) of the Senior Lenders is significantly lower than the midpoint of the Appraisal values.

      **2. The Sale of the Property to a Third Party May Not Be Consummated**

It is possible that the Property will not be sold for Cash to a third-party purchaser. In such event, the Debtors will not receive Cash in exchange for the Property and may instead simply convey the Property, free and clear of all liens, claims, encumbrances or interests (other than permitted liens or encumbrances, if any, specified by Senior Agent), to the Senior Agent or an Entity designated by the Senior Agent, which may be an Affiliate of the Senior Lenders, in satisfaction of the Debtors' Senior Loan Obligations.

      **3. The Transfer Free and Clear of Transfer Taxes May Not Be Approved.**

The Debtors believe that transfer of title to the Property under this Plan free and clear of transfer taxes pursuant to Section 1146 of the Bankruptcy Code is proper and in accordance with applicable law. *See Fla. Dept. of Revenue v. Piccadilly Cafeterias*, 128 S.Ct. 2326 (2008) (tax exemption provided under Section 1146(a) of the Bankruptcy Code applies to post-confirmation asset transfers made pursuant to a confirmed plan of reorganization); *In re New 118th, Inc.*, 398 B.R. 791 (Bankr. S.D.N.Y. 2009) (transfer of property that was necessary to the consummation of the plan was made "under a plan confirmed" and exempt from the payment of stamp or similar taxes under Bankruptcy Code Section 1146(a)). In the event the Court determines by Final Order that is not the case, the Plan can still be consummated, but the payment of transfer tax obligations may diminish recoveries by holders of Class 1 Claims under the Plan. In such event, the Mezzanine Agent shall pay the tax liability and the Guarantors shall become liable to the Mezzanine Agent for such amount under the Mezzanine Settlement Agreement.

## C. RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

### 1. The Financial Information Contained Herein Is Based on the Debtors' Books and Records and No Audit Was Performed.

The financial information contained in this Disclosure Statement has not been and will not be audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### 2. Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.

This Disclosure Statement contains various forward looking statements, including projections of the value of the Property, which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future value of the Property may turn out to be different from the financial projections. Therefore, the estimates contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the value that may be recovered by Creditors entitled to receive distributions under the Plan. While the Debtors believe that these estimates are reasonable, there can be no assurance that they will be realized.

## D. DISCLOSURE STATEMENT DISCLAIMER

### 1. The Information Contained Herein Is for Soliciting Votes Only.

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purpose.

### 2. This Disclosure Statement Contains Forward Looking Statements.

This Disclosure Statement contains "forward looking statements." Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 3. Certain Federal Income Tax Consequences

The tax consequences under the Plan to Holders of Claims or Interests may vary based upon the particular circumstances of each Holder. Moreover, the tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal precedent and the possibility of changes in the law. No ruling has been applied for or obtained from the Internal Revenue Service with respect to any of the tax aspects of the Plan and no opinion of counsel has been requested or obtained by the Debtors with respect thereto.

This discussion does not constitute tax advice or a tax opinion concerning the matters described. There can be no assurance that the Internal Revenue Service will not challenge any or all of the tax consequences described herein, or that such a challenge, if asserted, would not be upheld. Accordingly, each Holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, local, foreign or other tax consequences of the Plan.

Internal Revenue Service Circular 230 Disclosure: To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, any statements contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding tax-related penalties under the tax code. Statements regarding tax implications contained in this Disclosure Statement (including any attachments) are not written to support the marketing or promotion of the transactions or matters addressed by the Disclosure Statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

### 4. Allocation of Consideration to Interest.

A portion of the consideration received by a Holder in satisfaction of an Allowed Claim pursuant to the Plan may be allocated to the portion of such Allowed Claim (if any) that represents accrued but unpaid interest. Unless otherwise proscribed under applicable statute or rule, distributions under the Plan are allocated first to the principal of the Claim, then to any accrued interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the Holder as interest income, except to the extent the Holder has previously reported such interest as income.

In that event, only the balance of the distribution would be considered received by the Holder in respect of the principal amount of the Allowed Claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the Holder with respect to the Allowed Claim. If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the distribution is treated as interest, Holders may be required to provide certain tax information in order to avoid the withholding of taxes.

### 5. No Admissions Are Made by This Disclosure Statement.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Claims or Interests or any other parties in interest.

6. **No Reliance Should be Placed on any Failure to Identify Particular Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, File and prosecute Claims regardless of whether the Disclosure Statement identifies such Claims or Objections to Claims.

7. **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets.**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein, except with respect to the Claims of the Senior Lenders and the Mezzanine Lenders, as required by the Senior Settlement Agreements and Mezzanine Settlement Agreement. As stated previously, the Debtors do not believe there are any viable avoidance actions to be pursued.

8. **The Information Used Herein Was Provided by the Debtors and the Lenders, and Was Relied Upon by the Debtors' Advisors.**

The Debtors' advisors have relied upon information provided by the Lenders and the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9. **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10. **No Representations Made Outside the Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the United States Trustee.

# IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A.     LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

If no chapter 11 plan is confirmed, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets. A discussion of the effect that a chapter 7 liquidation would have on creditor recoveries is set forth in Section VI herein, entitled "Confirmation of the Plan." In preparing the liquidation analysis, the Debtors assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believe that liquidation under chapter 7 would result in: (1) smaller distributions to creditors than provided in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee; (2) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations; (3) the failure to realize the greater, going-concern value of the Property; and (4) the lack of funding for administrative, secured and priority claims.

## B.     FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors—or any other party in interest—could attempt to formulate a different plan of reorganization. However, the Debtors believe that the Plan as proposed provides for the greatest possible creditor recoveries.

## C.     LIFTING OF THE AUTOMATIC STAY

If the Plan is not confirmed, the Senior Agent could seek to lift the automatic stay to allow its foreclosure action to proceed. In that event, it is likely that none of the benefits of this Plan would be available to the Lenders, the Debtors, the Guarantors, or other creditors.

## X. U.S. FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

THE CONFIRMATION AND EXECUTION OF THE PLAN MAY HAVE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS. THE DEBTORS DO NOT OFFER ANY OPINION AS TO ANY FEDERAL, STATE, LOCAL OR OTHER TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS AS A RESULT OF CONFIRMATION OF THE PLAN OR OTHERWISE. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR.

## XI. RECOMMENDATION

The Debtors have determined that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result from a forced liquidation under chapter 7 of the Bankruptcy Code or a foreclosure action. In addition, any other alternative to the Plan might not include the settlements that facilitate the implementation of the Plan, and incentivize the cooperation of the participants. Accordingly, the Debtors recommend that Holders of Class 1 Senior Lender Claims support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

BROADWAY 401 LLC,
a Delaware limited liability company

By: Broadway 401 Manager LLC


Name:  David Weldler
Title:    Manager
Date:    December 31, 2009


BROADWAY MASS ASSOCIATES LLC,
a Delaware limited liability company

By: Broadway Mass Manager LLC


Name:  David Weldler
Title:    Manager
Date:    December 31, 2009


BROADWAY MASS TIC I LLC,
a Delaware limited liability company

By: Broadway Mass Manager LLC


Name:  David Weldler
Title:    Manager
Date:    December 31, 2009

Lovells LLP
Robin E. Keller, Esq.
590 Madison Avenue
New York, NY 10022
Tel: 212-909-0600
Fax: 212-909-0660

Bayard, P.A.
Neil B. Glassman, Esq.
Jamie L. Edmonson, Esq.
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel: 302-429-4224
Fax: 302-658-6395

Proposed Counsel for the Debtors and Debtors in Possession


156991

## XI. RECOMMENDATION

The Debtors have determined that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result from a forced liquidation under chapter 7 of the Bankruptcy Code or a foreclosure action. In addition, any other alternative to the Plan might not include the settlements that facilitate the implementation of the Plan, and incentivize the cooperation of the participants. Accordingly, the Debtors recommend that Holders of Class 1 Senior Lender Claims support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

BROADWAY 401 LLC,
a Delaware limited liability company

By: Broadway 401 Manager LLC

*[signature: David Weller]*

Name: David Weller
Title: Manager
Date: December 31, 2009

BROADWAY MASS ASSOCIATES LLC,
a Delaware limited liability company

By: Broadway Mass Manager LLC

*[signature: David Weller]*

Name: David Weller
Title: Manager
Date: December 31, 2009

BROADWAY MASS TIC I LLC,
a Delaware limited liability company

By: Broadway Mass Manager LLC

*[signature: David Weller]*

Name: David Weller
Title: Manager
Date: December 31, 2009

Lovells LLP
Robin E. Keller, Esq.
590 Madison Avenue
New York, NY 10022
Tel: 212-909-0600
Fax: 212-909-0660

