# EXHIBIT A

## AGREEMENT OF PURCHASE AND SALE

**AGREEMENT OF PURCHASE AND SALE**

**dated as of**

**January 29, 2010**

**by and between**

**PB CAPITAL CORPORATION, as Agent,**
**as Seller,**

**and**

**ERP OPERATING LIMITED PARTNERSHIP,**
**as Buyer**

---

**Premises**:

**401 Massachusetts Avenue, N.W.**

**and**

**425 Massachusetts Avenue, N.W.**
**Washington, D.C.**

# TABLE OF CONTENTS

Pages

| | | |
|---|---|---|
| 1. | Agreement to Purchase and Sell the Premises | 2 |
| 2. | Purchase Price/Deposit | 3 |
| 3. | Due Diligence Period | 5 |
| 4. | Access to Premises | 5 |
| 5. | Title and Title Insurance | 7 |
| 6. | Closing | 10 |
| 7. | Closing Costs and Prorations | 11 |
| 8. | Conditions Precedent | 13 |
| 9. | Closing Documents and Deliveries | 14 |
| 10. | Seller's Covenants | 16 |
| 11. | Assignment by Buyer | 17 |
| 12. | Destruction; Condemnation | 18 |
| 13. | Defaults/Remedies | 21 |
| 14. | Seller's Representations and Warranties | 24 |
| 15. | Buyer's Representations and Warranties | 26 |
| 16. | Disclaimers and Waivers | 27 |
| 17. | Notices | 29 |
| 18. | Survival | 30 |
| 19. | Broker | 30 |
| 20. | Waiver | 31 |
| 21. | Date for Performance; Time of the Essence | 31 |
| 22. | Further Assurances | 31 |

| 23. | **Severability** | 31 |
|-----|------------------|-----|
| 24. | **Successors and Assigns** | 31 |
| 25. | **Construction** | 31 |
| 26. | **Entire Agreement** | 32 |
| 27. | **Amendment** | 32 |
| 28. | **Applicable Law** | 32 |
| 29. | **Relationship of the Parties** | 32 |
| 30. | **Incorporation by Reference** | 32 |
| 31. | **Captions** | 32 |
| 32. | **Counterparts** | 32 |
| 33. | **Waiver of Trial by Jury** | 32 |
| 34. | **Confidentiality** | 32 |
| 35. | **No Third Party Beneficiary** | 33 |
| 36. | **Indemnification and Payment of Costs and Expenses** | 34 |
| 37. | **Section 1031 Exchange** | 34 |
| 38. | **Exculpation** | 34 |
| 39. | **Underground Storage Tank Disclosure** | 35 |
| 40. | **Soil Disclosure** | 35 |
| 41. | **No Recordation of this Agreement** | 35 |
| 42. | **Additional Financial Statements** | 35 |

Exhibits:

| Exhibit A | - | Description of the Land |
| Exhibit B | - | Escrow Instructions |
| Exhibit C | - | Contracts and Agreements |
| Exhibit D | - | Permitted Exceptions |
| Exhibit E | - | Form of Deed |
| Exhibit F | - | Form of General Assignment |
| Exhibit F-1 | | Form of Seller General Assignment |
| Exhibit G | - | Form of Bill of Sale |
| Exhibit H | - | Escrow Agent's Wiring Instructions |
| Exhibit I | - | Certificates of Occupancy |
| Exhibit J | - | Furniture, Fixtures and Equipment |
| Exhibit K | - | Tax Assessment Proceedings |
| Exhibit L | - | Access Agreement |
| Exhibit M | - | Insurance Policies |

# AGREEMENT OF PURCHASE AND SALE

**THIS AGREEMENT OF PURCHASE AND SALE** ("<u>Agreement</u>") is made and entered into as of January 29, 2010 (the "<u>Effective Date</u>"), by and between **PB CAPITAL CORPORATION**, a Delaware corporation, as Agent for the lenders pursuant to the Loan Agreement (hereinafter defined) ("<u>Seller</u>"), having an office at 230 Park Avenue, New York, New York 10169, and **ERP OPERATING LIMITED PARTNERSHIP**, an Illinois limited partnership (together with its assignee pursuant to <u>Section 11</u> hereof, "<u>Buyer</u>"), having an office at Two North Riverside Plaza, Suite 400, Chicago, Illinois 60606.  Seller and Buyer are sometimes referred to herein collectively as the "<u>parties</u>" and individually as a "<u>party</u>".

## RECITALS

As of the date hereof, Seller is the holder of a deed of trust (the "<u>Existing Mortgage</u>") encumbering those certain parcels of land (collectively and including the items described in <u>Sections 1(iii) – (vi)</u> and <u>(xi) – (xii)</u> hereof, the "<u>Land</u>") situate, lying and being located at 401 and 425 Massachusetts Avenue, N.W., Washington, D.C., as more particularly described on <u>Exhibit A</u> hereto. That portion of the Land located at 401 Massachusetts Avenue is improved by a vacant 14-story, 189-unit residential tower with a shared lobby, shared parking garage and common roof access (such portion of the Land, such improvements and all other rights and interests relating thereto as described below, collectively, the "<u>401 Premises</u>"). That portion of the Land located at 425 Massachusetts Avenue is improved by a vacant 14-story, 370-unit residential tower with a shared lobby, shared parking garage and common roof access (such portion of the Land, such improvements and all other rights and interests relating thereto as described below, collectively, the "<u>425 Premises</u>").

The 401 Premises is owned by Broadway 401 LLC, a Delaware limited liability company ("<u>401 Borrower</u>"). The 425 Premises is owned by (a) Broadway Mass Associates LLC, a Delaware limited liability company ("<u>425 Mass Associates Borrower</u>"), and (b) Broadway Mass TIC I LLC, a Delaware limited liability company ("<u>425 Mass TIC Borrower</u>"), as tenants in common. 401 Borrower, 425 Mass Associates Borrower and 425 Mass TIC Borrower, together with their successors and assigns, are hereinafter individually and collectively referred to as "<u>Borrower</u>".

