# EXHIBIT D

# THIRD AMENDMENT TO

# AGREEMENT OF PURCHASE AND SALE

# THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE

THIS THIRD AMENDMENT TO AGREEMENT OF PURCHASE AND SALE (this "**Third Amendment**") is made and entered into as of this 10th day of March, 2010, by and between PB Capital Corporation, a Delaware corporation, as Agent for the lenders pursuant to the Loan Agreement ("**Seller**"), and ERP Operating Limited Partnership, an Illinois limited partnership (together with its assignee pursuant to the Section 11 of the Agreement, "**Buyer**").

## RECITALS

A.   Seller and Buyer entered into a certain Agreement of Purchase and Sale dated as of January 29, 2010, as amended by the First Amendment to the Agreement of Purchase and Sale dated as of February 22, 2010 and by the Second Amendment to the Agreement of Purchase and Sale dated as of March 8, 2010 (as amended, the "**Agreement**"), with respect to the purchase and sale of certain real property located at 401 and 425 Massachusetts Avenue, N.W., Washington, D.C. as more particularly described in the Agreement.

B.   Seller and Purchaser desire to modify the Agreement as set forth in this Third Amendment.

**NOW, THEREFORE**, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller and Buyer, the parties hereto hereby agree as follows:

1.   **Incorporation of Definitions**. All undefined capitalized terms used in this Third Amendment shall have the meanings ascribed to them in the Agreement.

2.   **Additional Conditions Precedent**. The following shall be added to Section 8(a) of the Agreement as an additional condition precedent to the Buyer's obligation to close under the Agreement:

> Buyer's obligation to consummate the Closing hereunder shall be conditioned upon Seller's delivery at or prior to the Closing of the executed estoppel letter (the "**Required Estoppel**") substantially in the form attached hereto as Exhibit A.

3.   **Additional Seller's Covenants**. The following shall be added to Section 10 of the Agreement as additional Seller's covenants:

> At or before the Closing, Seller shall cause to be terminated that certain Marketing and Listing Agreement dated December 24, 2009 by and among McWilliams/Ballard, Inc., 401 Mass Avenue Holdings LLC and Seller (the "**MB Marketing Agreement**") and pay in full any termination or other fees in connection with such termination at or prior to Closing. Notwithstanding anything to the contrary provided for in the Agreement, from and after the Closing Date, Seller shall indemnify, defend and hold harmless Buyer and all of Buyer's affiliates and each of their respective directors, officers, employees and agents, from and against any and all claims, liabilities, obligations, costs and expenses including reasonable attorneys' fees and all amounts paid in defense of

any of the foregoing arising out of, based upon or resulting from any claim or cause of action arising out of, relating to or resulting from the failure to terminate the MB Marketing Agreement or failure to pay such termination or other fees due under the MB Marketing Agreement. Notwithstanding anything to the contrary provided for in the Agreement, Seller's covenant and Seller's indemnification obligation contained in this <u>Section 3</u> of this Third Amendment shall survive Closing without limitation as to time.

    4.    <u>**Roof Repair**</u>. Section 12(g) of the Agreement is hereby amended in its entirety to read as follows:

Section 12(g) <u>Roof Repair</u>. Buyer and Seller acknowledge that certain top-floor units (*i.e.*, Units PH214, PH215 and PH216) in the Improvements on the 425 Premises have been damaged as a result of leaks in the roof. Borrower's insurer has been notified of a claim and is in the process of investigating the matter, and, in connection therewith, has obtained an engineer's report (the "**Roof Damage Report**") to identify the cause of the failure of the roof and to develop a plan for repairing the defects in the roof and the resultant damages to the Improvements that exist as of the date hereof (the "**Existing Roof Damage**"). Seller has delivered to Buyer the Roof Damage Report. Notwithstanding anything to the contrary provided for in the Agreement, the parties have agreed to proceed to Closing despite the Existing Roof Damage (provided all other conditions to Closing set forth in the Agreement are satisfied or waived) and the following provisions shall apply. Between the date hereof and the Closing Date, Seller shall keep Buyer fully informed, on a timely basis, of all actions and correspondence relating to the Existing Roof Damage, the settlement of any claims for insurance proceeds relating thereto and all correspondence with any governmental authorities relating thereto. At Closing, (i) Seller shall assign to Buyer all of Seller's right, title and interest in and to all applicable Insurance Policies with respect to the Existing Roof Damage and Seller shall cause Borrower to assign to Buyer all of Borrower's right, title and interest in and to all applicable Insurance Policies with respect to the Existing Roof Damage (all of which assignments shall be in form and substance reasonably satisfactory to Buyer) and (ii) Buyer shall be entitled to a credit against the Purchase Price in the amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "**Roof Damage Credit**"). If the applicable Insurance Policies are assigned to Buyer on the Closing Date, then Seller and Buyer agree that (A) subject to Buyer's reasonable approval, Seller shall have the right to prosecute any claim Seller has against the Insurance Policies with respect to the Existing Roof Damage and (B) to the extent Buyer receives any insurance proceeds under the Insurance Policies in connection with the Existing Roof Damage, Buyer shall deliver same to Seller promptly after receipt thereof. If the applicable Insurance Policies relating to the Existing Roof Damage cannot be assigned to Buyer on the Closing Date, then Seller shall be entitled to receive and retain all insurance proceeds in connection with the Existing Roof Damage, and there shall be no change in the amount of the Roof Damage Credit referred to above. In any event, Seller shall have no obligation to Buyer (other than as expressly provided below in this Section 4 of the Third Amendment) to repair, or

compensate Buyer for, the Existing Roof Damage at any time prior to or following the Closing, it being acknowledged that the Roof Damage Credit referred to above shall constitute the full compensation of Buyer with respect to the Existing Roof Damage. Notwithstanding anything to the contrary in this Section 12(g), if: (i) there shall occur after the date of this Third Amendment additional damage to the roof and/or those certain top-floor units in the Improvements on the 425 Premises where the Existing Roof Damage is located; and (ii) such additional damage cannot reasonably be distinguished from the Existing Roof Damage (the "Indistinguishable Damage") (Seller and Buyer hereby agreeing that any additional damage to the roof and/or those top-floor units in the Improvements on the 425 Premises where the Existing Roof Damage is located that can be reasonably distinguished from the Existing Roof Damage is not included in the definition of the Indistinguishable Damage and is subject to the above provisions of this Section 12 without regard to this Section 12(g)), then in the event the cost to repair or restore the Existing Roof Damage plus the Indistinguishable Damage exceeds the Roof Damage Credit, then (A) in addition to the Roof Damage Credit, Buyer shall receive a credit at Closing from Seller in the amount of the applicable deductible under the applicable Insurance Policy, (B) Seller shall be entitled to receive or retain the next $250,000 plus the amount of the applicable deductible of the insurance proceeds allocable to the Existing Roof Damage and the Indistinguishable Damage, and (C) Buyer shall be entitled to receive or retain all insurance proceeds in excess of the $250,000 plus the applicable deductible retained by Seller under the preceding clause (B) above allocable to the Existing Roof Damage and the Indistinguishable Damage. Without limitation to any provisions of this Section 12, from the date hereof until the Closing Date, (x) Seller agrees to give Buyer reasonable access to the 425 Premises (including the roof) in order to jointly determine if there is a way to further protect the 425 Premises from any further damage due to the Existing Roof Damage and (y) Buyer and Seller agree to act in good faith to implement, at Seller's sole cost and expense, any such additional protection which is reasonable in scope and cost. Buyer and Seller acknowledge that the Existing Roof Damage and the Indistinguishable Roof Damage are not subject to the provisions of Section 12(a)-(f) of the Agreement. This Section 12(g) shall survive Closing without limitation as to time.