Bayard, P.A.
Neil B. Glassman, Esq.
Jamie L. Edmonson, Esq.
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel: 302-429-4224
Fax: 302-658-6395

Proposed Counsel for the Debtors and Debtors in Possession

36

## EXHIBIT A TO DISCLOSURE STATEMENT

### Proposed Joint Prepackaged Plan

**THIS PROPOSED PLAN IS NOT SUBJECT TO A COURT-APPROVED DISCLOSURE STATEMENT. THE CONSENT OF CERTAIN CREDITORS TO THIS PLAN IS BEING SOLICITED IN ACCORDANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE. THE DEBTORS WILL FILE CHAPTER 11 CASES AND SEEK COURT APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THIS PLAN IF THE REQUISITE PRE-FILING ACCEPTANCES ARE RECEIVED.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Broadway 401 LLC, <u>et al.</u>,[1] | ) Case No. 10-_____ (___) |
| | ) |
| Debtors. | ) |

---

### JOINT PREPACKAGED PLAN OF REORGANIZATION OF BROADWAY 401 LLC, BROADWAY MASS ASSOCIATES LLC AND BROADWAY MASS TIC I LLC UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Lovells LLP
Robin E. Keller, Esq.
590 Madison Avenue
New York, NY 10022
Tel: 212-909-0600
Fax: 212-909-0660

Bayard, P.A.
Neil B. Glassman, Esq.
Jamie L. Edmonson, Esq.
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Tel: 302-429-4224
Fax: 302-658-6395

Proposed Counsel for the Debtors and Debtors in Possession

Dated: December 31, 2009
Wilmington, Delaware

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Broadway 401 LLC, a Delaware limited liability company (6772), Broadway Mass Associates LLC, a Delaware limited liability company (8668), and Broadway Mass TIC I LLC, a Delaware limited liability company (3760).

You are receiving this plan, the accompanying disclosure statement and additional materials because you are a creditor in Class 1 under the Debtors' (as defined below) joint prepackaged chapter 11 plan. **PLEASE NOTE**: The Debtors are soliciting your vote to approve this plan before the Debtors file voluntary chapter 11 cases. If the requisite number and amount of Class 1 creditors vote to approve this plan and if other pre-filing conditions are met, the Debtors intend to file voluntary reorganization cases under chapter 11 of the Bankruptcy Code to implement this plan, at which time the Debtors will promptly seek an order or orders of the Bankruptcy Court approving the adequacy of the information contained in the disclosure statement, approving the solicitation of votes as having been in compliance with section 1126(b) of the Bankruptcy Code, and confirming this plan.

---

## IMPORTANT INFORMATION CONCERNING THIS PLAN

**THE CONTENTS OF THIS PLAN SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. THE DEBTORS STRONGLY URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS PLAN, THE DISCLOSURE STATEMENT, THE ACCOMPANYING MATERIALS AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

**THIS PLAN DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS OF CLAIMS AND INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS PLAN AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.**

**THE DEBTORS CANNOT ASSURE YOU THAT THE PLAN (OR THE DISCLOSURE STATEMENT AND EXHIBITS THERETO) THAT IS ULTIMATELY APPROVED BY THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES WILL CONTAIN THE SAME TERMS DESCRIBED HEREIN IN AND/OR WILL NOT CONTAIN DIFFERENT, ADDITIONAL OR MATERIAL TERMS THAT DO NOT APPEAR IN THIS PLAN. THEREFORE, MAKING INVESTMENT DECISIONS BASED UPON THE INFORMATION CONTAINED IN THIS PLAN (OR DISCLOSURE STATEMENT AND EXHIBITS THERETO) IS _HIGHLY SPECULATIVE._ THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO: (1) READ AND CONSIDER CAREFULLY THIS ENTIRE PLAN AND THE RELATED DISCLOSURE STATEMENT (INCLUDING EXHIBITS THERETO AND, IMPORTANTLY, SECTIONS VIII AND IX OF THE DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS" AND "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN", RESPECTIVELY); AND (2) CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO REVIEWING THIS PLAN, THE DISCLOSURE STATEMENT, THE ACCOMPANYING MATERIALS AND THE TRANSACTIONS CONTEMPLATED THEREBY PRIOR TO DECIDING WHETHER TO ACCEPT OR REJECT THIS PLAN.**

# TABLE OF CONTENTS

ARTICLE I. RULES OF INTERPRETATION; DEFINED TERMS .................................................. 1
    Section 1.01    Rules of Interpretation.......................................................................... 1
    Section 1.02    Defined Terms ...................................................................................... 2

ARTICLE II. UNCLASSIFIED CLAIMS................................................................................ 11
    Section 2.01    DIP Facility Claims............................................................................. 11
    Section 2.02    Administrative Claims......................................................................... 11
    Section 2.03    Priority Tax Claims............................................................................. 11

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS................. 11
    Section 3.01    Classification of Claims and Interests ................................................. 11
    Section 3.02    Classification and Treatment of Claims and Interests ......................... 12
    Section 3.03    Special Provision Governing Unimpaired Claims............................... 16

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ................................................ 16
    Section 4.01    Voting Class and Acceptance by Impaired Classes............................. 16
    Section 4.02    Presumed Acceptance of this Plan ...................................................... 16
    Section 4.03    Presumed Rejection of this Plan.......................................................... 16
    Section 4.04    Confirmation of this Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the
                    Bankruptcy Code................................................................................ 17
    Section 4.05    Controversy Concerning Impairment ................................................. 17

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN .............................................. 17
    Section 5.01    Sale of Property................................................................................... 17
    Section 5.02    Sources of Cash for Plan Distributions................................................ 18
    Section 5.03    Cancellation of Agreements and Discharge of Obligations ................. 19
    Section 5.04    Release of Liens, Claims and Interests ............................................... 19
    Section 5.05    Post-Effective Date Transactions ........................................................ 19
    Section 5.06    Retention of Assets.............................................................................. 20
    Section 5.07    Corporate Governance......................................................................... 20
    Section 5.08    Exemption from Certain Transfer Taxes ............................................. 20
    Section 5.09    General Settlement of Claims and Interests......................................... 20

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES........... 21
    Section 6.01    Assumption of Executory Contracts and Unexpired Leases ............... 21
    Section 6.02    Payments Related to Assumption of Executory Contracts and Unexpired Leases .......... 21
    Section 6.03    Preexisting Obligations to the Debtors Under Executory Contracts and
                    Unexpired Leases ............................................................................... 22
    Section 6.04    Intercompany Contracts, Contracts, and Leases Entered Into After the Petition
                    Date.................................................................................................... 22
    Section 6.05    Reservation of Rights ......................................................................... 22
    Section 6.06    Nonoccurrence of Effective Date ....................................................... 22

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS................................................ 22
    Section 7.01    Timing and Calculation of Amounts to Be Distributed ...................... 22
    Section 7.02    Disbursing Agent ............................................................................... 23
    Section 7.03    Delivery of distributions and Undeliverable or Unclaimed distributions...................... 23
    Section 7.04    Compliance with Tax Requirements/Allocations................................. 24
    Section 7.05    Setoffs ................................................................................................ 24
    Section 7.06    Claims Paid or Payable by Third Parties ............................................ 24

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS .................................................................................................. 25
    Section 8.01    Prosecution of Objections to Claims ........................................................... 25
    Section 8.02    No Filing of Proofs of Claim ...................................................................... 25
    Section 8.03    Procedures Regarding Disputed Claims ..................................................... 25
    Section 8.04    Special Rules for Distributions to Holders of Disputed Claims .................... 26

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...................................................................................................................... 26
    Section 9.01    Conditions Precedent to Confirmation ....................................................... 26
    Section 9.02    Conditions Precedent to Consummation ..................................................... 26
    Section 9.03    Waiver of Conditions ................................................................................ 27
    Section 9.04    Effect of Non Occurrence of Conditions to Consummation ......................... 27