Seller, Borrower and others have entered into a Settlement Agreement, dated as of December 24, 2009 (the "<u>Settlement Agreement</u>") pursuant to which Borrower has commenced a voluntary chapter 11 bankruptcy proceeding (the "<u>Chapter 11 Case</u>") under which Borrower has filed, and Seller has agreed to support, a plan of reorganization of Borrower (the "<u>Plan</u>") that provides for the conveyance of the Premises (hereinafter defined) to Seller's designee. Seller holds the Existing Mortgage as agent pursuant to a Consolidated, Amended and Restated Construction Loan Agreement, dated as of December 15, 2006, among Borrower, Seller and the lenders party thereto (the "<u>Loan Agreement</u>").

**NOW, THEREFORE**, in consideration of the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all of the parties hereto, the parties hereto agree as follows:

1.    **Agreement to Purchase and Sell the Premises.**  Subject to the terms and conditions of this Agreement, Seller hereby agrees to cause to be sold to Buyer and Buyer hereby agrees to purchase all of Borrower's right, title and interest in Land, together with:

(i)    all buildings and improvements currently located on the Land, together with all systems, fixtures and equipment, now attached or appurtenant to the Land (collectively, the "Improvements");

(ii)    all personal property (including furniture, furnishings, fixtures, equipment and appliances, including those items set forth on Exhibit J attached hereto) located on or in the Land and/or Improvements owned by Borrower and used in the operation, maintenance and/or use of the Land and/or the Improvements;

(iii)    all rights, privileges and appurtenances, and rights to the same, if any, belonging to and inuring to the benefit of the Land and/or the Improvements, including all licenses, permits and approvals issued by any governmental authority relating to the construction, use, occupancy, maintenance and/or operation of the Land and/or the Improvements, to the extent same are assignable;

(iv)    all easements and rights-of-way in or upon the Land, and all rights of access, ingress and egress thereto, whether public or private, all streets, alleys, passages, ways, water courses, water and mineral rights relating to the Land and/or the Improvements;

(v)    all right, title and interest, if any, of Borrower in and to any land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land to the center line thereof;

(vi)    all right, title and interest of Borrower in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street;

(vii)    all utility capacity, if any (and to the extent transferable), including, water, drainage, and sanitary sewer, and other utility capacities and rights relating thereto, affecting or applicable to the Land and/or the Improvements to the extent currently owned by Borrower;

(viii)    all contracts and agreements and equipment leases, if any listed on Exhibit C attached hereto relating to the operation, repair or maintenance of the Land, Improvements or personal property (other than the contract dated December 24, 2009 with McWilliams Ballard, Inc. listed on Exhibit C, the "Contracts") that Buyer elects to assume pursuant to a written notice delivered by Buyer to Seller prior to the later of (x) March 1, 2010 or (y) the Due Diligence Expiration Date (hereinafter defined) (Contracts that Buyer so elects to assume, collectively, the "Assumed Contracts");

(ix)    to the extent assignable without the consent of third parties, all trademarks, trade names, domain names, websites, permits, approvals, entitlements and other intangible property owned by Borrower, if any, and used solely in connection with

the Land and/or Improvements, including all of Borrower's right, title and interest in all plans and specifications, any and all transferable, unexpired warranties and guaranties, reports and materials relating to the construction, ownership, maintenance, use, occupancy and operation of the Land and/or Improvements (collectively, the "Intangible Personal Property");

(x)     all transferable consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality held by Borrower in respect of the Land or Improvements, but excluding the Development Rights, hereinafter defined (collectively, the "Approvals");

(xi)     any and all estates, rights tenements, hereditaments, privileges, easements, reversions, remainders and appurtenances of any kind benefiting or appurtenant to the Premises or all of any other portion of the Land and/or the Improvements with respect to which Borrower has an interest; and

(xii)     all other inchoate rights affecting or applicable to the Land with respect to which Borrower has an interest, but excluding transferable development rights within the meaning of Title 11 of District of Columbia Municipal Regulations, Section 1700, et seq., excluding Section 1708, with respect to the Land and Improvements (the "Development Rights") (the Land, the Improvements, the Assumed Contracts, the Intangible Personal Property, the Approvals, and all of the other foregoing items of real, personal, tangible and intangible property, other than the Development Rights, collectively, the "Premises" and the Premises includes the 401 Premises and the 425 Premises).

Buyer specifically acknowledges that the Development Rights have been separately transferred by Borrower to others and shall not be transferred to Buyer pursuant to this Agreement.

## 2.     Purchase Price/Deposit.

(a)     **Purchase Price.**  Seller is to cause to be sold and Buyer is to purchase the Premises for a total of ONE HUNDRED SIXTY-SEVEN MILLION DOLLARS ($167,000,000) (the "Purchase Price") pursuant to the terms and conditions of this Agreement. The Purchase Price, as increased or decreased by prorations and adjustments as provided in this Agreement, shall be payable as follows:

(i)     FIVE MILLION DOLLARS ($5,000,000) shall be deposited by Buyer in escrow with First American Title Insurance Company (the "Escrow Agent") on or prior to two (2) business days (hereinafter defined) after the Effective Date (together with any interest earned thereon, the "Initial Deposit") by wire transfer of immediately available federal funds pursuant to Escrow Agent's wiring instructions which are attached as Exhibit H hereto (the "Escrow Agent's Wiring Instructions") (it being acknowledged that this Agreement will not become effective until the Initial Deposit is received by Escrow Agent and shall automatically be null and void if the Initial Deposit is not received within the two (2)-business day period referred to above);

(ii)     TEN MILLION DOLLARS ($10,000,000) shall be deposited by Buyer in escrow with Escrow Agent on or prior to two (2) business days after the Due Diligence Expiration Date (such additional deposit, together with interest earned thereon, the "Additional Deposit"; the Initial Deposit, and the Additional Deposit, if deposited, shall be collectively referred to herein as the "Deposit") by wire transfer of immediately available federal funds pursuant to the Escrow Agent's Wiring Instructions; and

(iii)    The balance of the Purchase Price shall be paid on the Closing Date (hereinafter defined) by wire transfer of immediately available federal funds pursuant to wiring instructions provided by Seller on or prior to the Closing Date.