5. **Outside Closing Date**. Section 13(b) of the Agreement is hereby amended in its entirety to read as follows:

Section 13(b) <u>Outside Closing Date</u>. Notwithstanding anything to the contrary provided for in this Agreement (including <u>Section 13(a)</u>), if (for any reason or no reason, including any action or failure to act on the part of the bankruptcy court relating to the Chapter 11 Case or the impossibility of performance on the part of Seller, but specifically excluding the exercise by Buyer of Buyer's right to terminate this Agreement under <u>Section 3</u> hereof, or the exercise by Buyer or Seller of its right to terminate this Agreement under <u>Section 5</u> hereof (other than a termination (after the Due Diligence Expiration Date) by Buyer under <u>Section 5(d)</u> hereof as a result of Seller's election not to cure a Title

3

Objection that is a mechanic's lien that does not constitute a Monetary Encumbrance) or 12 hereof, or the exercise of Seller's right to terminate this Agreement for Buyer's default as provided for in Section 13(e) below) either (i) the Closing shall not have occurred on or before June 14, 2010 (the "**Initial Outside Closing Date**"), subject, however, to the automatic extension of the period between the Initial Final Order Date and the Closing Date as provided for in Sections 5(d) and 12(a) hereof and the exercise by Seller of its rights to extend such period as provided for in Sections 5(d) and 8(a) hereof), or (ii) the Final Confirmation Order Event shall not have occurred or Seller shall not have delivered the Final Confirmation Order Notice to Buyer on or before June 7, 2010 (the "**Initial Final Order Date**"), then Buyer shall have the right, but not the obligation, to terminate this Agreement by written notice to Seller (the "**Termination Notice**") delivered within five (5) business days after the Initial Outside Closing Date. If Buyer fails to deliver such Termination Notice within such five (5) business day period, then the Closing Date shall be automatically extended for successive thirty (30)-day periods (the end of each successive thirty (30)-day period, a "**Second Outside Closing Date**") (subject, however, to the automatic extension of the period between the Initial Final Order Date and the Closing Date as provided for in Sections 5(d) and 12(a) hereof and the exercise by Seller of its rights to extend such period as provided for in Sections 5(d) and 8(a) hereof) unless (A) the Final Confirmation Order Event shall not have occurred or Seller shall not have delivered the Final Confirmation Order Notice to Buyer on before the date (a "**Second Final Order Date**") that is thirty (30) days after, as applicable, the Initial Final Order Date or any immediately prior Second Final Order Date and (B) Buyer shall deliver the Termination Notice to Seller within five (5) business days after the then current Second Outside Closing Date (but in no event shall such extension be to a date that would render this Agreement unenforceable). Upon the delivery of the Termination Notice by Buyer within any such five (5) business day period after, as applicable, the Initial Outside Closing Date or any Second Outside Closing Date, Seller shall promptly (within two (2) business days of Seller's receipt of such Termination Notice): (1) cause the Deposit to be returned to Buyer; (2) pay to Buyer liquidated damages in the amount of $250,000 (the "**$250,000 Fee**"); and (3) pay to Buyer the actual and reasonable costs incurred by Buyer in connection with the successful enforcement of Buyer's rights under Section 36 of this Agreement ("**Buyer's Enforcement Costs**"). The rights and obligations of the parties with respect to return of the Deposit and payment of the $250,000 Fee and Buyer's Enforcement Costs shall survive any such termination of this Agreement without limitation as to time. Upon such return of the Deposit and payment in full of the $250,000 Fee and Buyer's Enforcement Costs, no party hereto shall have any further rights, duties, obligations or liabilities under this Agreement except for those rights, duties, obligations and/or liabilities which are expressly provided to survive the termination of this Agreement.

6. **Flood Repair Work to Units at 425 Premises.**

a. Prior to Closing Seller shall, at its sole cost and expense (i) diligently pursue, in accordance with all applicable laws, completion of, through the contractors indicated on Exhibit B (or such other contractors reasonably approved in writing by Buyer), all repairs described on Exhibit B with respect to damage on the ground floor and in Units 106, 108, 114, 115, 116, 117, 118 and 119 at the 425 Premises arising from the flood loss (the "**Flood Repair**"), all post-remediation verification work set forth on page 14-15 of the "Remediation Standard of Care" that is attached to that certain preliminary report prepared by INLOGIX Enterprises, LLC dated August 17, 2009 attached hereto as Exhibit C (the "**Post Remediation Verification**") and any additional work necessary to satisfy any issues raised by the Post Remediation Verification (the "**Additional Remediation Repair**" and together with the Flood Repair and the Post Remediation Verification, referred to collectively as the "**Flood Repair Work**") and (ii) deliver to Buyer a written certification stating that each contractor has received payment in full for all work performed and materials supplied to the extent invoiced through the Closing Date (and will pay for all work that is subsequently invoiced for work performed and materials supplied prior to the Closing) and either (x) the Flood Repair Work has been completed or (y) the Flood Repair Work has not been completed setting forth each contractor's description of the Flood Repair Work remaining to be completed and the reasonable estimate of the cost of completion of such Flood Repair Work. If the certification shall state that the Flood Repair Work has not been completed, then the parties shall nevertheless proceed to Closing (provided all other conditions to Closing set forth in the Agreement are satisfied or waived) and Buyer shall have the right to retain the contractors to complete the Flood Repair Work and the provisions of Section 6(b) below shall apply.