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ................................ 27
    Section 10.01    Compromise and Settlement ..................................................................... 27
    Section 10.02    Debtor Release ........................................................................................ 28
    Section 10.03    Third Party Release .................................................................................. 28
    Section 10.04    Exculpation ............................................................................................. 29
    Section 10.05    Preservation of Causes of Action .............................................................. 30
    Section 10.06    Injunction ............................................................................................... 30
    Section 10.07    Senior Lender Release; Mezzanine Lender Release ..................................... 31

ARTICLE XI. BINDING NATURE OF PLAN ............................................................................... 31

ARTICLE XII. RETENTION OF JURISDICTION ........................................................................... 32

ARTICLE XIII. MISCELLANEOUS PROVISIONS ......................................................................... 33
    Section 13.01    Payment of Statutory Fees ........................................................................ 33
    Section 13.02    Allowance and Payment of Professional Fees .............................................. 33
    Section 13.03    Modification of Plan ................................................................................. 34
    Section 13.04    Revocation of Plan ................................................................................... 34
    Section 13.05    Successors and Assigns ............................................................................ 34
    Section 13.06    Reservation of Rights ............................................................................... 34
    Section 13.07    Further Assurances ................................................................................... 34
    Section 13.08    Severability ............................................................................................. 34
    Section 13.09    Service of Documents ............................................................................... 35
    Section 13.10    Filing of Additional Documents ................................................................ 35

## EXHIBITS

EXHIBIT A:    Settlement Agreement with Senior Lenders

EXHIBIT B:    OCIP Letter Agreement

EXHIBIT C:    Settlement Agreement with Mezzanine Lenders

---

> THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO
> THIS PLAN BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.[2]

---

[2]    Including all other agreements, documents and instruments at any time executed and/or delivered in connection with or related thereto, ancillary or otherwise, and all exhibits, attachments and schedules referred to therein, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time prior to the Effective Date, including, without limitation, by the Plan Supplement, and following the Effective Date, in accordance with each Debtor's applicable constituent documents.

# INTRODUCTION

Broadway 401 LLC, Broadway Mass Associates LLC, and Broadway Mass TIC I LLC, each a Delaware limited liability company (collectively, the "Debtors"), hereby propose the following joint "prepackaged" plan of reorganization (this "Plan") for the transfer or sale of the Debtors' Property (as defined below), the resolution of numerous disputes and contentious claims among various parties in interest, including pursuant to the Senior Settlement Agreement, the Mezzanine Settlement Agreement, and the resolution of the outstanding claims against, and interests in, the Debtors pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Capitalized terms used in this Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I hereof. Reference is made to the accompanying disclosure statement (the "Disclosure Statement") for a discussion of the Debtors' history, business, historical financial information and properties, circumstances giving rise to the commencement of these Chapter 11 Cases and for a summary and analysis of this Plan and the treatment of creditors, interest holders, and other parties in interest provided for herein. There are also other agreements and documents, which are or will be filed with the Bankruptcy Court, that are referenced in this Plan or the Disclosure Statement. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## RULES OF INTERPRETATION; DEFINED TERMS

*Section 1.01      Rules of Interpretation*

a.      <u>General Rules of Interpretation</u>:  For purposes of this Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) unless otherwise specified, any reference in this Plan to an agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in this Plan to an existing document, schedule or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, any reference to an Entity as a Holder of a Claim or Interest shall include that Entity's successors and assigns; (e) unless otherwise specified, all references in this Plan to Articles or Sections are references to Articles or Sections of this Plan, respectively; (f) unless otherwise specified, all references in this Plan to Exhibits are references to Exhibits of this Plan; (g) the words "herein," "hereof" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (j) unless otherwise set forth in this Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of this Plan, all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

b.      <u>Computation of Time</u>:  In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

c.      <u>Reference to Monetary Figures</u>:  All references in this Plan to monetary figures shall refer to currency of the United States of America.

*Section 1.02      Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "*401 Development Rights*" means "transferable development rights" (but not including "combined lot development rights") relating to the 401 Premises that, in any case, are not necessary for the existing improvements on the 401 Premises and are transferable to premises other than the 401 Premises.

2.      "*401 Development Rights Sale Contract*" means that certain Agreement of Purchase and Sale of Transferable Development Rights (401 Massachusetts Avenue, N.W.) dated as of August 18, 2008, between Broadway 401 LLC and Argent Acquisitions LLC, as it may be amended.

3.      "*401 Premises*" means the real property located at 401 Massachusetts Avenue, District of Columbia, which is improved by a 14-story 189 unit residential tower and identified as Parcel 1 in Schedule 1 to the Senior Settlement Agreement, and including such improvements and all contracts (other than Executory Contracts that are rejected pursuant to this Plan or contracts that are otherwise specified as non-transferable), personal property, licenses, permits, warranties, trademarks, trade names, other intellectual property and general intangibles related to such real property, including any "combined lot development rights" and other development rights related to such property, but excluding the 401 Development Rights.

4.      "*401 Purchaser*" means the Senior Agent or a purchaser designated by the Senior Agent, which may be an Affiliate of the Senior Lenders, to whom the 401 Premises shall be conveyed by the Debtors pursuant to this Plan.

5.      "*425 Development Rights*" means "transferable development rights" relating to the 425 Premises that, in any case, are not necessary for the existing improvements on the 425 Premises and are transferable to premises other than the 425 Premises.

6.      "*425 Development Rights Sale Contract*" means that certain Agreement of Purchase and Sale of Transferable Development Rights (425 Massachusetts Avenue, N.W.) dated as of August 18, 2008, between Broadway Mass Associates LLC, Broadway Mass TIC I LLC and Argent Acquisitions LLC, as it may be amended.

7.      "*425 Premises*" means the real property located at 425 Massachusetts Avenue, District of Columbia, which is improved by a 14-story 370 unit residential tower and identified as Parcel 2 in Schedule 1 to the Senior Settlement Agreement, and including such improvements and all contracts (other than Executory Contracts that are rejected pursuant to this Plan or contracts that are otherwise specified as non-transferable), personal property, licenses, permits, warranties, trademarks, trade names, other intellectual property and general intangibles and development rights related to such real property, but excluding the 425 Development Rights.

8.      "*425 Purchaser*" means the Senior Agent or a purchaser designated by the Senior Agent, which may be an Affiliate of the Senior Lenders, to whom the 425 Premises shall be conveyed by the Debtors pursuant to this Plan.

9.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid, regardless of whether a fee application has been Filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

10.     *"Administrative Claim"* means any Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the respective Estates and operating the business of the Debtors; (b) all payment of fees and reimbursement of expenses of Entities to the extent Allowed by Final Order under sections 327, 328, 330 and 503 of the Bankruptcy Code; (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; and (d) the fees, costs, and expenses (including, without limitation, attorneys' fees and expenses) of the Senior Agent and the Senior Lenders, subject to the terms and conditions of the Senior Loan Documents, incurred in connection with these Chapter 11 Cases, the marketing of the 401 Premises and the 425 Premises, the negotiation, documentation and consummation of the Senior Settlement Agreement, the solicitation materials, this Plan and the restructuring transactions contemplated hereby and thereby, which, in each case, shall be Allowed in full and shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges under any applicable law or regulation by any Person.  For the avoidance of doubt, "Administrative Claim" does not include DIP Facility Claims, which are separately treated under this Plan.

11.     *"Affiliate"* has the meaning set forth at section 101(2) of the Bankruptcy Code.

12.     *"Allowed"* means with reference to any Claim or Interest:  (a) any Claim or Interest as to which no objection to allowance has been interposed on or before the Effective Date or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder; (b) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; (c) any Claim or Interest expressly deemed allowed by this Plan; or (d) any Claim or Interest deemed allowed by agreement of the Holder of such Claim or Interest, the Senior Agent and the Debtors.

13.     *"Allowed Professional Compensation"* means all Accrued Professional Compensation allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

14.     *"Avoidance Actions"* means any and all claims and causes of action which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

15.     *"Ballot"* means the ballot for voting to accept or reject this Plan, prepared and distributed by the Debtors to all Holders of Impaired Claims entitled to vote on this Plan.

16.     *"Bankruptcy Code"* means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

17.     *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases and, to the extent the United States District Court for the District of Delaware withdraws the reference to any of the Chapter 11 Cases under 28 U.S.C. § 157 and/or enters an order pursuant to 28 U.S.C. § 157(a), the United States District Court for the District of Delaware.