Whenever used in this Agreement, the term "dollars" or $ shall mean dollar denomination of the currency of the United States of America recognized as legal tender for all debts, public and private. The sale of the Premises pursuant hereto is sale in gross and not by the acre, without regard to the acreage for the Land, whether or not referenced herein.

(b)     **Deposit.** The Deposit shall be placed by Escrow Agent in an interest-bearing account and shall be held in accordance with the escrow terms set forth in this Agreement and in Exhibit B hereto. If the Closing (hereinafter defined) shall occur, the Deposit (including any interest earned thereon) shall be applied to the Purchase Price at the Closing. If Buyer shall terminate this Agreement on or prior to 5:00 p.m. (Eastern Time) on the Due Diligence Expiration Date (as defined in Section 3 hereof), then, without further notice or action by any party: (i) this Agreement shall be deemed terminated in accordance with Section 3 hereof; (ii) the Initial Deposit shall be promptly refunded to Buyer (within no more than two (2) business days of such termination); and (iii) thereafter neither party hereto shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives termination of this Agreement (which shall include the provision for the return of the Initial Deposit to Buyer). If Buyer shall not terminate this Agreement on or prior to 5:00 p.m. (Eastern Time) on the Due Diligence Expiration Date in accordance with Section 3 hereof, the Initial Deposit shall become nonrefundable to Buyer except as otherwise expressly set forth in this Agreement. The Additional Deposit shall be nonrefundable to Buyer once deposited with Escrow Agent except as otherwise expressly set forth in this Agreement. TIME IS OF THE ESSENCE for the delivery of the Initial Deposit and the Additional Deposit when due. The failure to deposit the Initial Deposit and/or the Additional Deposit when due shall be a default of Buyer hereunder. Notwithstanding any contrary provision of this Agreement, if Escrow Agent breaches its obligations under this Agreement to return the Deposit to Buyer, such breach shall not constitute a breach by Seller under this Agreement; provided Seller shall (A) not have taken any action or failed to take any necessary action resulting in Escrow Agent failing to return the Deposit to Buyer in accordance with the terms of this Agreement and (B) within two (2) business days after request thereof from Buyer, deliver to Buyer a written notice from Seller directing Escrow Agent to return the Deposit to Buyer and releasing Escrow Agent from any claims by Seller with respect to the Deposit.

(c)     **Independent Consideration.** In addition to the Purchase Price, upon execution of this Agreement by Seller, Buyer has paid to Seller the amount of One Hundred Dollars ($100), the receipt and adequacy of which is hereby acknowledged and confessed by Seller, which is hereby accepted by Seller as additional consideration for Seller's execution and

delivery of this Agreement (including the provisions granting Buyer the right to terminate this Agreement pursuant to Sections 3 and 13(b) hereof) and which additional consideration is (i) in addition to and independent of any other consideration provided for in this Agreement and (ii) earned and non-refundable as of the date of this Agreement. The provisions of this Section 2(c) shall survive any termination of this Agreement without limitation as to time.

**3. Due Diligence Period.** Buyer shall have until 5:00 p.m. (Eastern Time) on March 1, 2010 (the "Due Diligence Expiration Date"), in which to conduct, at Buyer's sole cost and expense, its Due Diligence Review (hereinafter defined). At any time on or before 5:00 p.m. (Eastern Time) on the Due Diligence Expiration Date (but at no time thereafter unless otherwise expressly provided in this Agreement), Buyer may terminate this Agreement for any reason or no reason whatsoever by giving written notice to Seller of its intention to do so, in which event the Escrow Agent shall promptly return the Deposit to Buyer without any further notice or action by any party hereto shall have any further rights, duties, obligations or liabilities under this Agreement except for those rights, duties, obligations and/or liabilities which are expressly provided to survive the termination of this Agreement (which shall include the provision for the return of the Deposit to Buyer). If Buyer fails to give Seller a notice of termination on or prior to 5:00 p.m. (Eastern Time) on the Due Diligence Expiration Date, Buyer shall no longer have any right to terminate this Agreement under this Section 3 and, except as otherwise expressly provided herein, Buyer shall be bound to proceed to Closing and consummate the transaction contemplated hereby pursuant to the terms of this Agreement.

**4. Access to Premises.** Buyer and Buyer's attorneys, accountants, architects, engineers and other representatives, brokers and potential lenders, at Buyer's sole cost and expense, shall have the right during the period from the Effective Date, through and including the date that this Agreement is terminated (provided that if the Due Diligence Review (hereinafter defined) extends beyond the Due Diligence Expiration Date, such extension shall not create any right on the part of Buyer to terminate this Agreement after the Due Diligence Expiration Date), to inspect and review the Premises and all matters relating to the Premises (the "Due Diligence Review"), including the physical condition of the Premises and Seller shall cause Borrower to provide such access, subject to the last sentence of this Section 4. Seller shall make available to Buyer and all of Buyer's representatives as aforementioned at Seller's office or at the office of Borrower (or at Buyer's election and at Buyer's cost, copies of same to be delivered to Buyer) true, complete and correct copies of all of the following materials (the "DD Deliveries"), in each case, to the extent in the possession of or otherwise reasonably available to Seller or (subject to the last sentence of this Section 4) Borrower, within five (5) business days (as used herein, "business day" shall mean every day other than Saturdays, Sundays, all days observed by the federal or New York State government as legal holidays and all days on which commercial banks in New York State are required or authorized by law to be closed) after the Effective Date: books, files, records and any other material documents relating to the Premises, including all records, reports and agreements with surviving indemnification or warranty rights relating to the physical condition of the Premises, all plans and specifications, engineering reports, environmental reports, governmental notices, feasibility studies, operating statements, governmental permits, approvals, contracts and agreements, licenses, surveys and title commitments (but specifically excluding any information or materials prepared by or on behalf of Seller for its internal analysis or review) concerning the Premises in Seller's or (subject to the last sentence of this Section 4) Borrower's possession or control. During the Due Diligence