b. In the event that all Flood Repair Work is not completed on or before Closing in accordance with Section 6(a) of this Third Amendment, then on the Closing Date, a portion of the Purchase Price in the amount of 150% of the aggregate total remaining cost of completing the Flood Repair Work noted in the contractors' estimates shall be held back and deposited into escrow with Escrow Agent (the "**Flood Repair Post Closing Escrow Deposit**") to be held in escrow for use by Buyer in paying for the costs of completing the Flood Repair Work. Any portion of the Flood Repair Post Closing Escrow Deposit not used by Buyer in connection with paying for the completion of such work shall be returned to Seller promptly after such completion. Seller and Buyer will execute an escrow agreement (the "**Post Closing Escrow Agreement**") with Escrow Agent, in the form attached as Exhibit E hereto, to govern the terms for holding, disbursing and returning the Flood Repair Post Closing Escrow Deposit. The escrowed fund set forth hereunder shall only be for the benefit of Buyer and its affiliates and no other Person shall have any rights to such escrowed fund. Seller shall have no obligation to perform, or compensate Buyer for, the Flood Repair Work following the Closing, it being acknowledged that the making of the Flood Repair Post Closing Escrow Deposit shall constitute the full compensation of Buyer with respect to the Flood Repair Work.

5

c.  If the Flood Repair Work is not completed prior to Closing, then, at Closing, Seller shall cause, at the request of Buyer, to be assigned to Buyer all contracts with or warranties issued by the contractors indicated on Exhibit B with respect to the Flood Repair Work.

d.  At Closing, Seller shall assign to Buyer all of Seller's right, title and interest in and to all applicable Insurance Policies with respect to the Flood Repair Work and Seller shall cause Borrower to assign to Buyer all of Borrower's right, title and interest in and to all applicable Insurance Policies with respect to the Flood Repair Work (all of which assignments shall be in form and substance reasonably satisfactory to Buyer). If the applicable Insurance Policies are assigned to Buyer on the Closing Date, then Seller and Buyer agree that (i) subject to Buyer's reasonable approval, Seller shall have the right to prosecute any claim Seller has against the Insurance Policies with respect to the Flood Repair Work and (ii) to the extent Buyer receives any insurance proceeds under the Insurance Policies in connection with the Flood Repair Work, Buyer shall deliver same to Seller promptly after receipt thereof. If the applicable Insurance Policies relating to the Flood Repair Work cannot be assigned to Buyer on the Closing Date, then Seller shall be entitled to receive and retain all insurance proceeds in connection with the Flood Repair Work, and there shall be no change in the amount of the Flood Repair Post Closing Escrow Deposit.

e.  This <u>Section 6</u> and the statements made by Seller in the certification provided under this <u>Section 6</u> of this Third Amendment shall survive Closing without limitation as to time.