18.     *"Bankruptcy Rules"* means, collectively, the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C.§ 2075, the Official Bankruptcy Forms, and the general, local and chambers rules of the Bankruptcy Court, each if and to the extent applicable in the Chapter 11 Cases.

19.     *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

20.     *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

21.     *"Causes of Action"* means all actions, causes of action (including Avoidance Actions), claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims of or belonging to the Estates, whether disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date, and also include, without limitation: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

22.     *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the chapter 11 cases pending for the Debtors in the Bankruptcy Court, which the Debtor will seek to procedurally consolidate on or soon after the Petition Date.

23.     *"Claim"* means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code, including, without limitation, any debt arising in any way in connection with any acts of a Debtor, obligation, demand, guaranty, option, right, contractual or other commitment, restriction and interest of any kind and nature, whether imposed by agreement, understanding, law, equity or otherwise, which arises on or prior to the Effective Date or otherwise relates to any acts or omissions of a Debtor existing on or prior to the Effective Date of whatever kind, type, nature or description, whether known or unknown, direct or indirect, contingent or fixed, choate or inchoate, matured or unmatured, liquidated or unliquidated and whether arising by agreement, statute, law or otherwise.

24.     *"Class"* means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

25.     *"Co-Lender Agreement"* means the Co-Lender Agreement, dated as of December 15, 2006, among the Senior Agent and the Senior Lenders, as amended by that certain letter agreement dated December 24, 2009, and as further amended, modified or supplemented from time to time.

26.     *"Completion Guaranty"* means that certain Consolidated, Amended and Restated Guaranty of Completion dated as of December 15, 2006, executed by Joseph Neumann and delivered to the Senior Agent in connection with the Senior Loan.

27.     *"Confirmation"* means the entry by the Bankruptcy Court of the Confirmation Order in the Chapter 11 Cases, subject to all conditions specified in Article IX of this Plan having been satisfied or waived pursuant to Article IX of this Plan.

28.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order in the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

29.     *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court to consider Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

30.     *"Confirmation Order"* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

31.     *"Consummation"* means the occurrence of the Effective Date.

32. *"Cure Claim"* means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors under sections 365 or 1123 of the Bankruptcy Code.

33. *"Debtor"* means each of Broadway 401 LLC, Broadway Mass Associates LLC, and Broadway Mass TIC I LLC, each a Delaware limited liability company, as a debtor and debtor in possession herein.

34. *"Debtor Release"* means the release given by the Debtors as set forth in Article X of this Plan.

35. *"Debtor Releasees"* means, collectively, (a) all current and former managers, members, officers, employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals and Affiliates of the Debtors, and (b) all current and former managers, members, officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals and Affiliates of each Person or Entity set forth in clause (a), each in their respective capacities as such.

36. *"Debtor in Possession"* means, each Debtor as a debtor in possession in its Chapter 11 Case.

37. *"Development Rights Escrow Agent"* means First American Title Insurance Company.

38. *"DIP Agent"* means PB Capital Corporation, in its capacity as administrative agent under the DIP Credit Facility, or any successor agent appointed pursuant thereto.

39. *"DIP Credit Facility"* means that certain post-petition loan facility, which the Senior Lenders agree to provide to the Debtors in connection with the Chapter 11 Cases pursuant to the terms and conditions set forth in the Senior Loan Agreement, as supplemented by that certain letter agreement dated December 24, 2009, and subject to the interim and final orders of the Bankruptcy Court approving and authorizing such post-petition financing.

40. *"DIP Facility Claim"* means any Claim derived from or based upon the DIP Credit Facility.

41. *"DIP Lender"* means each bank, financial institution or other lender that is a party to the DIP Credit Facility from time to time.

42. *"Disbursing Agent"* means the Debtors, or the Entity or Entities chosen by the Debtors to make or facilitate distributions pursuant to this Plan; provided, however, that with respect to any disbursements to be made to Holders of Senior Lender Claims, the Senior Agent shall act as the Disbursing Agent.

43. *"Disclosure Statement"* means the *Disclosure Statement for Joint Prepackaged Plan of Reorganization of Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC*, together with and including all other agreements, documents and instruments at any time executed and/or delivered in connection therewith or related thereto, ancillary or otherwise, and all exhibits, attachments and schedules referred to therein, all of which are incorporated by reference therein, as all of the same may be amended, modified, replaced and/or supplemented from time to time prior to the Effective Date.

44. *"Disputed Claim"* means any Claim or Interest that is not Allowed.

45. *"Effective Date"* means the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all of the conditions specified in Article IX of this Plan have been satisfied or waived pursuant to Article IX of this Plan.

46. *"Encumbrance"* means any mortgage, interest, deed of trust, security interest, pledge, lien, judgment, restriction (whether on voting, sale, transfer, disposition, or otherwise), lease, license, other right of usage, charge, option and other right of ownership, and any other encumbrance of every type and description whether imposed by law, agreement, understanding or otherwise, including, without limitation, all of the foregoing

that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' interest in the Property, or any similar right.

47.     *"Entity"* means an entity as defined in section 101(15) of the Bankruptcy Code.

48.     *"Environmental Indemnity"* means that certain Consolidated, Amended and Restated Environmental Indemnity dated as of December 15, 2006, executed by the Debtors and Joseph Neumann and delivered to the Senior Agent in connection with the Senior Loan.

49.     *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.     *"Exculpated Parties"* means, collectively: (a) the Debtors; (b) the Debtor Releasees; (c) the Senior Agent; (d) the Senior Lenders; (e) the Mezzanine Agent; (f) the Mezzanine Lenders; (g) the DIP Agent; (h) the DIP Lenders; (i) the Guarantors, subject to the Retained Liabilities; (j) the 401 Purchaser; (k) the 425 Purchaser; and (l) in respect of each of (c) through (l), all current and former managers, members, officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals, agents, Affiliates, fiduciaries and representatives of each, each in their respective capacities as such.

51.     *"Exculpation"* means the exculpation of the Exculpated Parties in accordance with Article X of this Plan.

52.     *"Executory Contract"* means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

53.     *"Federal Judgment Rate"* means the federal judgment rate, which is the weekly average one-year constant maturity (nominal) Treasury yield.

54.     *"Fee Claim"* means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

55.     *"File"* or *"Filed"* means file, filed or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

56.     *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired (other than pursuant to Bankruptcy Rule 9024) and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

57.     *"General Unsecured Claim"* means any Unsecured Claim against any Debtor that is not a/an DIP Facility Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, Senior Lender Claim, Mezzanine Mortgage Claim, Mezzanine Guaranty Claim, or Intercompany Claim; for the avoidance of doubt, the term "General Unsecured Claim" shall include the Unsecured Deficiency Claims of the Senior Agent and the Senior Lenders.

58.     *"Guaranties"* means, collectively: (i) the Completion Guaranty; (ii) the Environmental Indemnity; and (iii) the Recourse Liability Agreement.

59.     *"Guarantor"* means each of Samuel Weiss and Joseph Neumann, individually.

60.     *"Holder"* means the beneficial holder of any Claim or Interest.

61.     *"Impaired"* means any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

62.     *"Impaired Class"* means a Class of Impaired Claims or Class of Impaired Interests.

63.     *"Indemnification Provision"* means the indemnification provisions in place immediately prior to the Effective Date, whether in the formation documents, operating agreements, or employment contracts for the benefit of current and former managers, members, employees, attorneys, other professionals and agents of the Debtors and such current and former directors, officers, managers and members' respective Affiliates.

64.     *"Intercompany Claim"* means any Claim of a Debtor against another Debtor.

65.     *"Interest"* means any member's interest in a limited liability company as defined in § 18-108(8) of the Delaware Limited Liability Company Act, 6 Del. C. § 18-101, *et seq.*

66.     *"Lien"* means a lien as defined in section 101(37) of the Bankruptcy Code on or against any of the Debtors' property or Estate.

67.     *"Maturity Date"* means the date on which the Debtors' obligations under the Senior Loan Document matured and the Senior Loan Obligations became due and payable, which is August 18, 2008.

68.     *"McWilliams Ballard Lawsuit"* means that certain action pending in the United States District Court for the District of Columbia, captioned *McWilliams Ballard, Inc. vs. Broadway Management Co., Inc., et al.,* Civil Action No. 08-1670 (ESH).

69.     *"McWilliams Ballard Settlement Agreement"* means that certain settlement agreement dated as of December 24, 2009, among the Debtors, McWilliams Ballard, Inc. and others, which *inter alia* resolves all claims under and dismisses with prejudice as to all defendants the McWilliams Ballard Lawsuit.