Review, Buyer, at Buyer's sole cost, shall also have the right to make such inspections and investigations as Buyer may elect to make or obtain upon reasonable (and in no event, less than two (2) business days') notice to Seller and subject to Seller's right to have a representative present at all such tests; provided, however, notwithstanding anything to the contrary contained herein, Buyer acknowledges and agrees that: (i) any on-site inspections and examinations of the Premises shall be conducted during normal business hours and in a manner so as to minimize the disturbance to the Premises, and not to unreasonably interfere with the use or operation of, or any ongoing work being performed at, the Premises (including contractors, subcontractors and other construction workers), or any visitors or third parties; (ii) Buyer shall promptly restore any damage to the Premises or any adjacent property caused by any actions of Buyer or its agents or contractors; (iii) prior to entry onto the Premises, Buyer shall furnish Seller with a certificate of general liability and property damage insurance maintained by Buyer with single occurrence coverage of at least $10,000,000 (and aggregate coverage of $10,000,000) and naming Seller, Borrower and Seller's or Borrower's property manager and/or general contractor as additional insureds; and (iv) Buyer shall not conduct any environmental investigations or testing other than a standard "Phase I" investigation, or any other invasive testing (environmental or otherwise), without prior written consent of Seller, not to be unreasonably withheld, conditioned or delayed. None of Buyer's tests or investigations on any portion of the Premises shall create or give rise to any dangerous conditions and Buyer shall cause all parties involved in any tests to provide adequate safeguards and protections so as protect the general public from harm from the tests or conditions. Buyer will not contact any property manager or contractor with respect to the Premises without Seller's prior consent, not to be unreasonably withheld, and if Seller so elects, Seller shall have a representative at any conversation between Buyer and such manager or contractor. In addition, Buyer shall be permitted (notwithstanding the confidentiality provisions of <u>Section 34</u> hereof) to discuss the casualty insurance policies (but not any other insurance policies) for the Premises with the insurers thereunder, provided that Seller shall be entitled to have a representative at any such conversation between Buyer and such insurer. All information learned by Buyer in connection with its Due Diligence Review shall be kept confidential in accordance with <u>Section 34</u> hereof. All contractors, agents and representatives retained by or on behalf of Buyer shall be promptly paid by Buyer. Buyer shall indemnify against, defend and hold Seller harmless from any actual liabilities, costs (including reasonable attorneys' fees) damages (but not consequential, punitive or special damages) or mechanics' liens arising out of or resulting from the inspection of the Premises by Buyer or its agents or contractors and/or any acts or omissions of Buyer or its agents or contractors at the Premises; provided that the foregoing indemnity shall not extend to any claims (including claims that the Premises have declined in value) arising from or incurred in connection with (x) any pre-existing condition with respect to the Premises, except to the extent that Buyer or its agents or contractors have exacerbated such condition, (y) the results or findings of Buyer's environmental or other physical investigation of the Premises, or (z) any disclosure or notification made or given by Buyer or its agents or contractors to any governmental agency or other party that is required by law based upon the results, findings, tests or analysis of Buyer's environmental or other physical investigation of the Premises. Notwithstanding anything to the contrary in this Agreement, Buyer's obligations under this <u>Section 4</u> shall survive Closing or any termination of this Agreement. Buyer acknowledges that Seller does not have physical possession of the Premises as of the date hereof and that Seller's obligation under this Agreement to give Buyer access to the Premises and to deliver the DD Deliveries that are in the possession or control of Borrower

shall be limited to (A) designating Buyer as the beneficiary of that certain Access Agreement between Borrower and Seller dated as of December 24, 2009, which is attached hereto as Exhibit L, and (B) using commercially reasonable efforts to cause Borrower to give access to the Premises and copies of the DD Deliveries.

**5.**     **Title and Title Insurance.**

(a)     At the Closing, Seller shall cause to be conveyed to Buyer in accordance with this Agreement, and Buyer shall accept, fee simple title in and to the Premises, subject only to the Permitted Exceptions (hereinafter defined) and otherwise in accordance with the provisions of this Section 5.

(b)     Seller has delivered to Buyer a true, correct and complete copy of the most recent "as built" survey of the Land and Improvements (the "Survey") in Seller's possession. Buyer may order a current update of the Survey (the "Updated Survey") of the Premises, certified to Buyer and the Title Company (and such other persons or entities as Buyer may designate). Promptly after the Effective Date, Buyer shall order a commitment for an owner's title insurance policy with respect to the Land and Improvements ("Commitment") from First American Title Insurance Company (the "Title Company"), to issue, at the Closing and at Buyer's option, a standard form of 2006 ALTA Owner's Title Insurance Policy, at standard rates, containing an extended coverage endorsement insuring fee simple title to the Premises in the name of Buyer in the amount of the Purchase Price, subject only to the Permitted Exceptions and otherwise in a form reasonably satisfactory to Buyer, and which shall otherwise comply with the provisions of this Section 5 (the "Title Policy"). Buyer shall deliver a copy of any such Commitment and the Updated Survey, if any, to Seller promptly upon Buyer's receipt of same, but in any event, no later than twenty (20) days after the Effective Date. Buyer shall also send to Seller a statement ("Title Objection Statement") of any defects in or objections to title or the Updated Survey, other than the Permitted Exceptions expressly provided for in Section 5(f) below ("Title Objections") no later than twenty (20) days after the Effective Date. Any title exceptions, encumbrances, liens or other title or survey matters noted in the initial Commitment and not specifically identified in a timely initial Title Objection Statement shall be deemed to be a "Permitted Exception" for purposes of this Agreement.

(c)     Notwithstanding the foregoing, if after the issuance of the initial Commitment, the Title Company shall raise any additional or supplemental title encumbrances, liens or other title or survey exceptions (other than Permitted Exceptions), whether on a continuation, by endorsement or otherwise, Buyer shall have the right to send an additional Title Objection Statement to Seller within ten (10) days from receipt thereof (but in no event after any then scheduled Closing Date) objecting to such additional or supplemental title exceptions. Each item raised in an additional Title Objection Statement shall be deemed to be a Title Objection. Any additional or supplemental exceptions, encumbrances, liens or other title or survey matters not specifically identified in a timely Title Objection Statement as provided for in the first sentence of this Section 5(c) shall be deemed to be a "Permitted Exception".