7.  **Sprinkler and Fire Alarm Testing.**

a.  Prior to Closing Seller shall, at its sole cost and expense (i) cause East Coast Fire Protection, Inc. ("**ECFP**") to complete the annual sprinkler and fire alarm testing and inspections at the 401 Premises and the 425 Premises required pursuant to that certain Agreement between ECFP and 401 Borrower attached hereto as <u>Exhibit D</u> hereto (the "**Sprinkler and Fire Alarm Testing**") in accordance with all applicable laws and (ii) deliver to Buyer a written certification from ECFP stating that either (x) the Sprinkler and Fire Alarm Testing has been completed in accordance with all applicable laws and no further action is required to comply with law or (y) the Sprinkler and Fire Alarm Testing has not been completed in accordance with all applicable laws and/or further action is required to comply with law and setting forth ECFP's reasonable estimate for completion of such Sprinkler and Fire Alarm Testing and/or further action. If the certification from ECFP shall state that the Sprinkler and Fire Alarm Testing has not been completed in accordance with all applicable laws and/or further action is required to comply with law, then the parties shall nevertheless proceed to Closing (provided all other conditions to Closing set forth in the Agreement are satisfied or waived) and then Buyer shall have the right to retain ECFP to complete the Sprinkler and Fire Alarm Testing in accordance with all applicable laws and/or

6

take such further action as required to comply with law and the provisions of Section 7(b) below shall apply.

b.  In the event that all Sprinkler and Fire Alarm Testing and/or further action is not completed on or before Closing in accordance with Section 7(a) of this Third Amendment, then on the Closing Date, a portion of the Purchase Price in the amount of One Hundred Thousand Dollars ($100,000) shall be held back and deposited into escrow with Escrow Agent (the "**Fire Alarm System Post Closing Escrow Deposit**") to be held in escrow for use by Buyer in paying for the costs of completing the Sprinkler and Fire Alarm Testing and/or further action as required to comply with law as stated by ECFP. Any portion of the Fire Alarm System Post Closing Escrow Deposit not used by Buyer in connection with paying for the completion of such work shall be returned to Seller promptly after such completion. Seller and Buyer will execute the Post Closing Escrow Agreement, in the form attached as Exhibit E hereto, to govern the terms for holding, disbursing and returning the Fire Alarm System Post Closing Escrow Deposit. The escrowed fund set forth hereunder shall only be for the benefit of Buyer and its affiliates and no other Person shall have any rights to such escrowed funds. Seller shall have no obligation to perform, or compensate Buyer for, the Sprinkler and Fire Alarm Testing and/or further action required by law as stated by ECFP following the Closing, it being acknowledged that the making of the Fire Alarm System Post Closing Escrow Deposit shall constitute the full compensation of Buyer with respect to the Sprinkler and Fire Alarm Testing and/or further action required by law as stated by ECFP.

c.  This Section 7 of this Third Amendment shall survive Closing without limitation as to time.

8.  **Domestic Hot Water System**.

a.  Prior to Closing Seller shall, at its sole cost and expense (i) cause JCM Associates, Inc. ("**JCM**") to complete the repair of the domestic hot water system (the "**Hot Water System**") so that hot water is delivered (A) to each unit at the 401 Premises and the 425 Premises at the same time at a temperature of one hundred fifteen (115) degrees within one (1) minute of being operational and (B) continuously to seventy two (72) showers in the 425 Premises and thirty three (33) showers in the 401 Premises at the same time for fifteen (15) minutes (the "**Hot Water System Standard**") and (ii) deliver to Buyer a written certification from Seller (as independently verified by Buyer who shall have the right to be present during the testing of the Hot Water System) stating that either (x) the Hot Water System Standard has been achieved or (y) the Hot Water System Standard has not been achieved. If the certification from Seller shall state that the Hot Water System Standard has not been achieved, then the parties shall nevertheless proceed to Closing (provided all other conditions to Closing set forth in the Agreement are satisfied or waived) and Buyer shall have the right to retain JCM (or another contractor selected by Buyer), to complete the repair to the Hot Water System so that the Hot Water System Standard is achieved and the provisions of

7

Section 8(b) below shall apply. Seller shall have the right to have its engineer present during any test or repair of the Hot Water System being conducted by Buyer's contractors after Closing.