70.     *"Mezzanine Agent"* means iStar Financial Inc., in its capacity as agent for the Mezzanine Lenders under the Mezzanine Loan.

71.     *"Mezzanine Borrower"* means each of Broadway 401 Massachusetts Ave Mezz LLC, Broadway 425 Massachusetts Ave Mezz TIC LLC, and Broadway 524 Massachusetts Ave Mezz LLC.

72.     *"Mezzanine Guaranty"* means that certain Guaranty by the Debtors in favor of the Mezzanine Agent dated December 15, 2006, made in connection with the Mezzanine Loan Agreement.

73.     *"Mezzanine Guaranty Claim"* means any Claim derived from or based upon the Mezzanine Guaranty.

74.     *"Mezzanine Lender"* means each lender that is a party to the Mezzanine Loan Agreement.

75.     *"Mezzanine Lender Claims"* means, collectively, the Mezzanine Guaranty Claims and Mezzanine Mortgage Claims.

76.     *"Mezzanine Lender Release"* means the release provision set forth in Article X of this Plan

77.     *"Mezzanine Loan Agreement"* means that certain Mezzanine Construction Loan Agreement dated December 15, 2006, by and between the Mezzanine Borrowers, the Mezzanine Agent and the Mezzanine Lenders in the original principal amount of $25,000,000.00.

78. *"Mezzanine Mortgage"* means that certain Guaranty Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents dated December 15, 2006, made by the Debtors in favor of the Mezzanine Agent, which encumbers the Property and was made in connection with the Mezzanine Loan, but which was not filed as a matter of record with any government office.

79. *"Mezzanine Mortgage Claim"* means any Claim derived from or based upon the Mezzanine Mortgage.

80. *"Mezzanine Settlement Agreement"* means that certain settlement agreement dated as of December 24, 2009, among the Mezzanine Borrowers, the Mezzanine Agent and each Guarantor, which is attached hereto as Exhibit C.

81. *"OCIP Letter Agreement"* has the definition set forth in the Senior Settlement Agreement.

82. *"OCIP Policy"* means the insurance policy that is the subject of the OCIP Letter Agreement.

83. *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or Priority Tax Claim.

84. *"Other Secured Claim"* means any Secured Claim, other than a DIP Facility Claim or Senior Lender Claim.

85. *"Person"* means a person as defined in section 101(41) of the Bankruptcy Code.

86. *"Petition Date"* means the date on which the Debtors file their petitions for relief commencing the Chapter 11 Cases.

87. *"Plan"* means this *Joint Prepackaged Plan of Reorganization of Broadway 401 LLC, Broadway Mass Associates LLC and Broadway Mass TIC I LLC Under Chapter 11 of the Bankruptcy Code* dated December 31, 2009, as the same has been and may be further amended, modified or supplemented from time to time, including, without limitation, the Plan Supplement, if any, which is incorporated herein by reference.

88. *"Plan Supplement"* means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules, which are set forth in the Disclosure Statement and which shall be filed with the Bankruptcy Court 7 days prior to the Confirmation Hearing, all of which shall be satisfactory in all regards to the Senior Agent and the Senior Lenders.

89. *"Post-Effective Date Transactions"* means a dissolution or winding up of a Debtor or the consolidation, merger, restructuring, conversion, dissolution, transfer, liquidation, contribution of assets, or other transaction pursuant to which a Debtor merges with or transfers substantially all of its assets and liabilities to a non-Debtor Affiliate or newly formed Entity, prior to, on or after the Effective Date, as provided for in Article V of this Plan.

90. *"Priority Tax Claim"* means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

91. *"Property"* means, collectively, the 401 Premises and the 425 Premises.

92. *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under this Plan.

93.     *"Recourse Liability Agreement"* means (i) that certain Consolidated, Amended and Restated Recourse Liability Agreement dated as of December 15, 2006, executed by the Debtors and Joseph Neumann and delivered to the Senior Agent in connection with the Senior Loan; and (ii) that certain Limited Recourse Guaranty dated as of December 15, 2006, executed by Samuel Weiss and delivered to the Senior Agent in connection with the Senior Loan.

94.     *"Reinstated"* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before, on, or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

95.     *"Release Date"* has the meaning set forth in Section 10 of the Mezzanine Settlement Agreement and Section 9 of the Senior Settlement Agreement.

96.     *"Releasing Party"* means each of the Debtors, the Debtor Releasees, the Guarantors, the DIP Agent, the DIP Lenders, the Senior Agent, the Senior Lenders, the Mezzanine Agent, the Mezzanine Lenders, the 425 Purchaser, the 401 Purchaser, Holders of Interests in the Debtors, each Holder of a Claim belonging to a Class that either votes to accept this Plan or is deemed to accept this Plan, and, to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, all other Holders of Claims and Interests.

97.     *"Retained Liabilities"* means those liabilities of Guarantor under the Guaranties and the Settlement Agreements that, pursuant to the Senior Settlement Agreement, continue after the Effective Date or the Release Date, as applicable.

98.     *"Retained Professional"* means any Entity: (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

99.     *"Secured"* means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to this Plan as a Secured Claim.

100.    *"Senior Agent"* means PB Capital Corporation, in its capacity as agent under the Senior Loan Agreement, and its successors and assigns in such capacity.

101.    *"Senior Lender Claim"* means any Claim derived from or based upon the Senior Loan Documents.

102.    *"Senior Lender Release"* means the release provision set forth in Article X of this Plan

103.    *"Senior Lender"* means each of PB Capital Corporation, PB (USA) Realty Corporation and iStar Financial Inc., in their capacities as lenders party to the Senior Loan Agreement, and their respective successors and assigns in such capacities.

104.    *"Senior Loan"* means the pre-petition loan in the original principal amount of up to $190,000,000.00, made by the Senior Lenders to the Debtors pursuant to the Senior Loan Agreement.

105.    *"Senior Loan Agreement"* means that certain Consolidated, Amended and Restated Construction Loan Agreement dated as of December 15, 2006, by and among the Debtors, the Senior Agent and the Senior Lenders, as amended, modified or supplemented from time to time.

106.    *"Senior Loan Documents"* means the Senior Loan Agreement, the Senior Note, the Senior Mortgage, the Guaranties and the other "Loan Documents" (as defined in the Senior Loan Agreement), each as amended, modified or supplemented from time to time.

107.    *"Senior Loan Obligations"* means the Debtors' obligations under the Senior Loan Documents.

108.    *"Senior Mortgage"* means that certain Consolidated, Amended and Restated Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Rents dated as of December 15, 2006, issued by the Debtors for the benefit of the Senior Agent, as amended, modified or supplemented from time to time.

109.    *"Senior Note"* means each of the following, as amended, modified or supplemented from time to time: (a) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $95,000,000, made by the Debtors to iStar Financial Inc.; (b) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $70,000,000, made by the Debtors to PB (USA) Realty Corporation; and (c) that certain Promissory Note, dated as of December 15, 2006, in the principal amount of $25,000,000, made by the Debtors to PB Capital Corporation.

110.    *"Senior Settlement Agreement"* means that certain Settlement Agreement, dated as of December 24, 2009, by and between each of the Debtors, the Senior Agent and the Guarantors, and joined in by the Senior Lenders, which is attached as <u>Exhibit A</u> hereto.

111.    *"Termination Event"* has the definition set forth in the Senior Settlement Agreement and the Mezzanine Settlement Agreement, as applicable.

112.    *"Third Party Release"* means the release provision set forth in Article X of this Plan.

113.    *"Third Party Releasee"* means each of the Senior Agent, the Senior Lenders, the DIP Agent, the DIP Lenders, the Mezzanine Agent, the Mezzanine Lenders, the 425 Purchaser, the 401 Purchaser, the Holders of Interests in the Debtors, each Holder of a Claim who votes to accept this Plan, and, to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, who directly or indirectly is entitled to receive a distribution under this Plan (including via an attorney, agent, indenture trustee or securities intermediary), and all of their respective current and former managers, members, officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals and Affiliates, each in their respective capacities as such.

114.    *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

115.    *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

116.    *"Unsecured Claim"* means a Claim that is not secured by a lien on property in which one of the Debtors' estates have an interest.