(d)     In the event Buyer shall deliver a Title Objection Statement as provided for in Section 5, Seller shall have the right, but not the obligation (subject to the last sentence of this Section 5(d)), to attempt to cure the Title Objections referred to therein. Within ten (10)

31921204.DOC                                          7

days after receipt of a Title Objection Statement (but in no event later than any then scheduled Closing Date, as extended as provided in the immediately following sentence), Seller shall notify Buyer in writing whether Seller elects to attempt to cure any such Title Objections that Seller is not obligated to cure ("Seller's Title Election Notice"). To the extent required, the period between the Initial Final Order Date (hereinafter defined) and the Initial Outside Closing Date (hereinafter defined) or the Second Final Order Date (hereinafter defined) and the Second Outside Closing Date (hereinafter defined; the Initial Outside Closing Date or the Second Outside Closing Date, as each of same may be extended pursuant to the terms (and subject to the limitations) of this Agreement (including Section 13(b), being the "Outside Closing Date"), and the Closing Date shall be automatically extended for the number of days required so that the Closing Date shall occur on the sixth (6th) business day after receipt by Buyer of Seller's Title Election Notice (or after expiration of Seller's time to deliver Seller's Title Election Notice) in order to enable Seller to respond to a Title Objection Statement and in order to allow Buyer to respond to a Seller's Title Election Notice. If Seller shall fail to deliver a Seller's Title Election Notice within ten (10) days after receipt of a Title Objection Statement, then Seller shall be deemed to have elected not to cure any applicable Title Objection. If Seller elects to attempt to cure any such Title Objections that Seller is not obligated to cure, then (i) Seller shall have until the Closing Date to remove, satisfy or cure the same (subject to Seller's right to give a Seller's No Cure Notice as provided in the immediately following sentence) and (ii) if necessary, and as applicable, Seller shall have the right, by written notice to Buyer delivered no later than any then scheduled Closing Date (as already extended as provided for above in this Section 5(d)), to extend the period between the Initial Final Order Date or the Second Final Order Date and the applicable Outside Closing Date pursuant to the terms (and subject to the limitations) of this Agreement (including Section 13(b) hereof) in order to enable Seller to cure or remove any such Title Objections. If Seller elects to attempt to cure any such Title Objections that Seller is not obligated to cure and Seller is thereafter unable to effect a cure of such Title Objections prior to any then scheduled Closing Date (as same may have been adjourned), Seller shall give written notice of such election or inability to Buyer prior to the then scheduled Closing Date (a "Seller's No Cure Notice"). Within five (5) business days after receipt of a Seller's No Cure Notice, Buyer shall elect one of the following options (A) to accept a conveyance of the Premises subject to the Permitted Exceptions and any Title Objection that Seller is not obligated to cure and unwilling or unable to cure, and without reduction of the Purchase Price or (B) to terminate this Agreement by sending written notice thereof to Seller. To the extent required, the period between the Initial Final Order Date or the Second Final Order Date and the applicable Outside Closing Date (as same may be extended pursuant to the terms (and subject to the limitations) of this Agreement (including Section 13(b)) shall be automatically extended (and the Closing Date correspondingly extended) for the number of days required so that the Closing Date shall occur on the sixth (6th) business day after receipt by Buyer of any Seller's No Cure Notice in order to enable Buyer to make the applicable election. Upon delivery of any such notice of termination by Buyer, then, without any further notice or action by any party: (1) this Agreement shall be conclusively deemed to have been terminated; (2) the Deposit shall be promptly (within no more than two (2) business days of such termination) returned to Buyer; and (3) thereafter neither party hereto shall have any further rights, obligations or liabilities hereunder except to the extent that any obligation or liability set forth herein expressly survives termination of this Agreement (which includes the provision for the return of the Deposit to Buyer). If Buyer shall fail to notify Seller in writing of Buyer's election to so terminate this Agreement within such five (5) business

days after Buyer's receipt of a Seller's No Cure Notice, Buyer shall be deemed to have elected to accept the conveyance of the Premises. Notwithstanding anything to the contrary contained herein, Seller shall (y) be required to remove all Monetary Encumbrances (hereinafter defined) and Seller Exceptions and (z) have no obligation to cure any Title Objection that is not a Monetary Encumbrance or Seller Exception, and Seller's failure to cure any Title Objection that is not a Monetary Encumbrance or a Seller Exception shall in no event be a default by Seller.

(e)     If on the Closing Date there are any Title Objections that Seller is obligated or has elected to cure, pay or discharge, Seller may, in addition to any other methods available to it under this Agreement, use any portion of the Purchase Price to satisfy the same, provided Seller shall simultaneously either deliver to Buyer at the Closing, instruments in recordable form, sufficient to satisfy such Title Objections of record, together with the cost of recording or filing said instruments, or arrange with the Title Company for the issuance of the Title Policy to Buyer free of any such Title Objections. If on the Closing Date there are any Title Objections that Seller is obligated to remove or cure, and that Seller has failed to remove or cure, then Buyer shall have the right (but not the obligation) to apply a portion of the balance of the Purchase Price necessary to satisfy same, and such amount shall be deemed paid to Seller and deducted from the amount of the Purchase Price payable to Seller at the Closing.

(f)     The following shall constitute the "Permitted Exceptions" and, notwithstanding anything to the contrary contained herein, shall not be a "Title Objection":

(i)     real estate taxes or installments thereof, which, although a lien on the Closing Date, are not due and payable prior to the Closing Date, subject to adjustment as hereinafter set forth;

(ii)     all title exceptions, encumbrances, liens or other title or survey matters which are not included by Buyer in an initial or any additional Title Objection Statement within the applicable time periods set forth in this Section 5 or are included in a Title Objection Statement but are waived by Buyer in accordance with this Agreement;

(iii)     standard printed exceptions set forth in the standard form of commitment for owners' title insurance in use in the District of Columbia subject to an extended coverage endorsement over the so-called general or standard exceptions which are part of the printed form of the Title Policy;

(iv)     those exceptions set forth on Exhibit D hereto which are not Monetary Encumbrances; and

(v)     all title exceptions, encumbrances, liens or other title or survey matters that are created by Buyer.