b. In the event that the Hot Water System Standard is not achieved or further action is not completed in accordance with Section 8(a) of this Third Amendment on or before Closing, then on the Closing Date, a portion of the Purchase Price in the amount of Two Hundred Thousand Dollars ($200,000) shall be held back and deposited into escrow with Escrow Agent (the "**Hot Water System Post Closing Escrow Deposit**") to be held in escrow for use by Buyer in paying for the costs of completing the Hot Water System repair so that the Hot Water System Standard is achieved. Any portion of the Hot Water System Post Closing Escrow Deposit not used by Buyer in connection with paying for the completion of such work shall be returned to Seller promptly after such completion. Seller and Buyer will execute the Post Closing Escrow Agreement, in the form attached as Exhibit E hereto, to govern the terms for holding, disbursing and returning the Hot Water System Post Closing Escrow Deposit. The escrowed funds set forth hereunder shall only be for the benefit of Buyer and its affiliates and no other Person shall have any rights to such escrowed funds. Seller shall have no obligation to perform, or compensate Buyer for, the Hot Water System following the Closing, it being acknowledged that the making of the Hot Water System Post Closing Escrow Deposit shall constitute the full compensation of Buyer with respect to the Hot Water System.

c. This Section 8 and the statements made by Seller in the certification provided under this Section 8 of this Third Amendment shall survive Closing without limitation as to time.

9. **Warranties**.

a. Notwithstanding anything to the contrary provided for in this Agreement, (i) Seller shall request from NEOGARD Division of Jones-Blair Co. ("**NEOGARD**") the written consent to the assignment of all warranties issued by NEOGARD to the 401 Borrower and/or the 425 Borrower and shall reasonably cooperate with Buyer in obtaining such consent and (ii) Seller shall request the written consent of any other third parties to the assignment of any additional warranties and guaranties designated by Buyer that by their express terms require consent of such third parties to the assignment or transfer of such warranties or guaranties. The covenants contained in this Section 9 of this Third Amendment shall survive Closing for a period of six months after Closing.

b. Schedule 2 to Exhibit F of the Agreement is hereby deleted and replaced in its entirety with the Amended Schedule 2 to Exhibit F attached hereto.

10. **Allocation**. Buyer and Seller agree that allocation of the Purchase Price for the real property shall be (a) Fifty Six Million Dollars ($56,000,000) for the 401 Premises and (b) One Hundred Eleven Million Dollars ($111,000,000) for the 425 Premises. The parties shall use

8

such Purchaser Price allocation with respect to any Transfer Taxes payable in connection with the recordation of the Deeds or the Transfer Tax Documents contemplated in the Agreement and all other applicable purposes.

11. **Additional Contracts**.

   a. The parties acknowledge that the following Contract was inadvertently omitted from Exhibit C to the Agreement, and said Exhibit C is hereby amended by inserting the following description of said Contract at the beginning of said Exhibit C:

   > Arc Water Treatment Co. of MD, Inc.
   > 10620 Riggs Hill Road Unit J
   > Jessup, MD 20794-9431
   > (Water Treatment)

   b. The following Contract was entered into by Borrower after the date of the Agreement, and Buyer, to the extent it has a right to do so under the Agreement, hereby consents to the same:

   > East Coast Fire Protection, Inc.
   > 7526 Connelly Drive, Suite L,
   > Hanover, MD 21076
   > (Sprinkler and Fire Alarm Testing and Inspection)

   Exhibit C to the Agreement is hereby amended by adding such Contract thereto. To the extent such Contract requires the consent of the other party to assign such Contract, Seller will use commercially reasonable efforts to deliver to Buyer such written consent at Closing.

   c. Seller shall, at Buyer's option, cause the following Contract (which was entered into by Borrower's affiliate, Broadway Management Co., Inc.) to be assigned to Buyer at Closing:

   > Alarm Tech Solutions, LLC
   > 8141 Telegraph Road, Suite F,
   > Severn, MD 21144
   > (Fire Alarm System Monitoring)

12. **Warranty Claims related to the Roof Damage, the Flood Repair Work, the Sprinkler and Fire Alarm Testing and the Hot Water System**. At Closing, Seller shall cause Borrower to assign to Buyer all of Seller's right, title and interest in and to all applicable contractor/supplier warranties (the "Applicable Warranties") with respect to the Roof Damage, Flood Repair Work, Sprinkler and Fire Alarm Testing and Hot Water System (all of which assignments shall be in form and substance reasonably satisfactory to Buyer) and Seller shall have the right to prosecute the claims thereunder related to the Roof Damage, the Flood Repair Work, the Sprinkler and Fire Alarm Testing and the Hot Water System, subject to the reasonable approval of Buyer. If Buyer shall receive payment with respect to any Applicable Warranties