117.  "*Unsecured Deficiency Claim*" means the claim asserted by the Senior Agent on behalf of the Holders of Allowed Senior Lender Claims pursuant to section 506(a)(1) of the Bankruptcy Code.

118.  "*Voting Class*" means Class 1.

119.  "*Voting Deadline*" means 5:00 p.m. prevailing Eastern time on January 8, 2010.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

*Section 2.01      DIP Facility Claims*

Except to the extent a DIP Lender agrees otherwise, all Allowed DIP Facility Claims, if any, shall be paid in full on the Effective Date in full and final satisfaction, settlement, release and discharge of, and in exchange for, such DIP Facility Claims.

*Section 2.02      Administrative Claims*

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid such Allowed Administrative Claim in accordance with the terms of the applicable contract or agreement governing such Claim, if any.  Except to the extent a Holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Administrative Claim and the Debtors agree otherwise, all other Holders of Allowed Administrative Claims will be paid, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Administrative Claim, in full in Cash on or as soon as reasonably practicable after the Effective Date.

*Section 2.03      Priority Tax Claims*

Except to the extent a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Priority Tax Claim and the Debtors agree otherwise, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors, each Holder of an Allowed Priority Tax Claim, if any, shall receive on account of such Allowed Priority Tax Claim: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the Effective Date; or (2) Cash equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code (or such lesser rate as is agreed to by the Holder of such Holder of an Allowed Priority Tax Claim), payable over a period ending no later than five (5) years from the Petition Date; *provided, however,* that the Debtors reserve the right to prepay such amounts at any time under the latter option.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*Section 3.01      Classification of Claims and Interests*

All Claims and Interests, except DIP Facility Claims, Administrative Claims and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

a. Summary of Classification and Treatment of Classified Claims and Interests

The classification of Claims against and Interests in the Debtors pursuant to this Plan is as follows:

| SUMMARY OF STATUS AND VOTING RIGHTS | | | |
|---|---|---|---|
| Class | Claim/Interest | Status | Voting Rights |
| 1 | Senior Lender Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Not Entitled To Vote – Deemed to Accept |
| 3 | Other Priority Claims | Unimpaired | Not Entitled To Vote – Deemed to Accept |
| 4 | Mezzanine Lender Claims | Impaired | Not Entitled to Vote – Deemed to Reject |
| 5 | General Unsecured Claims | Impaired | Not Entitled to Vote – Deemed to Reject |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote – Deemed to Reject |
| 7 | Interests | Impaired | Not Entitled to Vote - Deemed to Reject |

Section 3.02    Classification and Treatment of Claims and Interests

a. Class 1 – Senior Lender Claims

(a)    *Classification*: Class 1 consists of all Senior Lender Claims.

(b)    *Treatment*:

(A)    *Allowance*. The Senior Lender Claims are hereby deemed Allowed in the principal amount of not less than $190,000,000.00, *plus*: (i) accrued and unpaid interest at the applicable default rate set forth in the Senior Loan Document for the period from the Maturity Date through and including the Petition Date; (ii) protective advances made pursuant to the Senior Loan Agreement prior to the Petition Date; and (iii) reasonable and documented out-of-pocket fees and actual expenses payable from the Maturity Date through and including the Petition Date, subject to the terms and conditions of the Senior Loan Documents.

(B)    *Treatment*. On the Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for, all Allowed Senior Lender Claims:

(1)    the 401 Premises shall be conveyed to the 401 Purchaser free and clear of all Liens, Claims, Encumbrances or interests (other than permitted Liens or Encumbrances, if any, specified by Senior Agent);

(2)    the 425 Premises shall be conveyed to the 425 Purchaser free and clear of all Liens, Claims, Encumbrances or interests (other than permitted Liens or Encumbrances, if any, specified by Senior Agent);

(3)    in the event that the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract are terminated prior to the Effective Date or rejected by the Debtors on the Effective Date, the 401 Development Rights and/or the 425 Development Rights, as applicable, shall be conveyed free and clear of all Liens, Claims, Encumbrances or interests (other than permitted Liens or Encumbrances, if any, specified

by Senior Agent) to, at the Senior Lenders' election and in their sole discretion, either the 401 Purchaser, the 425 Purchaser or a third party purchaser (provided the purchase price is acceptable to the Senior Agent in its sole discretion);

(4)     in the event that the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract remain in effect on the Effective Date (*i.e.*, have not been terminated prior to the Effective Date or rejected in connection with this Plan), but have not been consummated, the Debtors shall assume and assign the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract, as applicable, to, at the Senior Lenders' election and in their sole discretion, either the 401 Purchaser, the 425 Purchaser or a third party purchaser (provided the purchase price is acceptable to the Senior Agent in its sole discretion);

(5)     the Development Rights Escrow Agent shall disburse, as applicable (if the same has not previously been distributed by the Development Rights Escrow Agent in accordance with the Senior Settlement Agreement): (1) the net proceeds from the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract, if such sales are consummated, or (2) if such contracts are terminated, any deposits to which the Debtors become entitled pursuant to the terms of the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract, to the Disbursing Agent, for application in accordance with the Senior Settlement Agreement;

(6)     in the event purchase money financing is provided by one or more lender(s) to the 401 Purchaser and/or the 425 Purchaser, the Senior Note and Senior Mortgage shall be modified, *inter alia*, to reflect the 401 Purchaser and/or the 425 Purchaser, as applicable, as the successor obligor thereunder and the amount and terms of such purchase money financing and the 401 Purchaser and/or the 425 Purchaser shall assume the Senior Note and Senior Mortgage as modified;

(7)     the proceeds or the rights to proceeds, as applicable, of any insurance policies maintained in connection with the 401 Premises in connection with a casualty thereto shall be disbursed or assigned to the 401 Purchaser;

(8)     the proceeds or the rights to proceeds, as applicable, of any insurance policies maintained in connection with the 425 Premises in connection with a casualty thereto shall be disbursed or assigned to the 425 Purchaser;

(9)     the Debtors shall, in accordance with the terms of the OCIP Letter Agreement attached hereto as <u>Exhibit B</u>, if requested by the Senior Agent, cooperate with Senior Agent to effect a division of the OCIP Policy into separate policies covering the Property and the other property or, if this is not feasible, cause the OCIP Policy to be endorsed to name the Senior Agent or its designee as a "named insured"; <u>provided that</u> the proceeds of certain refunds of premiums and/or collateral deposited in connection with the OCIP Policy shall be disposed of pursuant to the terms of the OCIP Letter Agreement;

(10)     any refunds of real estate taxes paid with respect to the 401 Premises

shall be disbursed to the 401 Purchaser;

(11)     any refunds of real estate taxes paid with respect to the 425 Premises shall be disbursed to the 425 Purchaser;

(12)     the Senior Agent, on behalf of the Senior Lenders, shall receive an Allowed Unsecured Deficiency Claim classified in Class 5 and hereby deemed Allowed in the amount of not less than $70,000,000; and

(13)     any Cash, including Cash Collateral, remaining in the Debtors' Cash balances after payment of Allowed Administrative Claims, DIP Facility Claims, and Priority Tax Claims pursuant to this Plan shall be disbursed to the Senior Lenders.

(c)     Upon the occurrence of the Effective Date, the Guaranties shall be released, extinguished and discharged, subject however to the Retained Liabilities, pursuant to the terms of Sections 8 and 9 of the Senior Settlement Agreement and Section 9 and 10 of the Mezzanine Settlement Agreement.

(d)     *Voting*: Class 1 is an Impaired Class. Each Holder of a Senior Lender Claim is entitled to vote on this Plan.

2.   Class 2 – Other Secured Claims

(a)     *Classification*: Class 2 consists of all Other Secured Claims.

(b)     *Treatment*: The legal, equitable and contractual rights of the Holders of Other Secured Claims will not be altered by this Plan. Except to the extent a Holder of an Other Secured Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Secured Claim and the Debtors agree otherwise, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Confirmation Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent applicable) shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Secured Claim, in the sole discretion of the Debtors, one of the following alternative treatments:

•     Reinstatement of such Allowed Other Secured Claim;

•     payment of such Allowed Other Secured Claim either (i) in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Other Secured Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such Other Secured Claim;

•     delivery of the collateral securing such Allowed Other Secured Claim; or

•     such other treatment so as to render the Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)     *Voting*: Class 2 is an Unimpaired Class. Each Holder of an Other Secured Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan.

3. Class 3 – Other Priority Claims

    (a) *Classification*: Class 3 consists of all Other Priority Claims.