(g)     As used herein, a "Monetary Encumbrance" shall mean any exceptions or encumbrances, liens or other title matters affecting the Premises that is raised as a Title Objection in a Title Objection Statement by Buyer in accordance with this Section 5 and that (i) is a mortgage, deed of trust, security agreement, financing statement or any other instrument which evidences or secures indebtedness created by Borrower or Seller, (ii) is a mechanic's lien or any other lien (other than one described in clause (iii) or (iv) below) which can be satisfied by

the payment of a liquidated sum not exceeding $1,000,000 in the aggregate, (iii) is a mechanic's lien arising from labor, materials or services rendered or delivered after the date that is ninety (90) days prior to the petition date in the Chapter 11 Case, at the request or expressly consented to by Seller (regardless of amount) or (iv) is a mechanic's lien arising from labor, materials or services rendered to or delivered after the date that is ninety (90) days prior to the petition date in the Chapter 11 Case not at the request of or expressly consented to by Seller, and which can be satisfied by the payment of a liquidated sum not exceeding $5,000,000 in the aggregate. A Monetary Encumbrance described in the immediately preceding clauses (ii), (iii) or (iv) will be deemed "removed" for purposes of this Agreement if the Title Insurer agrees to issue a Title Policy (at its regular rates and without additional premium) that either omits such Monetary Encumbrance as an exception to coverage or else affirmatively insures that such Monetary Encumbrance will not be collected out of or enforced against the Premises; provided, however, that no such affirmative insurance shall be limited by its terms to the extent of any indemnity given by Seller or Borrower.

(h)     As used herein, a "Seller Exception" shall mean all exceptions, encumbrances, liens or other title or survey matters that are created or expressly consented to in writing by Seller that are not Monetary Encumbrances and that are not listed in Section 5(f) above.

(i)     If a mechanic's lien is filed against the Premises after the Closing that relates to labor, materials or services rendered or delivered after the petition date in the Chapter 11 Case but prior to the Closing Date (A) at the request of or expressly consented to by Seller, then Seller shall indemnify Buyer for any actual losses, damages, claims, costs and expenses, including reasonable attorney's fees (but excluding consequential punitive or special damages) resulting therefrom (without any limitation as to amount) or (B) not at the request of or expressly consented to by Seller, then Seller shall indemnify Buyer for any actual losses, damages, claims, costs and expenses, including reasonable attorney's fees (but excluding consequential, punitive or special damages) resulting therefrom, up to an aggregate amount of $5,000,000. Such indemnities shall survive for a period of six (6) months after the Closing.

6.     **Closing.**

(a)     **Closing Date.** Unless otherwise agreed by Buyer and Seller, the closing of the transactions set forth herein (the "Closing") shall occur on the date (the "Closing Date") that is the later of (a) fifteen (15) days after the Due-Diligence Expiration Date or (b) five (5) business days after Seller's delivery of written notice (the "Final Confirmation Order Notice") to Buyer of the first to occur of (i) the entry by the bankruptcy court of a final and non-appealable order in the Chapter 11 Case, in form and substance reasonably satisfactory to Buyer, confirming the Plan substantially in the form filed by Borrower at the commencement of its Chapter 11 Case, with such modifications as shall not be inconsistent with this Agreement and the passage of all time periods during which an appeal to such order can be filed without any such appeal having been filed, or (ii) the entry of such other final and non-appealable order by a court of competent jurisdiction, in form and substance reasonably satisfactory to Buyer, which permits Seller the right to obtain or direct transfer of title to and possession of the Premises in accordance with the terms of this Agreement and the passage of all time periods during which an appeal to such order can be filed without any such appeal having been filed (such final and non-appealable

order confirming the Plan or such other final and non-appealable order, the "Confirmation Order" and the passage of all time periods during which an appeal to such Confirmation Order can be filed without any such appeal having been filed, the "Final Confirmation Order Event"). In any event, the Confirmation Order shall provide for the conveyance of the Premises to Buyer, as designee of Seller, free and clear of all: (A) liens, claims, interests and encumbrances (other than Permitted Exceptions); (B) tenancies and occupancy rights; and (C) contracts and agreements (other than Assumed Contracts). The Closing Date is not subject to any extension or adjournment except as expressly provided in this Agreement. If the Closing Date as determined above in this Section 6 would fall on a day that is not a business day, then the Closing Date will be the immediately following business day.

    **(b)**    **Closing Location**. The Closing shall be held on the Closing Date: (a) at the offices of Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022; (b) at Buyer's election, by escrow closing with the Escrow Agent without the requirement to meet at a specified location; or (c) at such other place and time as Buyer and Seller shall determine.

    **7.    Closing Costs and Prorations.**

    **(a)**    **Closing Costs.** In connection with the sale of the Premises contemplated hereunder, Seller shall pay (i) one-half of the escrow fee, if any, charged by the Escrow Agent; (ii) all District of Columbia Real Estate Transfer Tax and District of Columbia Real Estate Recordation Tax (if any) in connection with the transfer of the Premises to Buyer (the "Transfer Taxes"); and (iii) recording fees for recording the Deed; and Buyer shall pay (x) one-half of the escrow fee, if any, charged by the Escrow Agent (provided that if Buyer cancels this Agreement in accordance with Section 3 hereof, the entirety of such escrow fee will be paid by Buyer); (y) title premiums for its Title Policy (including any endorsements requested by Buyer); and (z) all costs and expenses incurred by Buyer in connection with its Due Diligence Review. All other fees, costs and expenses not expressly addressed in this Section 7 or elsewhere in this Agreement shall be paid by the party incurring the same or shall be allocated between Seller and Buyer in accordance with applicable local custom for transactions involving similar properties.