    (b) *Treatment*: The legal, equitable and contractual rights of the Holders of Other Priority Claims will not be altered by this Plan. Except to the extent a Holder of an Other Priority Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Priority Claim and the Debtors agree otherwise, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Priority Claim, one of the following alternative treatments:

- to the extent an Other Priority Claim is Allowed on or prior to the Effective Date, such Claim shall be paid in full in Cash on or as soon as reasonably practicable after the Effective Date;

- to the extent an Other Priority Claim is Allowed after the Effective Date, such Claim shall be paid thereafter either (i) in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such Other Priority Claim or (ii) in accordance with the course of practice between the Debtors and such Holder with respect to such an Other Priority Claim; or

- such other treatment so as to render the Allowed Other Priority Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

    (c) *Voting*: Class 3 is an Unimpaired Class. Each Holder of an Other Priority Claim is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan.

4. Class 4 - Mezzanine Lender Claims

    (a) *Classification*: Class 4 consists of all Mezzanine Lender Claims.

    (b) *Treatment*: No property of the Estates will be distributed to or retained by Holders of Class 4 Claims.

    (c) *Voting*: Class 4 is an Impaired Class. Each Holder of a Class 4 Claim is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan.

5. Class 5 – General Unsecured Claims

    (a) *Classification*: Class 5 consists of all General Unsecured Claims, including the Unsecured Deficiency Claim.

    (b) *Treatment*: No property of the Estates will be distributed to or retained by Holders of Class 5 Claims.

    (c) *Voting*: Class 5 is an Impaired Class. Each Holder of a Class 5 Claim is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan.

6. Class 6 – Intercompany Claims

    (a)    *Classification*: Class 6 consists of all Intercompany Claims.

    (b)    *Treatment*: No property of the Estates will be distributed to or retained by Holders of Class 6 Claims.

    (c)    *Voting*: Class 6 is an Impaired Class. Each Holder of a Class 6 Claim is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan.

7. Class 7 – Interests

    (a)    *Classification*: Class 7 consists of all Interests.

    (b)    *Treatment*: No property of the Estates will be distributed or retained by Holders of Class 7 Interests and such Interests shall be deemed cancelled and extinguished on the Effective Date.

    (c)    *Voting*: Class 7 is an Impaired Class. Each Holder of a Class 7 Interest is conclusively presumed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject this Plan.

*Section 3.03*    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided herein, nothing under this Plan shall affect the Debtors' rights and defenses in respect of any Claim that is Unimpaired under this Plan, including, without limitation, all rights in respect of (1) legal and equitable defenses to, (2) setoff or recoupment against or (3) counter-claims with respect to any such Unimpaired Claims.

## ARTICLE IV.

## ACCEPTANCE OR REJECTION OF THE PLAN

*Section 4.01*    *Voting Class and Acceptance by Impaired Classes*

Class 1 is Impaired under this Plan and, therefore, entitled to vote to accept or reject this Plan. Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class has accepted this Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of Claims in such Class actually voting vote to accept this Plan.

*Section 4.02*    *Presumed Acceptance of this Plan*

Classes 2 and 3 are Unimpaired under this Plan. Pursuant to section 1126(f) of the Bankruptcy Code, the Holders of Claims in such Classes are conclusively presumed to have accepted this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

*Section 4.03*    *Presumed Rejection of this Plan*

Classes 4, 5, 6, and 7 will receive no distribution under this Plan. Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Class 4, 5, 6 and 7 Claims or Interests are conclusively presumed to have rejected this Plan and, therefore, are not entitled to vote to accept or reject this Plan.

*Section 4.04    Confirmation of this Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class. The Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan pursuant to section 1126(c) of the Bankruptcy Code. The Debtors reserve the right to modify this Plan in accordance with Article XIII hereof to the extent, if at all, Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

*Section 4.05    Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired under this Plan, after notice and a hearing, the Bankruptcy Court shall determine such controversy on or prior to the Confirmation Date.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

*Section 5.01    Sale of Property*

The Confirmation Order shall constitute an order of the Bankruptcy Court authorizing and directing the Debtors, without the need for any approval by the Debtors' direct or indirect members, to:

a.  execute and deliver those documents necessary or appropriate to consummate the Senior Settlement Agreement and the Mezzanine Settlement Agreement, the documents provided for therein, and the various transactions contemplated by this Plan;

b.  assume the Senior Settlement Agreement, the Mezzanine Settlement Agreement, the McWilliams Ballard Settlement Agreement and the OCIP Letter Agreement;

c.  (i) convey title to the 401 Premises pursuant to Sections 363 and 1123(a)(5)(D) of the Bankruptcy Code, free and clear of all Liens, Claims, Encumbrances or interests (other than permitted Liens or Encumbrances, if any, specified by Senior Agent), to the 401 Purchaser pursuant to this Plan, and (ii) permit the Senior Mortgage to survive and in the event purchase money financing is provided by one or more lenders, permit the assignment (if necessary) of all or a portion of the Senior Note and Senior Mortgage to such lender(s) and the modification of the Senior Note and Senior Mortgage in the manner contemplated by this Plan to, *inter alia*, reflect the amount and terms of such purchase money financing and permit assumption of the Senior Note and Senior Mortgage (as modified) by the 401 Purchaser;

d.  (i) convey title to the 425 Premises pursuant to Sections 363 and 1123(a)(5)(D) of the Bankruptcy Code, free and clear of all Liens, Claims, Encumbrances or interests (other than permitted Liens or Encumbrances, if any, specified by Senior Agent), to the 425 Purchaser pursuant to this Plan, and (ii) permit the Senior Mortgage to survive and in the event purchase money financing is provided by one or more lenders, permit the assignment (if necessary) of all or a portion of the Senior Note and Senior Mortgage to such lender(s) and the modification of the Senior Note and Senior Mortgage in the manner contemplated by this Plan to, *inter alia*, reflect the amount and terms of such purchase money financing and permit assumption of the Senior Note and Senior Mortgage (as modified) by the 425 Purchaser;

e.  in the event that the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract are terminated prior to the Effective Date or rejected by the Debtors on the Effective Date, convey the 401 Development Rights and/or the 425 Development Rights, as applicable, free and clear of all Liens, Claims, Encumbrances or interests (other than permitted Liens or Encumbrances, if any, specified by Senior Agent) to, at the Senior

Lenders' election and in their sole discretion, the 401 Purchaser, the 425 Purchaser or a third party purchaser (provided the purchase price is acceptable to the Senior Agent in its sole discretion);

f. in the event that the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract remain in effect on the Effective Date (i.e., have not been terminated prior to the Effective Date or rejected in connection with this Plan), but have not been consummated, assume and assign the 401 Development Rights Sale Contract and/or the 425 Development Rights Sale Contract, to, at the Senior Lenders' election and in their sole discretion, the 401 Purchaser, the 425 Purchaser or a third party purchaser (provided the purchase price is acceptable to the Senior Agent in its sole discretion);

g. instruct the Development Rights Escrow Agent to disburse, as applicable (if the same have not previously been disbursed by the Development Rights Escrow Agent in accordance with the Senior Settlement Agreement): (1) the net proceeds from the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract, if such sales are consummated, or (2) if such contracts are terminated, any deposits to which the Debtors become entitled pursuant to the terms of the 401 Development Rights Sale Contract and the 425 Development Rights Sale Contract, to the Disbursing Agent, in either case, for application in accordance with the Senior Settlement Agreement;

h. disburse or assign the rights to, as applicable, the proceeds of any insurance policies maintained in connection with the 401 Premises in connection with a casualty thereto shall be disbursed or assigned to the 401 Purchaser;

i. disburse or assign the rights to, as applicable, the proceeds of any insurance policies maintained in connection with the 425 Premises in connection with a casualty thereto shall be disbursed or assigned to the 425 Purchaser;

j. take such actions with respect to the OCIP Policy as may be required by the terms of the OCIP Letter Agreement;

k. disburse any refunds of real estate taxes paid with respect to the 401 Premises to the 401 Purchaser;

l. disburse any refunds of real estate taxes paid with respect to the 425 Premises to the 425 Purchaser;

m. permit Senior Agent or its affiliate to enter into contracts for the sale of residential units of the 401 Premises and/or the 425 Premises prior to acquisition by the 401 Purchaser or the 425 Purchaser, respectively, provided that the obligations of Senior Agent or such affiliate under such contracts shall be conditioned on the acquisition by the 401 Purchaser or the 425 Purchaser of the 401 Premises or the 425 Premises, as applicable; and

n. pay all allowed Administrative Claims, Priority Tax Claims, Other Secured Claims and Priority Claims in full and disburse any Cash, including Cash Collateral, remaining in the Debtors' Cash balances to the Senior Lenders.