    **(b)**    **Prorations.** Subject to Section 7(c) hereof, all of the following shall be prorated as of the day immediately preceding the Closing Date and be based upon a 365 day year and the actual number of days in the month in which the Closing Date occurs (any credit to Buyer pursuant to this Section 7 to be applied as a credit against the Purchase Price, and any credit due to Seller pursuant to this Section 7 to be paid to Seller in addition to, and together with, the payment of the Purchase Price), provided, however, to the extent same are discharged in the Confirmation Order, there shall be no adjustment for same:

        (i)    Real estate taxes and assessments levied against the Premises. Any taxes paid at or prior to Closing shall be prorated based upon the amounts actually paid. If taxes and assessments for the current year have not been paid before Closing, Seller shall be charged at Closing an amount equal to that portion of such taxes and assessments that relates to the period before Closing and Buyer shall pay the taxes and assessments prior to their becoming delinquent. Any such apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not been fixed shall be based upon the tax rate and/or assessed valuation last fixed. To the extent

that the actual taxes and assessments for the current year differ from the amount apportioned at Closing, the parties shall make all necessary adjustments by appropriate payments between themselves following Closing;

(ii)     Water charges and sewer rents, if any, on the basis of the lien years, respectively, for which the same have been assessed;

(iii)     The value of fuel stored on the Premises at the price then charged by Seller's supplier including any applicable taxes;

(iv)     Charges under transferable service or maintenance contracts being assigned to Buyer if and to the extent assumed by Buyer;

(v)     Gas, electricity and other utility charges for which Seller is liable, if any, such charges to be apportioned on the basis of the most recent reading occurring prior to the Closing Date; and

(vi)     Such other operating expenses and income or other items pertaining to the Premises that are customary for properties of the nature of the Premises in the District of Columbia.

(c)     **Utilities.**     Seller shall attempt to arrange with the utility companies providing utility services to the Premises to have the utility meters read as of a date no earlier than one (1) business day before the Closing Date and to have final bills rendered to Seller for the period prior to the Closing Date. Buyer shall be responsible for making arrangements with the utility companies providing services to the Premises for accounts to be opened and maintained in Buyer's name, and utility services to be provided for the period from and after the Closing.

(d)     **Final Adjustment After Closing.**     If final prorations under this Section 7 cannot reasonably be made as of the Closing Date, then Buyer and Seller shall make final prorations based upon final invoices, bills and reconciliations, as and when the same become available, with Buyer and Seller making final adjustments between them as soon thereafter as reasonably practicable, and with payment made within thirty (30) days of substantiation of any such proration under this Agreement.

(e)     **Real Estate Tax Reduction Proceedings.**     Buyer acknowledges that Borrower has heretofore filed applications for the reduction of the assessed valuation of the Premises for the current tax period and previous tax periods and has caused proceedings to be instituted to review such assessed valuations. Buyer shall have no interest in any sums collected from such proceedings and claims with respect to the tax period in which the Closing occurs or any previous period, however, such reduction shall be reflected in the apportionments to the extent such reduction is determined. Other than the pending tax assessment proceedings listed in Exhibit K, Seller shall not take (and shall not consent to Borrower's taking) any action to settle or compromise any such claim with respect to the tax assessments on the Premises for the current tax period or future tax periods.

(f)  **Survival.**  This <u>Section 7</u> shall survive the Closing for a period of one (1) year from the Closing Date.

8.  **Conditions Precedent.**

(a)  **To Buyer's Obligations.**  Buyer's obligations to pay the Purchase Price and to accept delivery of the Deed on the Closing Date are subject to the following conditions precedent being fully satisfied as of the Closing Date (or expressly waived in writing by Buyer):

(i)  The Confirmation Order shall have been entered, the Final Confirmation Order Event shall have occurred and Seller shall have tendered to Buyer title to the Premises as required by this Agreement subject only to the Permitted Exceptions;

(ii)  Seller shall have duly performed in all material respects all of Seller's other obligations under this Agreement to be performed as of the Closing Date (provided, however, as of the Closing Date, Seller shall comply with the covenants set forth in <u>Section 5(a)</u>, <u>Section 10(i)</u>, <u>Section 10(vi)</u> and <u>Section 10(vii)</u> in all respects without giving effect to any materiality qualifiers) and delivered to Buyer all documents required by this Agreement, including those required by <u>Section 9(a)</u> hereof;

(iii)  Seller shall, at Seller's sole cost and expense, have caused, effective as of the Closing Date (A) the OCIP Letter Agreement (as defined in the Disclosure Statement filed by Borrower at the commencement of the Chapter 11 Case (the "<u>Disclosure Statement</u>")) to be modified so that Buyer has no obligations or liabilities under the OCIP Letter Agreement or the OCIP Policy (as defined in the Disclosure Statement), (B) the new marketing agreement with McWilliams Ballard, Inc. contemplated in the Disclosure Statement to be terminated (if the same shall not have automatically terminated by its terms), and Seller shall have paid all termination or other fees payable in connection with such termination, (C) all Contracts, other than the Assumed Contracts, to be terminated, and (D) the Premises to be free of the items described in clauses (A), (B) and (C) of <u>Section 10(i)</u> hereof; and

(iv)  All of Seller's representations and warranties shall be true and correct in all material respects (provided, however, Seller's representations and warranties set forth in <u>Sections 14(a)</u>, <u>(b)</u>, <u>(e)</u>, <u>(f)</u>, and <u>(g)</u> shall be true and correct in all respects without giving effect to any materiality qualifiers) as of the date of this Agreement and as of the Closing Date (except to the extent that such representations and warranties by their terms speak as of the date of this Agreement or some other date, in which case, as of such earlier date).

Buyer shall have the right to waive the satisfaction, in whole or in part, of any of the conditions precedent set forth in this <u>Section 8(a)</u>, but no waiver shall be effective unless it is in writing and duly executed by Buyer.  Provided Seller is not then in material default under this Agreement, if the Final Confirmation Order Event shall have occurred but any of the foregoing conditions shall not have been satisfied as of the then scheduled Closing Date, Seller shall have the right, upon written notice given to Buyer, to adjourn the Closing Date as provided in (and subject to the

limitations of) this Agreement (including <u>Section 13(d) hereof</u>) in order to enable Seller to satisfy such condition(s).