*Section 5.02*     *Sources of Cash for Plan Distributions*

All Cash necessary to make payments required pursuant to this Plan will be obtained from the proceeds of the DIP Credit Facility and the Debtors' Cash balances. Cash payments to be made pursuant to this Plan will be made by the Disbursing Agent; provided, however, that the Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be

accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

Subject in all respects to the interim and final orders entered in connection with the DIP Credit Facility, including the Carve-Out (as defined in such orders), and subject to the occurrence of the Effective Date, the Senior Lenders shall pay the following liabilities and obligations: (i) quarterly fees of the United States Trustee, (ii) reasonable attorney's fees incurred post-Effective Date by the Debtors in connection with the preparation and filing of any required monthly operating reports or tax returns and obtaining a final decree closing the Debtors' chapter 11 cases, provided that such payments shall not exceed $10,000; and (iii) such other liabilities, if any, expressly assumed by the Senior Lenders in the Senior Settlement Agreement.

*Section 5.03      Cancellation of Agreements and Discharge of Obligations*

Except as otherwise expressly provided for and preserved herein, upon the occurrence of the Effective Date, (1) the Guaranties (subject to the Retained Liabilities) together with any instruments or documents evidencing or creating any indebtedness or obligations of a Guarantor executed in connection therewith or pursuant thereto, and (2) any other notes, bonds, agreements, if any, or any other instruments or documents evidencing or creating any indebtedness or obligations of a Debtor that relate to Claims or Interests Impaired under this Plan, shall be cancelled, and the obligations of the Debtors under each of the foregoing shall be discharged; *provided, however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or this Plan or result in any expense or liability to the Debtors; *provided further* that the Senior Note and the Senior Mortgage shall not be cancelled and shall instead be treated as set forth in Sections 3.02 and 5.01 above.

*Section 5.04      Release of Liens, Claims and Interests*

Except as otherwise expressly provided for and preserved herein, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released (*provided however*, that in the event that the sale of the 401 Premises and/or the 425 Premises is financed with purchase money financing, the Senior Note and the Senior Mortgage shall not be cancelled and shall instead be treated as set forth in Sections 3.02 and 5.01 above), and the Holder of such Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Debtors.

Notwithstanding the foregoing: (1) the security interests and liens granted in favor of the Senior Agent under the Senior Loan Documents shall not be released or deemed released until receipt by the Senior Agent of the distributions provided under this Plan; and (2) the liens granted in favor of the DIP Lenders under the DIP Credit Agreement shall not be released or deemed released except as provided in the interim or final orders entered in connection with the DIP Credit Facility.

*Section 5.05      Post-Effective Date Transactions*

On or after the Effective Date, the Debtors are hereby authorized to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate this Plan. The Post-Effective Date Transactions may include such dissolutions, transfers or liquidations as may be determined by the Debtors, in their sole discretion, to be necessary or appropriate.  The actions to effect the Post-Effective Date Transactions may include:

a.    the execution and delivery of appropriate agreements or other documents of transfer, dissolution or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable Entities may agree;

b.  the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable parties agree;

c.  the filing of appropriate certificates of dissolution on terms consistent with the terms of this Plan pursuant to applicable state law; and

d.  all other actions that the Debtors determine are necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with a Post-Effective Date Transaction.

## Section 5.06    *Retention of Assets*

Except as otherwise provided herein or in any agreement, instrument or other document relating thereto, on or after the Effective Date of each Estate, all property of each Estate (including, without limitation, Causes of Action) and any property acquired pursuant hereto shall remain with, and be preserved and reserved in, the Estates for distribution in accordance with this Plan or abandoned in the discretion of the Debtors pursuant to the Confirmation Order with the consent of the Senior Agent and the Senior Lenders.

## Section 5.07    *Corporate Governance*

### a.    Effectuating Documents and Corporate Action

Upon the Effective Date, all actions contemplated by this Plan (including all matters that would otherwise require approval of the managers or members of the Debtors) shall be deemed to have been so authorized and approved in all respects pursuant to applicable law and without any requirement of further action by the members or managers of the Debtors, or the need for any approvals, authorizations, actions or consents, whether such actions are to occur before, on or after the Effective Date. All matters provided for in this Plan involving the corporate structure of the Debtors and any corporate action required by the Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the managers or members of the Debtors.

The members, managers, or any other appropriate officer of each Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto.

## Section 5.08    *Exemption from Certain Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to this Plan (including without limitation: (i) the conveyance of the 401 Premises to the 401 Purchaser; (ii) the conveyance of the 425 Premises to the 425 Purchaser; (iii) the conveyance of the 401 Development Rights to the 401 Purchaser, the 425 Purchaser or a third party; and (iv) the conveyance of the 425 Development Rights to the 401 Purchaser, the 425 Purchaser or a third party) shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, the sale of the Property and the maintenance or creation of security for each of the foregoing, to the extent applicable.

## Section 5.09    *General Settlement of Claims and Interests*

As discussed in the Disclosure Statement and as provided for herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and

other benefits provided under this Plan, and as a result of arm's-length negotiations among (1) the Debtors, (2) the Guarantors, (3) the Senior Agent and the Senior Lenders, and (4) the Mezzanine Agent and the Mezzanine Lenders, upon the Effective Date, the provisions of this Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, controversies and issues resolved pursuant to this Plan arising from or based on the Chapter 11 Cases.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*Section 6.01*     *Assumption of Executory Contracts and Unexpired Leases*

As part of the Plan Supplement, the Debtors will file schedules of: (i) Executory Contracts and Unexpired Leases to be assumed; and (ii) Executory Contracts and Unexpired Leases to be rejected. Except as otherwise set forth herein, each Executory Contract or Unexpired Lease shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume filed on or before the Confirmation Date; (4) is set forth in a schedule filed as part of the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed; or (5) is otherwise treated in a manner agreed upon by the Debtors, the Senior Agent and the counterparty to the Executory Contract or Unexpired Lease.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections and assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Unless otherwise provided herein, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under this Plan. In addition, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith. Notwithstanding the foregoing, the Debtors shall have the right to terminate, amend, or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

a.   Insurance Policies and Similar Agreements

Notwithstanding anything to the contrary contained herein, unless specifically rejected by order of the Bankruptcy Court, the Debtors shall assume and assign the insurance policies and any agreements, documents or instruments relating thereto in effect as of the Petition Date. Nothing herein shall constitute or be deemed as a waiver of any cause of action that the Debtors may hold against any Entity, including, without limitation, the issuer, under any of the Debtors' insurance policies. Notwithstanding anything herein to the contrary, the designation of an insurance policy or agreement as an Executory Contract shall neither be construed as nor deemed to be an admission that such contract constitutes an Executory Contract.

Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption and assignment to the 401 Purchaser, 425 Purchaser, Senior Agent or an Entity designated by the Senior Agent, which may be an Affiliate of the Senior Lenders, as Senior Agent may elect, of the insurance policies pursuant to section 365(a) of the Bankruptcy Code.

*Section 6.02*     *Payments Related to Assumption of Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in

Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided, however*, that the Debtors may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 6.03    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

Section 6.04    *Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date*

Intercompany contracts, contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Debtor in the ordinary course of business.

Section 6.05    *Reservation of Rights*

Notwithstanding anything to the contrary contained herein, neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

Section 6.06    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VII.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

Section 7.01    *Timing and Calculation of Amounts to Be Distributed*

Except to the extent an Allowed Claim has been satisfied by the Debtors prior to the Effective Date (pursuant to an order of the Court, in the ordinary course of business or otherwise), the Holder of an Allowed Claim and the Debtors agree otherwise or unless otherwise provided in this Plan, distributions and deliveries to Holders of Allowed Claims to be made pursuant to this Plan will be so made on or as soon as reasonably practicable after the Effective Date.

To the extent a Claim has not been Allowed prior to or as of the Effective Date, distributions and deliveries to such Holders shall be made on or as soon as reasonably practicable after the date on which such Claim becomes Allowed in accordance with the provisions of this Plan. No payment or distribution provided under this Plan will be