      (b)    **To Seller's Obligations.** Seller's obligations to deliver the Deed and otherwise to consummate the Closing are subject to the following conditions precedent being fully satisfied as of the Closing Date (or expressly waived in writing by Seller):

      (i)    The Confirmation Order shall have been entered and the Final Confirmation Order Event shall have occurred;

      (ii)    Subject to the satisfaction of all of the conditions precedent to Buyer's obligations to pay the Purchase Price and to accept delivery of the Deed as provided for in <u>Section 8(a)</u> above, Seller shall have received the Purchase Price, as adjusted pursuant to this Agreement (it being understood that, at Closing, the Deposit shall be delivered to Seller from escrow and applied toward payment of the Purchase Price);

      (iii)    Subject to the satisfaction of all of the conditions precedent to Buyer's obligations to pay the Purchase Price and to accept delivery of the Deed as provided for in <u>Section 8(a)</u> above, Buyer shall have delivered to Seller all documents required by this Agreement, including those required by <u>Section 9(b)</u> hereof and shall otherwise have performed in all material respects all of Buyer's other obligations under this Agreement to be performed as of the Closing Date; and

      (iv)    all of Buyer's representations and warranties shall be true and correct in all material respects.

Seller shall have the right to waive the satisfaction, in whole or in part, of any of the conditions precedent set forth in this <u>Section 8(b)</u>, but no waiver shall be effective unless it is in writing and duly executed by Seller.

      **9.**    **Closing Documents and Deliveries.**

      (a)    **Seller's Closing Documents and Deliveries.** At or prior to the Closing, in addition to any other documents required under this Agreement, Seller, at its sole cost and expense, shall execute and acknowledge as required, or cause Borrower to execute and acknowledge as required, as applicable, and deliver to Buyer, the following:

      (i)    a special warranty deed from Borrower in the form attached hereto as <u>Exhibit E</u> (the "<u>Deed</u>");

      (ii)    a general assignment and assumption from Borrower in the form attached hereto as <u>Exhibit F</u> (the "<u>General Assignment</u>"); and, to the extent Buyer elects to assume the Contracts listed in <u>Exhibit C</u> attached hereto with Marjorie A. Brown or JMB Management Services, Inc., an assignment and assumption agreement from Seller substantially in the form of <u>Exhibit F-1</u> hereto (the "<u>Seller General Assignment</u>");

(iii)    a bill of sale from Borrower in the form attached hereto as Exhibit G (the "Bill of Sale");

(iv)    an FP-7 DC Real Estate Transfer and Recordation Tax Form executed by Borrower, with respect to the transfer of the Premises to Buyer pursuant to this Agreement (the "Transfer Tax Documents");

(v)    a FIRPTA Affidavit or Transferor's Certificate of Non-Foreign Status from Borrower as required by Section 1445 of the Internal Revenue Code and an IRS Form 1099;

(vi)    an executed original counterpart of a closing settlement statement apportioning any costs as required by this Agreement (the "Settlement Statement");

(vii)    all current original real estate tax bills, water and sewer charge bills, if any, and current bills for any other municipal impositions or assessments pertaining to the Premises;

(viii)    certificates of occupancy (which are listed on Exhibit I attached hereto) for all the Improvements and all continuing permits, licenses and approvals for the Improvements in Seller's possession;

(ix)    to the extent not previously delivered to and in the possession of Buyer, computer and security codes, and keys for the Premises (with identification of the lock to which each such key relates) relating to the operation, use and maintenance of the Premises in Seller's possession;

(x)    a certificate of Seller certifying that all representations and warranties of Seller contained in this Agreement are true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date; and

(xi)    such other documents, instruments or agreements reasonably required to consummate the Closing pursuant to this Agreement.

(b)    **Buyer's Closing Documents.**  At or prior to the Closing, in addition to any other documents required under this Agreement, Buyer, at its sole cost and expense, shall execute and acknowledge as required, and deliver to Seller, the following (executed by Buyer, if applicable):

(i)    a counterpart of the Bill of Sale, the Transfer Tax Documents, the General Assignment and, to the extent Buyer elects to assume the Contracts listed in Exhibit C attached hereto with Marjorie A. Brown or JMB Management Services, Inc., the Seller General Assignment, executed by Buyer;

(ii)    a counterpart of the Settlement Statement, executed by Buyer;

(iii)    a certificate of Buyer certifying that all representations and warranties of Buyer contained in this Agreement are true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date;

(iv)    such evidence as shall be reasonably requested by and acceptable to Seller and Seller's counsel, of the authority of Buyer and of the persons or parties executing this Agreement and all closing documents on behalf of Buyer to enter into and consummate this Agreement and to execute and deliver all documents reasonably necessary to consummate the transaction described in or contemplated by this Agreement; and

(v)    such other documents, instruments or agreements reasonably required to consummate the Closing pursuant to this Agreement.

10.    **Seller's Covenants.** Seller covenants and agrees that:

(i)    Between the date hereof and the first to occur of the Closing Date or the earlier termination of this Agreement, Seller shall not directly or indirectly enter into or consent to: (A) any condominium unit contracts, leases or occupancy agreements affecting the Premises; (B) any agreements which create exceptions to marketable title (including any condominium declarations); or (C) any other agreements affecting the Premises extending beyond Closing. Nothing in this Section 10(i) shall be construed as expanding any obligation of Seller to cure any defect in title beyond what is provided in Section 5 hereof. Seller shall not, directly or indirectly, enter into or consent to any contract, lease or agreement inconsistent with the foregoing. The covenant contained in clause (A) of this Section 10(i) shall survive the Closing for a period of three (3) months.

(ii)    Between the date hereof and the first to occur of the Closing Date or the earlier termination of this Agreement, Seller shall not use (and shall not consent to Borrower's use of) any portion of the Premises (including the surface and subsurface thereof) for the dumping, emission, discharge, existence, release or storage of any Hazardous Materials (hereinafter defined) except those used in the construction, operation and maintenance of the Premises in accordance with applicable law.

(iii)    Between the date hereof and the first to occur of the Closing Date or the earlier termination of this Agreement, Seller shall (and shall cause Borrower to) maintain and operate the Premises in compliance with law and certificates of occupancy and in the same condition and repair as on the date of execution and delivery of this Agreement, ordinary wear and tear and damage by casualty or a taking by condemnation excepted (subject in all events to the provisions of Section 12 hereof).

(iv)    Between the date hereof and the first to occur of the Closing Date or the earlier termination of this Agreement, Seller shall promptly inform Buyer of any change in the status of the Premises of which Seller becomes aware that would affect the rights or obligations of Seller or Buyer under this Agreement in any material respect.